UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
CO.,

                             Plaintiffs,           **COMPLAINT**

          -against-

MIKHAIL STRUTSOVSKIY, M.D.
a/k/a MICHAEL STRUT, M.D.,                Case No. _____ (   )
RES PHYSICAL MEDICINE & REHABILITATION
SERVICES, P.C.,
AARON HIRSCH,
DEAN TRZEWIECZYNSKI,                **Plaintiff Demands**
KENNETH ANDRUS,                      **a Trial by Jury**
VASCU.FLO, INC., and
VASCUSCRIPT, INC.,

                           Defendants.
-----------------------------------------------------------------X

       Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege, upon information and belief, as follows:

<u>NATURE OF THE ACTION</u>

       1.     This action seeks to recover more than $300,000.00 in no-fault benefits that the

Defendants wrongfully have obtained from GEICO by submitting, or causing to be submitted,

hundreds of fraudulent no-fault charges for initial consultations, follow-up evaluations, trigger

point injections, prolotherapy injections, ultrasound guidance for the injections,

electromyography tests, nerve conduction velocity tests, drug screening, and related services

(collectively the "Fraudulent Services"), as well as fraudulent no-fault charges for prescription

medications, including large quantities of narcotics (collectively the "Drugs"), that allegedly have been provided to persons involved in New York automobile accidents ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not obligated to pay more than $405,000.00 in pending claims submitted by or through Defendants Mikhail Strutsovskiy, M.D. a/k/a Michael Strut, M.D. ("Dr. Strutsovskiy"), RES Physical Medicine & Rehabilitation Services, P.C. ("RES"), or VascuScript, Inc. ("VascuScript") because:

(i)      Dr. Strutsovskiy and RES are not in compliance with material licensing requirements in that they engage in unlawful fee-splitting with non-physicians and, therefore, are ineligible to bill for or to collect no-fault benefits;

(ii)      RES is fraudulently incorporated, unlawfully owned and controlled by non-physicians and, therefore, is ineligible to bill for or to collect no-fault benefits; and

(iii)      the Fraudulent Services, which are billed through Dr. Strutsovkiy and RES, and the Drugs, which are billed through VascuScript, are not medically necessary, and have been provided – to the extent that they have been provided at all – and billed pursuant to pre-determined, fraudulent protocols solely designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who supposedly are subjected to them.

3.      As discussed below, the Defendants at all times have known that:

(i)      Dr. Strutsovskiy never has truly owned or controlled RES, through which many of the charges for the Fraudulent Services have been submitted to GEICO;

(ii)      RES has been secretly and unlawfully owned and controlled by Defendants Aaron Hirsch ("Hirsch") and Vascu.Flo, Inc. ("VascuFlo") (collectively the "Management Defendants"), neither of whom are licensed to practice medicine or to operate a medical professional corporation;

(iii)      the financial and operational relationships between the Defendants have been created to allow the Management Defendants to secretly and unlawfully own and control RES and to illegally split fees with RES and Dr. Strutsovskiy;

(iv)      the Fraudulent Services and Drugs that are billed to GEICO through Dr. Strutsovskiy, RES, and VascuScript are not medically necessary, and have been ordered, performed, and provided – to the extent that they have been performed

2

and provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants.

4.       As such, the Defendants never have had any right to be compensated for the Fraudulent Services and Drugs.

5.       The Defendants' scheme began in mid-2010, has continued uninterrupted since that time, and remains ongoing. As a result of the Defendants' scheme, GEICO has incurred damages exceeding $300,000.00.

6.       The mechanics of the Defendants' fraudulent scheme pose a clear and present danger to the public health and welfare. Specifically, almost none of the Fraudulent Services and Drugs are medically necessary, and Insureds therefore have no legitimate medical incentive to seek treatment from Dr. Strutsovskiy or RES. In order to induce Insureds to report for medically-useless "treatment" from Dr. Strutsovskiy and RES, Dr. Strutsovkiy prescribes large quantities of narcotics to most Insureds, many of which are distributed to the Insureds through VascuScript. This, despite the fact that the Defendants know that the Insureds have no genuine medical complaints requiring narcotics prescriptions, much less the enormous amounts of narcotics prescribed by Dr. Strutsovskiy. Upon information and belief, the Insureds either use the narcotics prescribed by Dr. Strutsovskiy to feed their drug addictions (some of which appear to be created by the prescribing methods employed by Dr. Strutsovskiy), or else re-sell them on the street.

## THE PARTIES

I.       **Plaintiffs**

7.       Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their

principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

## II.   Defendants

### A.   Dr. Strutsovskiy

8.      Defendant Dr. Strutsovskiy is a convicted felon who nonetheless has been licensed to practice medicine in New York since November 14, 2008. Previously, Dr. Strutsovskiy obtained a Pennsylvania medical license on June 29, 2006, and a Virginia medical license on December 9, 2005. Dr. Strutsovskiy resides in the Town of Clarence, County of Erie, State of New York and is a citizen of the State of New York.

9.      In July 2009, in the United States District Court for the Western District of New York, Dr. Strutsovskiy was convicted of a felony after pleading guilty to one count of "Aiding and Abetting a False Statement Related to Health Care Fraud" in violation of 18 U.S.C. §1035(a)(2). A copy of the information, the waiver of indictment, and Dr. Strutsovskiy's plea agreement collectively are annexed hereto as Exhibit "A".

10.      The information alleged that, from January 2003 through September 2004, Dr. Strutsovskiy knowingly and willfully made materially false and fraudulent statements and misrepresentations in connection with the payment and delivery of health care services. In particular, Dr. Strutsovskiy caused Medicare claim forms to be submitted for reimbursement in which he falsely represented that he had rendered treatment to Medicare beneficiaries. In his plea agreement, Dr. Strutsovskiy admitted to submitting reimbursement claim forms to the Medicare program, which falsely certified that medical care provided to program beneficiaries was medically necessary. Dr. Strutsovskiy further admitted to certifying that he personally provided

services to beneficiaries when he had not. Dr. Strutsovskiy also admitted that his criminal activities were part of a larger scheme devised by his former employer to defraud the Medicare program. <u>See</u> Exhibit "A".

11.    In his plea agreement, Dr. Strutsovskiy also admitted facts demonstrating that the fraudulent Medicare claims were submitted through a physical therapy professional corporation that – while nominally owned on paper by Dr. Strutsovskiy – actually was secretly and unlawfully owned and controlled by laypersons and a lay entity. <u>See</u> Exhibit "A".

12.    The Court accepted Dr. Strutsovskiy's guilty plea, sentenced him to 10 months of house arrest, three years' probation, and ordered him to pay $131,138.00 in restitution to the Medicare program. A copy of the Docket Sheet that contains the sentence from Dr. Strutsovskiy's criminal case, W.D.N.Y. Docket No. CR 09-00072, is annexed hereto as Exhibit "B".

13.    Following Dr. Strutsovskiy's felony conviction, the New York State Board for Professional Medical Conduct (the "State Board") placed him on three years' probation and fined him, as well. The Virginia Department of Health Professions suspended Dr. Strutsovskiy's Virginia medical license, and the Pennsylvania State Board of Medicine placed him on probation.

14.    In addition, the Centers for Medicare & Medicaid Services ("CMS") revoked Dr. Strutsovskiy's billing privileges following his felony conviction. Dr. Strutsovskiy challenged this revocation, but it was upheld. When challenging CMS' decision, Dr. Strutsovskiy admitted that the Medicare fraud scheme that resulted in his conviction was controlled by the "Russian Mafia". A copy of the Department of Health and Human Services Departmental Appeals Board decision

upholding the revocation, and referencing Dr. Strutsovskiy's admission that he was involved with the Russian Mafia, is annexed hereto as Exhibit "C".

**B.      RES**

15.      Defendant RES is a New York medical professional corporation with its principal place of business in the Town of Cheektowaga, County of Erie, State of New York. RES was fraudulently incorporated in New York on or about January 31, 2011, and nominally is owned on paper by Dr. Strutsovskiy. In actuality, however, RES has been owned and controlled by the Management Defendants – neither of whom are licensed physicians – in contravention of New York law.

**C.      Hirsch**

16.      Defendant Hirsch resides in the Town of Amherst, County of Erie, State of New York and is a citizen of the State of New York. Hirsch, who is a pharmacist, is not and never has been licensed to practice medicine. Nonetheless, Hirsch secretly and unlawfully has owned, controlled, and derived economic benefit from the operation of RES. Furthermore, Hirsch secretly and unlawfully has split fees with Dr. Strutsovskiy.

17.      Hirsch owns and controls VascuFlo, and has used VascuFlo as a vehicle to unlawfully own, control, and derive economic benefit from RES and to unlawfully split fees with Dr. Strutsovskiy.

18.      In addition, Hirsch owns and controls VascuScript, and has used VascuScript as a vehicle to distribute the Drugs to Insureds and to submit large-scale fraudulent billing for the Drugs to GEICO and other Insurers.

**D.    VascuFlo**

19.    Defendant VascuFlo is a New York corporation with its principal place of business in the Town of Cheektowaga, County of Erie, State of New York. VascuFlo was incorporated on or about September 10, 2001, is owned and controlled by Hirsch, and has been used by Hirsch to illegally own and control RES, and to unlawfully split fees with Dr. Strutsovskiy.

**E.    Trzewieczynski**

20.    Defendant Dean Trzewieczynski ("Trzewieczynski") resides in the Town of Amherst, County of Erie, State of New York and is a citizen of the State of New York. Trzewieczynski, who is a pharmacist, owns and controls VascuScript, and has used VascuScript as a vehicle to distribute the Drugs to Insureds and to submit large-scale fraudulent billing for the Drugs to GEICO and other Insurers.

**F.    Andrus**

21.    Defendant Kenneth Andrus ("Andrus") resides in the Town of Lancaster, County of Erie, State of New York and is a citizen of the State of New York. Andrus, who is a pharmacist, owns and controls VascuScript, and has used VascuScript as a vehicle to distribute the Drugs to Insureds and to submit large-scale fraudulent billing for the Drugs to GEICO and other Insurers.

**G.    VascuScript**

22.    Defendant VascuScript is a New York corporation with its principal place of business in the Town of Cheektowaga, County of Erie, State of New York. VascuScript was incorporated on or about February 24, 2009, and is owned and controlled by Hirsch,

7

Trzewieczynski, and Andrus. VascuScript, which operates a pharmacy, has been used by the Defendants as a vehicle to distribute large-scale, medically useless narcotics (i.e., the Drugs) to Insureds as an inducement to continue reporting to Dr. Strutsovskiy and RES for medically unnecessary treatment.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

24.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Western District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.      An Overview of the No-Fault Laws and Licensing Statutes

25.     GEICO underwrites automobile insurance in the State of New York.

26.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y.

Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

27.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services and medicines.

28.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those goods and services. Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").   In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

29.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.  In New York, only a licensed physician may: (i) practice medicine; (ii) own and control a professional corporation authorized to operate a medical practice; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services. Unlicensed individuals may not: (i) practice medicine; (ii) own or control a professional corporation authorized to operate a medical practice; (iii) employ or supervise

physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

30.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

31.     Therefore, under the No-Fault Laws, a medical professional corporation is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, or if it engages in unlawful fee-splitting with non-physicians. Likewise, under the No-Fault Laws a physician is not eligible to receive No-Fault Benefits if he engages in unlawful fee-splitting with non-physicians, which is prohibited by, inter alia, New York's Education Law.

32.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

33.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

II.    **The Defendants' Fraudulent Scheme**

34.    Beginning in mid-2010, and continuing through the present day, the Defendants have masterminded and implemented a complex fraudulent scheme in which: (i) the Management Defendants unlawfully have owned, controlled, and derived economic benefit from Dr. Strutsovskiy's and RES's medical practice; (ii) Dr. Strutsovkiy and RES have purported to provide the medically unnecessary Fraudulent Services to Insureds, which then have been charged to GEICO and other insurers; (iii) as an incentive for the Insureds to report to Dr. Strutsovskiy and RES for the medically unnecessary Fraudulent Services, Dr. Strutsovkiy has prescribed massive amounts of medically unnecessary narcotics (i.e., the Drugs) to the Insureds; and (iv) the Defendants then have caused VascuScript to fill many of the narcotics prescriptions and distribute the medically unnecessary Drugs to Insureds, and to submit separate additional charges for the Drugs to GEICO.

A.    **The Fraudulent Establishment of Dr. Strutsovskiy's Medical Practice**

35.    Dr. Strutsovskiy's lifestyle choices, coupled with his conviction and house arrest, left him bankrupt and in urgent need of money.

36.    In November 2009, four months after his conviction and while he was still under house arrest, Dr. Strutsovskiy filed for bankruptcy. Copies of Dr. Strutsovskiy's bankruptcy petition and the related schedules collectively are annexed hereto as Exhibit "D". In the schedules accompanying his bankruptcy petition, Dr. Strutsovskiy listed only about $21,000.00 in assets – chiefly attributable to a tax refund – against approximately $420,000.00 in debts. See Exhibit "D".

37.     While some of these debts were attributable to student loans, many of the debts reflected Dr. Strutsovskiy's desire to live a lifestyle that was far beyond his means. For instance, the debts listed on Dr. Strutsovskiy's bankruptcy schedules included more than $200,000.00 in consumer debt that Dr. Strutsovskiy compiled on 13 separate credit cards. See Exhibit "D".

38.     Though Dr. Strutsovskiy was discharged in bankruptcy in February 2010, and was released from house arrest in about May 2010, these events did not alleviate his financial distress.

39.     Although – following his release from house arrest – Dr. Strutsovkiy's probationary medical license technically allowed him to practice medicine, he was faced with a series of obstacles to the lifestyle he desired. For example, because he was barred as a participant in the Medicare system, he was denied access to a large patient population as well as the largest national payor network. In addition, medical malpractice insurance carriers refused to provide Dr. Strutsovskiy with malpractice insurance because the State Board had placed him on probation. Most private insurers will not authorize treatment provided by an uninsured physician, which severely limited the scope of Dr. Strutsovskiy's practice and, collectively, these factors limited his ability to generate the money necessary to support the lifestyle he desired.

40.     Dr. Strutsovskiy therefore was receptive when the Management Defendants approached him and recruited him to participate in a No-Fault fraud scheme, whereby Dr. Strutsovskiy would purport to establish a legitimate medical practice, but – in actuality – the practice would be owned and controlled by the Management Defendants and used to submit large-scale fraudulent billing to GEICO and other insurers.

41.     Specifically, in about June 2010, in exchange for a designated salary or other form of compensation from the Management Defendants, Dr. Strutsovskiy agreed to serve as the

nominal or "paper" owner of a medical practice (the "Medical Practice") to be located at 2470 Walden Avenue, Cheektowaga, New York, a sizable office building that is controlled by the Management Defendants, and also houses the VascuFlo central office and the VascuScript office (the "VascuFlo-VascuScript Building").

42.     In about June 2010, Dr. Strutsovskiy purported to open the Medical Practice at the VascuFlo-VascuScript Building, ostensibly as a sole proprietorship.

43.     The Management Defendants – rather than Dr. Strutsovskiy – provided most start-up costs and investment in the Medical Practice. Dr. Strutsovskiy did not incur most of the costs necessary to establish the Medical Practice.

44.     Dr. Strutsovskiy was not in a position to incur most of the costs necessary to establish the Medical Practice, because he had no significant assets, and no credit as the result of his bankruptcy. Furthermore, no legitimate lender would provide Dr. Strutsovskiy with the capital necessary to establish the Medical Practice because Dr. Strutsovskiy did not have malpractice insurance and was unable to obtain malpractice insurance.

45.     Once the Medical Practice began operating from the VascuFlo-VascuScript Building, Dr. Strutsovskiy immediately ceded true beneficial ownership and control over the Medical Practice to the Management Defendants.

46.     Dr. Strutsovskiy never has had any true ownership interest in or control over the Medical Practice. True ownership and control over the practice has rested at all times with the Management Defendants, who have used the façade of the Medical Practice to do indirectly what they are forbidden from doing directly, namely to: (i) employ a physician; (ii) control his practice; (iii) charge for and derive an economic benefit from his services; and (iv) generate

prescriptions for medically-unnecessary narcotics (i.e., the Drugs) that the Defendants then could distribute through VascuScript and bill to GEICO and other insurers.

47.     Throughout the course of Dr. Strutsovskiy's relationship with the Management Defendants, all decision-making authority relating to the operation and management of the Medical Practice has been vested entirely with the Management Defendants. In addition, Dr. Strutsovskiy neither has controlled nor maintained any of the Medical Practice's bank accounts, books or records; never has selected, directed, and/or controlled any of the individuals or entities that have been responsible for handling any aspect of the Medical Practice's financial affairs; never has hired or supervised any of the Medical Practice's employees or independent contractors; and has been completely unaware of the most fundamental aspects of how the Medical Practice operates.

48.     During his tenure as the paper owner of the Medical Practice under the control of the Management Defendants, Dr. Strutsovskiy's only function at the Medical Practice has been to come to the office several days each week, perform the Fraudulent Services, and write large-scale prescriptions for the Drugs. In this capacity, Dr. Strutsovskiy  never has been anything more than a de facto employee of the Management Defendants.

49.     To facilitate their unlawful ownership interest in and control over the Medical Practice, the Management Defendants have arranged for the Medical Practice – which supposedly is owned by Dr. Strutsovskiy – to use the VascuFlo telephone number and secretarial staff and to operate from Suite 2200 of the VascuFlo-VascuScript Building, the same suite that serves as VascuFlo's central office.

50.     In order to siphon the Medical Practice's profits to themselves, the Management Defendants have arranged for Dr. Strutsovskiy and the Medical Practice to enter into a series of "management," "marketing," "lease", "billing", and "collections" agreements with themselves. These agreements call for exorbitant payments from the Medical Practice, in amounts far exceeding the Medical Practice's actual revenues, for facility lease, equipment lease, and/or the alleged performance of certain designated services including management, marketing, billing, and collections regardless of: (i) the volume of the Medical Practice's business; (ii) the income generated by the Medical Practice; and (iii) the actual value of the leasehold interests and services that have been provided.

51.     While these agreements ostensibly have been created to permit the Management Defendants to provide leaseholds, "management," "marketing," and "billing" services to the Medical Practice, they actually have been used as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own the Medical Practice; and (ii) to siphon off the profits that have been generated by the billings submitted to GEICO and other insurers through the Medical Practice.

52.     To further facilitate the Management Defendants' unlawful ownership of and control over the Medical Practice, and to enable them to more easily siphon the Medical Practice's profits to themselves, the Defendants in many cases have listed VascuFlo as the service provider on No-Fault billing submitted through the Medical Practice. Representative examples of billing submitted through the Medical Practice listing VascuFlo as the service provider are annexed hereto as Exhibit "E".

**B.      The Conversion of the Medical Practice Into RES**

53.      By late 2010, after unlawfully operating the Medical Practice for less than six months, the Management Defendants already had submitted almost $100,000.00 in fraudulent billing through the Medical Practice to GEICO, alone.

54.      The Management Defendants were concerned that the volume of fraudulent billing submitted through the Medical Practice eventually would draw attention to their scheme.

55.      Accordingly, in late 2010 the Management Defendants began to take a series of purely cosmetic steps aimed at concealing their unlawful ownership of and control over the Medical Practice and creating the false impression that Dr. Strutsovskiy owns and controls the Medical Practice.

56.       First, the Management Defendants moved the Medical Practice from Suite 2200 of the VascuFlo-VascuScript Building, the same suite that serves as VascuFlo's central office, to Suite 300 of the VascuFlo-VascuScript Building. While this move was intended to create the appearance of distance between the Medical Practice's operations and the Management Defendants' operations, the distinction is entirely illusory. The Management Defendants control Suite 300, just as they control Suite 2200.

57.      Second, the Management Defendants approached Dr. Strutsovskiy and offered to purchase the use of Dr. Strutsovskiy's medical license in order to fraudulently incorporate RES, a medical professional corporation.

58.      The Management Defendants sought to fraudulently incorporate RES in order to: (i) create the illusion of some distinction between the Medical Practice and the Management Defendants' other business enterprises at the VascuFlo-VascuScript Building; and (ii) form an

entity with a new tax identification number through which they could submit increasing amounts of fraudulent billing to GEICO and other insurers, while simultaneously reducing the amount of fraudulent billing submitted under the Medical Practice's tax identification number, thereby helping to conceal and perpetuate the scheme.

59.      In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing RES to operate a medical practice, the Management Defendants entered into a secret arrangement with Dr. Strutsovskiy.  In exchange for a designated salary or other form of compensation, in late 2010 Dr. Strutsovskiy agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of RES and that he truly owns and controls the professional corporation.

60.      Once RES was fraudulently incorporated on about January 31, 2011, Dr. Strutsovskiy ceded true beneficial ownership and control over the professional corporation to the Management Defendants, just as he had done with the Medical Practice.

61.      As was the case with the Medical Practice, the Management Defendants – rather than Dr. Strutsovskiy – provided most start-up costs and investment in RES. Dr. Strutsovskiy did not incur most of the costs necessary to establish RES's practice.

62.      As with the Medical Practice, Dr. Strutsovskiy never has been the true shareholder, director, or officer of RES, and never has had any true ownership interest in or control over RES. True ownership and control over RES has rested at all times entirely with the Management Defendants, who have used the façade of RES to do indirectly what they are forbidden from doing directly, namely to: (i) employ a physician; (ii) control his practice; (iii)

charge for and derive an economic benefit from his services; and (iv) generate prescriptions for medically-unnecessary narcotics (i.e., the Drugs) that they then could distribute through VascuScript and bill to GEICO and other insurers.

63.     As with the Medical Practice, throughout the course of Dr. Strutsovskiy's relationship with the Management Defendants, all decision-making authority relating to the operation and management of RES has been vested with the Management Defendants. In addition, Dr. Strutsovskiy neither has controlled nor maintained any of RES's bank accounts, books or records; never has selected, directed, and/or controlled any of the individuals or entities that have been responsible for handling any aspect of RES's financial affairs; never has hired or supervised any of RES's employees or independent contractors, and has been completely unaware of the most fundamental aspects of how RES operates.

64.     As with the Medical Practice, during his tenure as the paper owner of RES under the control of the Management Defendants, Dr. Strutsovskiy's only function at RES has been to come to the office several days each week, perform the Fraudulent Services, and write large-scale prescriptions for the Drugs. In this capacity, Dr. Strutsovskiy has continued to be nothing more than a de facto employee of the Management Defendants.

65.     After causing RES to be fraudulently incorporated, the Management Defendants have continued to cause it to use the VascuFlo telephone number, so as to facilitate their unlawful ownership interest in and control over Dr. Strutsovskiy's practice.

66.     In order to siphon RES's profits to themselves, the Management Defendants have arranged for Dr. Strutsovskiy and RES to enter into a series of "management," "marketing," "lease", "billing", and "collections" agreements with themselves. These agreements call for

exorbitant payments from RES, in amounts far exceeding RES's actual revenues, for facility lease, equipment lease, and/or the alleged performance of certain designated services including management, marketing, billing, and collections regardless of: (i) the volume of RES's business; (ii) the income generated by RES; and (iii) the actual value of the leasehold interests and services that have been provided.

67.     While these agreements ostensibly have been created to permit the Management Defendants to provide leaseholds, "management," "marketing," and "billing" services to RES, they actually have been used as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own RES; and (ii) to siphon off the profits that have been generated by the billings submitted to GEICO and other insurers through RES.

68.     The ownership and control of the Medical Practice and RES by non-physicians compromises patient care, as the provision of medical services by the Medical Practice and RES is subject to the pecuniary interests of non-physicians as opposed to the exercise of independent medical judgment by a true doctor-owner.

### C.     The Defendants' Fraudulent Treatment and Billing Protocol

69.     Virtually all of the Insureds whom Dr. Strutsovskiy purports to treat at RES and the Medical Practice are involved in relatively minor, "fender-bender" accidents, to the extent that they are involved in any actual accidents at all. Concomitantly, almost none of the Insureds whom Dr. Strutsovskiy purports to treat at RES and the Medical Practice suffer from any significant injuries or health problems as a result of the relatively minor accidents they experience or purport to experience.

70.     Even so, in order to be profitable, the Defendants' scheme requires the performance of the medically-useless Fraudulent Services and distribution of the Drugs to virtually every Insured according to a pre-determined, fraudulent protocol.

71.     Each step in this fraudulent treatment protocol is designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby enable the Defendants to submit the maximum amount of billing for the medically-unnecessary Fraudulent Services and Drugs.

### 1.     The Fraudulent Initial Consultations

72.     The Medical Practice and RES do not advertise or market their services to the general public. Instead, the Medical Practice and RES primarily obtain their patients in two ways: (i) through the payment of kickbacks to a network of physicians and chiropractors in the greater Buffalo area, who specialize in treating patients with No-Fault insurance who claim to have been injured in automobile accidents; and (ii) through word-of-mouth among individuals seeking narcotics to feed their drug addictions or to illegally redistribute at a profit on the street.

73.     Upon receiving a referral to the Medical Practice or RES, or upon presenting at the Medical Practice or RES in search of narcotics, virtually every Insured purportedly receives an initial consultation from Dr. Strutsovskiy.

74.     The Management Defendants and Dr. Strutsovskiy then bill the initial consultations to GEICO through either the Medical Practice or RES under current procedural terminology ("CPT") code 99244, resulting in a charge of $146.60, or under CPT code 99245, resulting in a charge of $185.16 or $240.71.

75.     These charges for the initial consultations are fraudulent in that the initial consultations are medically unnecessary. To the extent that the initial consultations are performed at all, they either are performed pursuant to the kickback arrangements between the Defendants and the physicians or chiropractors who refer Insureds to the Medical Practice and RES, or else they are performed solely at the behest of Insureds who present at the Medical Practice or RES in search of narcotics, but without any genuine medical problems arising from any automobile accidents.

76.     In the cases where the initial consultations are performed solely at the behest of Insureds who present at the Medical Practice or RES in search of narcotics, the use of CPT codes 99244 or 99245 is fraudulent because the use of these codes falsely represents – among other things – that another physician or appropriate source actually referred the Insured to the Medical Practice or RES for an opinion or advice.

77.     The charges for the initial consultations also are fraudulent in that they misrepresent the nature and extent of the initial consultations.

78.     According to the New York Workers' Compensation Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT code 99244 or 99245 typically requires that the Insured present with problems of moderate-to-high severity.

79.     Though the Management Defendants, Dr. Strutsovskiy, and RES routinely bill for the initial consultations under CPT codes 99244 and 99245, the Insureds never present with problems of moderate-to-high severity. Rather, the Insureds almost never have any medical problems as the result of any automobile accident.

80.     Furthermore, the use of CPT code 99244 typically requires that the physician spend 60 minutes of face-to-face time with the Insured or the Insured's family, and the use of CPT code 99245 typically requires that the physician spend 80 minutes of face-to-face time with the Insured or the Insured's family.

81.     Though the Management Defendants, Dr. Strutsovskiy, and RES routinely bill for the initial consultations under CPT codes 99244 and 99245, neither Dr. Strutsovskiy nor any other physician associated with the Medical Practice or RES ever spends 60 or 80 minutes on the initial consultations. Rather, the initial consultations rarely last more than 15 minutes, to the extent that they are conducted at all.

82.     In addition, when the Management Defendants, Dr. Strutsovskiy, and RES submit charges for the initial consultations under CPT code 99245, they represent that Dr. Strutsovskiy has: (i) taken a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity".

83.     Similarly, when the Management Defendants, Dr. Strutsovskiy, and RES submit charges for the initial consultations under CPT code 99244, they represent that Dr. Strutsovskiy has: (i) taken a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

84.     Pursuant to the Fee Schedule, a "comprehensive" patient history requires – among other things – that the healthcare provider take a history of all body systems, not only the body systems that are related to the Insured's present complaint.

85.     Pursuant to the Fee Schedule, a "comprehensive" patient history also requires that the healthcare provider take a complete past, family, and social history from the Insured.

22

86.     Though the Management Defendants, Dr. Strutsovskiy, and RES routinely falsely represent that Dr. Strutsovskiy has taken a "comprehensive" patient history from the Insureds during the initial consultations, Dr. Strutsovskiy never takes a history of all of any Insured's body systems, nor does he ever take a complete past, family, and social history from any Insured. To the extent that Dr. Strutsovskiy takes any patient history at all, it virtually always is limited to a request that the Insureds recount any major medical issues they have experienced, and the nature of the underlying automobile accident.

87.     In order to create the illusion that Dr. Strutsovskiy takes a "comprehensive" patient history from Insureds, the Management Defendants, Dr. Strutsovskiy, and RES routinely compile fraudulent initial consultation reports and submit them to GEICO in support of their billing for the initial consultations. The Management Defendants, Dr. Strutsovskiy, and RES cobble the patient history sections of these initial consultation reports from pre-existing language. For instance, large numbers of purported initial consultation reports submitted by or through the Medical Practice or RES include the following, identical patient history language:

(i)     "[He/she] was evaluated and released [from the hospital emergency room] the same day. [He/she] was diagnosed with cervical and lumbar spine strain and other soft tissue injury. However, patient later developed severe pain which progressively got worse."

(ii)    "Patient [had pain/developed stiffness] right away."

(iii)   "Also, [he/she] c/o … headaches and insomnia."

(iv)    "Pain in throbbing aching and sometimes lightning sharp in nature."

(v)     "Pain is constant Variable [sic] in intensity."

(vi)    "Prolonged more than [5/10/20] min walking, standing or sitting aggravate pain."

(vii)   "Rest and Pain [sic] meds partially relieve pain."

23

Representative examples of initial consultation reports containing this identical boilerplate language collectively are annexed hereto as Exhibit "F".

88.     Pursuant to the Fee Schedule, a "comprehensive" physical examination requires – among other things – that the healthcare provider either: (i) conduct a general examination of multiple patient organ systems; or (ii) conduct a complete examination of a single patient organ system.

89.     The Fee Schedule identifies the following organ systems: (i) eyes; (ii) ears, nose, mouth, and throat; (iii) cardiovascular; (iv) respiratory; (v) gastrointestinal; (vi) genitourinary; (vii) musculoskeletal; (viii) skin; (ix) neurologic; (x) psychiatric; and (xi) hematologic/lymphatic/immunologic.

90.     Though the Management Defendants, Dr. Strutsovskiy, and RES routinely falsely represent that Dr. Strutsovskiy has conducted a "comprehensive" physical examination of Insureds during the initial consultations, Dr. Strutsovskiy never conducts a general examination of multiple organ systems, nor does he conduct a complete examination of a single organ system. To the extent that Dr. Strutsovskiy conducts any patient examination at all, the examinations virtually always are limited to a perfunctory check of the Insureds' vital signs.

91.     In order to create the illusion that Dr. Strutsovskiy conducts a "comprehensive" physical examination during the initial consultations, the Management Defendants, Dr. Strutsovskiy, and RES insert a fraudulent examination section into the initial consultation reports. Like the phony patient history section of the initial consultation reports, the examination section of the reports is cobbled together from pre-existing, boilerplate language.

92. For instance, large numbers of purported initial consultation reports submitted by or through the Medical Practice or RES include the following, identical "examination" language:

(i)    "[The patient] appears in distress related to pain and functional limitations."

(ii)   "Mood and affect are appropriate for circumstances. Alert and oriented to place, person, and time. Understands and follows all commands. No cyanosis. No clubbing. No enlarged lymph nodes."

(iii)  "No facial asymmetry. Pupils are equal, about 5mm, reactive to light and accommodation. Oral mucosal membranes are pink, moist, no oral sores."

(iv)   "Neck was supple. Free of scars and lymphadenopathy."

(v)    "[Chest was] [c]lear to auscultation, no wheezing, and no rales. Vesicular breathing bilaterally."

(vi)   "Heart sounds were regular, S1-S2, no murmur. No rub. No gallop."

(vii)  "[Abdomen was] [s]oft, nontender, nondistended with normal bowel sounds. Liver showed no tenderness and not enlarged."

(viii) "No peripheral edema. Peripheral pulses were normal on both feet. No dystrophic changes of skin and nails of both feet. No pressure sores."

(ix)   "Neurological exam demonstrated normal mental status, mild emotional lability, mood and affect as mentioned above. No confusion, but the patient was very emotional during the interview. Swallowing is intact without evidence of swallowing disturbance. Gag reflexes were present. Cranial nerves II-XII were intact. There was no nystagmus. No facial asymmetry. Sensation to light tough, pinprick and proprioception was preserved in upper extremities. Deep tendon reflexes were normal throughout the body."

See Exhibit "F".

93. In the examination sections of virtually all of the boilerplate initial consultation reports, the only language that varies to any appreciable degree is the language describing the Insured (i.e., as a "middle aged African American female", a "young white male", etc., and the

language describing the putative "results" of the musculoskeletal aspects of Dr. Strutsovskiy's physical examinations).

94.     The Management Defendants, Dr. Strutsovskiy, and RES vary the boilerplate language that they use in the musculoskeletal sections of the initial consultation reports so that the reports do not conflict with the types of accidents that the Insureds claim to experience.

95.     Even so, most of the musculoskeletal sections of the initial consultation reports contain the following, identical boilerplate language, with – as noted – identical typographical and/or grammatical errors:

(i)      "Spurling tests (provocative test for foraminal encroaching) was [sic] positive …."

(ii)     "Occipital area was tender and sensitive for palpation."

(iii)    "Also positive pain on palpation over Sternocleidomastoid bilaterally, Anterior, Middle and Posterior Scalenes, cervicis capitus, upper trapezius … ."

(iv)     "Also positive pain on palpation over lumbar paraspinals, bilateral sacrosiliac joints, bilateral gluteus maximus medius and tensor fascia lata."

(v)      "Also pain on palpation over the over [sic] lateral border of the sacrum bilaterally."

(vi)     "The Pt demonstrated decreased functional ROM in Cervical spine and lumbar spine approximately [25-50 %] in all planes."

(vii)    "There were no bony misalignments and [sic] acute fractures but the Pt had difficulty with squatting and toe walking and heel walking because of neck/midthoracic/low back pain."

(viii)   "Percussion over the spinous processes causes sharp pain over the midthoracic/cervical/lower spine areas."

(ix)     "There was tenderness and mild edema in the neck/midthoracic/lumbosacral paraspinal muscles."

(x)    "The Pt has significant muscle spasm and multiple trigger points in the neck/midthoracic/lumbosacral areas."

(xi)   "Lasegue testing (SLR) was positive, and the patient had tight hamstrings."

See Exhibit "F".

96.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

97.    Though the Management Defendants, Dr. Strutsovskiy, and RES routinely falsely represent that Dr. Strutsovskiy's initial consultations involve medical decision-making of "high complexity" (when billed under CPT code 99245) or "moderate complexity" (when billed under CPT code 99244), in actuality the initial consultations do not involve any medical decision-making at all.

98.    First, in virtually every case, the initial consultations do not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds present to Dr. Strutsovskiy for "treatment" – either pursuant to the kickbacks paid to the referring physicians and chiropractors, or after self-referring to the Defendants' offices in search of narcotics prescriptions – they do not arrive with any medical records. Furthermore, prior to the initial consultations, Dr. Strutsovskiy neither requests any medical records from the referring providers, nor conducts any diagnostic tests.

99.     In purporting to perform the initial consultations, Dr. Strutsovskiy does not even consider any information that the Insureds choose to verbally self-report, inasmuch as the initial consultations have a pre-determined outcome. Specifically, they are performed for the sole purpose of enabling Dr. Strutsovskiy to provide a false pain diagnosis so as to permit the Defendants to provide and bill for the Fraudulent Services and Drugs.

100.    Second, in virtually every case, there is no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor medical complaints, to the limited extent that they ever have any medical complaints arising from automobile accidents at all. Nor, by extension, is there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Dr. Strutsovskiy, to the extent that Dr. Strutsovskiy provides any such diagnostic procedures or treatment options in the first instance. In almost every instance, any diagnostic procedures and "treatments" that Dr. Strutsovskiy actually provides are limited to a series of medically unnecessary pain management modalities, none of which are health- or life-threatening if properly administered.

101.    Third, in virtually every case, Dr. Strutsovskiy does not consider any significant number of diagnoses or treatment options for Insureds during the initial consultations. Rather, during almost every initial consultation, Dr. Strutsovskiy asks the Insureds a few boilerplate questions about their automobile accidents and medical history, makes a nearly identical diagnosis for every Insured, and prescribes a virtually identical course of treatment for every Insured.

102.     Specifically, in almost every instance, during the initial consultations the Insureds do not report any medical problems that legitimately can be traced to an underlying automobile accident.

103.     Even so, in nearly every case, the Management Defendants, Dr. Strutsovskiy, and RES prepare initial consultation reports in which Dr. Strutsovskiy purports to diagnose an absurdly-lengthy list of maladies for each Insured, all of which supposedly are caused by the relatively minor fender-benders that the Insureds purportedly have experienced. This boilerplate list of symptoms includes, in virtually every case, at least six and often more than 10 of the following:

(i)      Whiplash injury, cervical sprain/strain.

(ii)     Cervical pain.

(iii)    Cervical radiculopathy.

(iv)     Low back pain.

(v)      Midthoracic sprain/strain.

(vi)     Occipital neuralgia.

(vii)    Lumbar sprain/strain.

(viii)   Cervicocranial syndrome.

(ix)     Sacroiliitis.

(x)      Soft tissue injury and Myofascial pain syndrome, trigger points, muscle guarding.

(xi)     Post-traumatic stress disorder.

(xii)    Adjustment disorder.

(xiii)   Functional deficit secondary to above.

      (xiv)    Lumbar Disc Displacement without Mylopathy.

<u>See</u> Exhibit "F".

104.    The Management Defendants, Dr. Strutsovskiy, and RES clearly cut-and-paste this boilerplate list of symptoms into virtually every Insured's initial consultation report, considering that:

    (i)    The capitalization of certain ordinarily-uncapitalized terms is identical in most initial consultation reports, for instance "Disc Displacement", "Mylopathy", and "Myofascial".

    (ii)    In the phrase "Lumbar Disc Displacement", there is an extra space between the words "Lumbar" and "Disc" in a large number of initial consultation reports.

    (iii)    Almost every section of the initial consultation reports is printed in Times New Roman font. However, in a large number of initial consultation reports the words "Cervicocranial syndrome" and "Sacroiliitis" incongruously are printed in Courier font.

<u>See</u> Exhibit "F".

105.    In many cases, Dr. Strutsovskiy purports to diagnose soft tissue injuries such as sprains and strains in the Insureds months or even well over a year after the Insureds supposedly experienced automobile accidents, long after any actual sprain or strain would have resolved. For instance:

    (i)    On September 25, 2010, an Insured named Patient "1" purportedly was involved in an automobile accident. Patient "1" did not present to Dr. Strutsovskiy for an "initial consultation" until July 14, 2011, almost 10 months after his alleged accident. Even so, Dr. Strutsovskiy purported to diagnose Patient "1" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "1"'s accident.

    (ii)    On October 5, 2009, an Insured named Patient "2" purportedly was involved in an automobile accident. Patient "2" did not present to Dr. Strutsovskiy for an "initial consultation" until May 13, 2011, more than 19 months after his alleged accident. Even so, Dr. Strutsovskiy purported to diagnose Patient "2" with various soft

tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "2"'s accident.

(iii)     On April 25, 2010, an Insured named Patient "3" purportedly was involved in an automobile accident. Patient "3" did not present to Dr. Strutsovskiy for an "initial consultation" until October 20, 2011, almost 17 months after her alleged accident. Even so, Dr. Strutsovskiy purported to diagnose Patient "3" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "3"'s accident.

(iv)     On July 23, 2010, an Insured named Patient "4" purportedly was involved in an automobile accident. Patient "4" did not present to Dr. Strutsovskiy for an "initial consultation" until May 13, 2011, more than nine months after her alleged accident. Even so, Dr. Strutsovskiy purported to diagnose Patient "4" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "4"'s accident.

(v)      On December 25, 2009, an Insured named Patient "5" purportedly was involved in an automobile accident. Patient "5" did not present to Dr. Strutsovskiy for an "initial consultation" until August 2, 2010, more than seven months after his alleged accident. Even so, Dr. Strutsovskiy purported to diagnose Patient "5" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "5"'s accident.

(vi)     On November 27, 2010, an Insured named Patient "6" purportedly was involved in an automobile accident. Patient "6" did not present to Dr. Strutsovskiy for an "initial consultation" until October 7, 2011, more than 10 months after his alleged accident. Even so, Dr. Strutsovskiy purported to diagnose Patient "6" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "6"'s accident.

(vii)    On November 20, 2010, an Insured named Patient "7" purportedly was involved in an automobile accident. Patient "7" did not present to Dr. Strutsovskiy for an "initial consultation" until July 1, 2011, more than seven months after his alleged accident. Even so, Dr. Strutsovskiy purported to diagnose Patient "7" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "7"'s accident.

(viii)   On May 22, 2009, an Insured named Patient "8" purportedly was involved in an automobile accident. Patient "8" did not present to Dr. Strutsovskiy for an "initial consultation" until September 13, 2010, more than 15 months after her alleged accident. Even so, Dr. Strutsovskiy purported to diagnose Patient "8" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "8"'s accident.

(ix)     On March 15, 2010, an Insured named Patient "9" purportedly was involved in an automobile accident. Patient "9" did not present to Dr. Strutsovskiy for an "initial consultation" until September 27, 2010, more than six months after her alleged accident. Even so, Dr. Strutsovskiy purported to diagnose Patient "9" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "9"'s accident.

(x)      On June 24, 2009, an Insured named Patient "10" purportedly was involved in an automobile accident. Patient "10" did not present to Dr. Strutsovskiy for an "initial consultation" until January 17, 2011, more than 18 months after his alleged accident. Even so, Dr. Strutsovskiy purported to diagnose Patient "10" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "10"'s accident.

(xi)     On December 3, 2009, an Insured named Patient "11" purportedly was involved in an automobile accident. Patient "11" did not present to Dr. Strutsovskiy for an "initial consultation" until April 11, 2011, more than 16 months after her alleged accident. Even so, Dr. Strutsovskiy purported to diagnose Patient "11" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "11"'s accident.

(xii)    On March 7, 2009, an Insured named Patient "12" purportedly was involved in an automobile accident. Patient "12" did not present to Dr. Strutsovskiy for an "initial consultation" until November 12, 201, more than 20 months after his alleged accident. Even so, Dr. Strutsovskiy purported to diagnose Patient "12" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "12"'s accident.

106.    In order to create the false appearance that the Insureds are involved in serious automobile accidents of a type that actually could cause the extensive physical injuries the Management Defendants, Dr. Strutsovskiy, and RES report in the initial consultation reports, the Management Defendants, Dr. Strutsovskiy, and RES falsely report that many Insureds suffer from psychological problems as the result of their purported accidents.

107.    Specifically, the Management Defendants, Dr. Strutsovskiy, and RES insert boilerplate language into many initial consultation reports which falsely contends that each

Insured "appears in distress" and that the "patient was very emotional during the interview" with Dr. Strutsovskiy. See Exhibit "F".

108.    Then, many Insureds receive – as part of their boilerplate list of diagnoses – a phony diagnosis of "post-traumatic stress disorder" and "adjustment disorder". Id.

109.    Dr. Strutsovskiy, who is not a psychiatrist or psychologist, is not qualified to diagnose post-traumatic stress disorder or adjustment disorder.

110.    The Insureds receive these phony "diagnoses" regardless of their individual circumstances or unique presentment. In actuality, none of the Insureds actually suffer from "post-traumatic stress disorder", "adjustment disorder", or any other legitimate psychological problems as the result of the minor automobile accidents they supposedly experience.

111.    According to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition (the "DSM-IV"), which is published by the American Psychiatric Association and provides a common language and standardized criteria for the classification of mental disorders, a diagnosis of "post-traumatic stress disorder" requires – among other things – that the patient "experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others." In addition, a post-traumatic stress disorder diagnosis requires that the patient's response "involved intense fear, helplessness, or horror."

112.    According to the DSM-IV, a diagnosis of "adjustment disorder" requires – among other things – the "development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s)," and likewise requires that the patient exhibit "marked distress that is in excess of what would be expected

from exposure to the stressor" or "significant impairment in social or occupational (academic) functioning."

113.    To the extent that they are involved in any actual automobile accidents at all, virtually every one of the Insureds whom Dr. Strutsovskiy purports to treat has been involved in a very minor accident involving a low-speed collision or a side-swipe. Most of the Insureds do not go to the hospital at all following the alleged accidents, and the minority of Insureds who do go to the hospital generally are briefly observed on an outpatient basis and sent on their way after an hour or two. These trivial "fender-benders" do not induce any form of "adjustment disorder" in the Insureds who purportedly experience them, much less "post-traumatic stress disorder" – a condition typically associated with the abject horror of military combat, terrorist attacks, kidnapping or torture.

114.    Instead, Dr. Strutsovskiy's fraudulent psychological diagnoses – like the other conditions that Dr. Strutsovskiy purports to diagnose during the initial consultations – are used by the Defendants solely as a basis to perform and bill for the other Fraudulent Services and to prescribe, distribute, and bill for the Drugs.

**2.      The Fraudulent Follow-Up Evaluations**

115.    In addition to the fraudulent initial consultations, the Management Defendants, Dr. Strutsovskiy, and RES typically purport to subject Insureds to at least five, and often more than 10, fraudulent follow-up evaluations during the course of their treatment protocol.

116.    The Management Defendants, Dr. Strutsovskiy, and RES then bill the follow-up evaluations to GEICO through the Medical Practice or RES under CPT code 99213, resulting in a charge of $39.64, or CPT code 99214, resulting in a charge of $74.78.

117.    Like the initial consultations, the charges for the follow-up evaluations are fraudulent in that the follow-up evaluations are medically unnecessary. To the extent that the follow-up evaluations are performed at all, they either are performed pursuant to the kickback arrangements with the physicians or chiropractors who refer Insureds to the Medical Practice and RES, or else they are performed solely at the behest of Insureds who present at the Medical Practice or RES in search of narcotics, but without any genuine medical problems arising from any automobile accidents.

118.    The charges for the follow-up evaluations also are fraudulent in that they misrepresent the nature and extent of the follow-up evaluations.

119.    According to the Fee Schedule, the use of CPT code 99213 typically requires that the Insured present with problems of low-to-moderate severity, and the use of CPT code 99214 typically requires that the Insured present with problems of moderate-to-high severity.

120.    Though the Management Defendants, Dr. Strutsovskiy, and RES routinely bill for the follow-up evaluations under CPT codes 99213 and 99214, the Insureds almost never have any medical problems at all as the result of any automobile accident.

121.    Furthermore, the use of CPT code 99213 typically requires that the physician spend 15 minutes of face-to-face time with the Insured or the Insured's family, and the use of CPT code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family.

122.    Though the Management Defendants, Dr. Strutsovskiy, and RES routinely bill for the follow-up evaluations under CPT codes 99213 and 99214, neither Dr. Strutsovskiy nor any other physician associated with the Medical Practice or RES ever spends 15 or 25 minutes on the

follow-up evaluations. Rather, the follow-up evaluations rarely last more than five minutes, to the extent that they are conducted at all.

123. In addition, when the Management Defendants, Dr. Strutsovskiy, and RES submit charges for the follow-up evaluations under CPT code 99213, they falsely represent that Dr. Strutsovskiy has performed at least two of the following three components: (i) taken an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused" physical examination; and (iii) engaged in medical decision-making of "low complexity".

124. Similarly, when the Management Defendants, Dr. Strutsovskiy, and RES submit charges for the follow-up evaluations under CPT code 99214, they falsely represent that Dr. Strutsovskiy has performed at least two of the following three components: (i) taken a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

125. Pursuant to the Fee Schedule, an "expanded problem focused" patient history requires – among other things – that the healthcare provider take a brief history of the Insured's illness, as well as a review of the body systems that are related to the Insured's present complaint.

126. Pursuant to the Fee Schedule, a "detailed" patient history requires – among other things – that the healthcare provider take an extended history of the Insured's illness, a review of the body systems that are related to the Insured's present complaint in additional to other body systems, and any past, family, medical or social history that is directly related to the Insured's problems.

127. During the purported follow-up evaluations, Dr. Strutsovskiy never takes an "expanded problem focused" or "detailed" patient history from any Insured.

128.    In order to create the illusion that Dr. Strutsovskiy takes an "expanded problem focused" or "detailed" patient history from Insureds, the Management Defendants, Dr. Strutsovskiy, and RES routinely compile fraudulent follow-up evaluation reports and submit them to GEICO in support of their billing for the follow-up evaluations.

129.    In the "illness history" section of virtually all of the phony follow-up evaluation reports that they compile, the Management Defendants, Dr. Strutsovskiy, and RES falsely report that the Insured received some relief as the result of the Fraudulent Services and/or Drugs that the Defendants provided, but that the Insured continued to suffer pain requiring additional Fraudulent Services and/or Drugs.

130.    The Management Defendants, Dr. Strutsovskiy, and RES include this language in virtually every follow-up evaluation report in order to falsely reinforce the rationale for Fraudulent Services and/or Drugs the Defendants previously provided to the Insureds, and to provide a false justification for additional Fraudulent Services and/or Drugs, thereby enabling the Defendants to submit the maximum amount of billing for the medically-unnecessary Fraudulent Services and Drugs.

131.    In keeping with the fact that Dr. Strutsovskiy does not take any actual patient history during the follow-up evaluations, and in keeping with the fact that the follow-up evaluations are conducted solely in order to justify the Defendants' previous fraudulent billing and to create a false justification for additional fraudulent billing, the Management Defendants, Dr. Strutsovskiy, and RES use virtually identical, boilerplate language in the "review of systems" section of almost every follow-up evaluation report.

132. Specifically, virtually every follow-up evaluation report falsely contends that all of 14 the Insureds' systems were reviewed, and that the systems were normal except that the Insureds continued to suffer from musculoskeletal pain, depression, anxiety, and insomnia. Representative examples of the follow-up evaluation reports containing this boilerplate language collectively are annexed hereto as Exhibit "G".

133. Pursuant to the Fee Schedule, an "expanded problem focused" physical examination requires – among other things – that the healthcare provider conduct a limited examination of the Insured's affected body area or organ system and other symptomatic or related organ systems.

134. Pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare provider conduct an extended examination of the Insured's affected body areas and other symptomatic or related organ systems.

135. During the purported follow-up evaluations, Dr. Strutsovskiy never conducts an "expanded problem focused" or "detailed" physical examination of any Insured.

136. In order to create the illusion that Dr. Strutsovskiy conducts an "expanded problem focused" or "detailed" physical examination during the follow-up evaluations, the Management Defendants, Dr. Strutsovskiy, and RES insert a fraudulent examination section into the follow-up evaluation reports. Like the phony patient history section of the follow-up evaluation reports, the examination section of the reports is cobbled together from pre-existing, boilerplate language.

137.   For instance, large numbers of purported follow-up evaluation reports submitted by or through the Medical Practice or RES include the following, identical "examination" language, with identical grammatical error as noted:

(i)   "Cardiovascular: Regular rate and rhythm".

(ii)   "Respiratory: Clear to auscultation, bilaterally".

(iii)   "Abdomen: Soft, nontender, nondistended, positive bowel sounds".

(iv)   "Neurologic: Sensation intact in an in [sic] to pinprick in all dermatomes. Deep tendon reflexes intact bilaterally. Cranial nerves II through XII grossly intact. No dysdiadochokinesia or dysmetria noted".

(v)   "Skin: Grossly intact. No abnormal lesions noted".

(vi)   "Psychological: No abnormalities noted".

See Exhibit "G".

138.   In the examination sections of virtually all of the boilerplate follow-up evaluation reports, the only language that varies to any appreciable degree is the language describing the putative "results" of the musculoskeletal aspects of Dr. Strutsovskiy's physical examinations.

139.   The Management Defendants, Dr. Strutsovskiy, and RES vary the boilerplate language that they use in the musculoskeletal sections of the follow-up evaluation reports so that the reports do not conflict with the types of accidents that the Insureds claim to experience or the phony information reported in the musculoskeletal sections of the initial consultation reports.

140.   While the boilerplate language that the Management Defendants, Dr. Strutsovskiy, and RES use in the musculoskeletal sections of the follow-up evaluation reports varies to some degree from Insured to Insured, the musculoskeletal sections of the follow-up

evaluation reports virtually always falsely report that the Insureds continue to suffer from some form of back pain.

141.    The Management Defendants, Dr. Strutsovskiy, and RES falsely report this back pain in the musculoskeletal sections of the follow-up evaluation reports in order to falsely reinforce the rationale for Fraudulent Services and/or Drugs the Defendants previously provided to the Insureds, and to provide a false justification for additional Fraudulent Services and/or Drugs, thereby enabling the Defendants to submit the maximum amount of billing for the medically-unnecessary Fraudulent Services and Drugs.

142.    Furthermore, during the follow-up evaluations, Dr. Strutsovskiy never engages in medical decision-making of "moderate complexity" (when billed under CPT code 99214) or even "low complexity" (when billed under CPT code 99213). In actuality, the follow-up evaluations – like the initial consultations – do not involve any medical decision-making at all.

143.    As with the initial consultations, in virtually every case the follow-up evaluations do not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information.

144.    When the Insureds present at the Defendants' offices for "treatment" – either pursuant to the kickbacks to the referring physicians and chiropractors, or after self-referring to the Defendants' offices in search of narcotics prescriptions – they do not arrive with any medical records. Nor does Dr. Strutsovskiy obtain any records from other healthcare providers during any Insured's course of treatment.

145.    Nor does Dr. Strutsovskiy review the phony patient records that the Management Defendants, Dr. Strutsovskiy, and RES generate to create a false justification for their fraudulent

treatment protocol, because he knows that they are created solely to justify the Defendants' billing and do not accurately reflect the Insureds' medical status.

146.    In purporting to perform the follow-up evaluations, Dr. Strutsovskiy does not even consider any information that the Insureds choose to verbally self-report, inasmuch as the follow-up evaluations – like the initial consultations – have a pre-determined outcome. Specifically, they are performed for the sole purpose of enabling Dr. Strutsovskiy to reiterate a false pain diagnosis so as to permit the Defendants to continue provide and bill for the Fraudulent Services and Drugs.

147.    In addition, in virtually every case, there is no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor medical complaints, to the limited extent that they ever have any medical complaints arising from automobile accidents at all. Nor, by extension, is there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Dr. Strutsovskiy, to the extent that Dr. Strutsovskiy provides any such diagnostic procedures or treatment options in the first instance. In almost every instance, any diagnostic procedures and "treatments" that Dr. Strutsovskiy actually provides are limited to a series of medically unnecessary pain management modalities, none of which are health- or life-threatening if properly administered.

148.    Moreover, in virtually every case, Dr. Strutsovskiy does not consider any significant number of diagnoses or treatment options for Insureds during the initial consultations. Rather, during almost every follow-up evaluation, Dr. Strutsovskiy simply reiterates the ersatz, virtually identical soft tissue and back pain diagnoses that he made for each Insured during their

respective initial consultations, and prescribes the same, virtually identical course of treatment for every Insured.

149.    Though Insureds almost never have any actual soft tissue injuries or back pain that can be traced to any underlying automobile accident, during the follow-up evaluations Dr. Strutsovskiy routinely reiterates his soft tissue and back pain diagnoses so as to enable the Defendants to continue billing for the Fraudulent Services and Drugs.

150.    In many cases, during the follow-up evaluations Dr. Strutsovskiy purports to diagnose the continuing existence of soft tissue injuries such as sprains and strains well over a year after the Insureds supposedly experienced automobile accidents, long after any actual sprain or strain would have resolved. For instance:

(i)     On October 5, 2009, an Insured named Patient "2" purportedly was involved in an automobile accident. Dr. Strutsovskiy continued to diagnose Patient "2" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "2"'s accident, during follow-up evaluations as late as late summer 2011, almost two years after the alleged accident.

(ii)    On October 5, 2009, an Insured named Patient "1" purportedly was involved in an automobile accident. Dr. Strutsovskiy continued to diagnose Patient "1" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "1"'s accident, during follow-up evaluations as late as winter 2011, more than two years after the alleged accident.

(iii)   On April 25, 2010, an Insured named Patient "3" purportedly was involved in an automobile accident. Dr. Strutsovskiy continued to diagnose Patient "3" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "3"'s accident, during follow-up evaluations as late as winter 2011, more than a year and a half after the alleged accident.

(iv)    On April 26, 2010, an Insured named Patient "13" purportedly was involved in an automobile accident. Dr. Strutsovskiy continued to diagnose Patient "13" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "13"'s accident, during follow-up

evaluations as late as late fall 2011, almost a year and a half after the alleged accident.

(v)     On March 15, 2010, an Insured named Patient "9" purportedly was involved in an automobile accident. Dr. Strutsovskiy continued to diagnose Patient "9" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "9"'s accident, during follow-up evaluations as late as fall 2011, a year and a half after the alleged accident.

(vi)     On June 24, 2009, an Insured named Patient "10" purportedly was involved in an automobile accident. Dr. Strutsovskiy continued to diagnose Patient "10" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "10"'s accident, during follow-up evaluations as late as early fall 2011, more than two years after the alleged accident.

(vii)     On December 3, 2009, an Insured named Patient "11" purportedly was involved in an automobile accident. Dr. Strutsovskiy continued to diagnose Patient "11" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "11"'s accident, during follow-up evaluations as late as late summer 2011, more than a year and a half after the alleged accident.

(viii)     On June 25, 2010, an Insured named Patient "14" purportedly was involved in an automobile accident. Dr. Strutsovskiy continued to diagnose Patient "14" with various soft tissue injuries, including various types of strains and sprains, and contended that the injuries arose from Patient "14"'s accident, during follow-up evaluations as late as winter 2011, a year and a half after the alleged accident.

151.    The Defendants use the phony follow-up evaluations solely in order to create a paper trail with which to support continued billing for the Fraudulent Services and Drugs.

**3.    The Fraudulent Drug Screening and Drugs**

152.    While some Insureds are referred to the Medical Practice and RES pursuant to kickbacks to referring physicians and chiropractors, the Medical Practice and RES obtain most of their patients through the Defendants' willingness to prescribe and distribute large amounts of medically unnecessary narcotics to Insureds (i.e., the Drugs).

153.     The Insureds virtually never suffer serious injuries in the relatively minor automobile accidents they purport to experience.

154.     To the limited extent that the Insureds suffer any injuries at all as the result of the automobile accidents they purport to experience, and continue to suffer those injuries by the time they report to the Medical Practice or RES for treatment, the injuries virtually always are limited to acute pain arising from minor sprains and strains. These types of complaints virtually always resolve on their own after a short period, and conservative treatments such as rest, ice packs, and the use of non-steroidal, anti-inflammatory analgesics, such as ibuprofen or naproxen sodium, typically are all that are required to relieve the pain.

155.     In most cases, narcotics are not indicated for the treatment of acute pain arising from minor sprains and strains.

156.     Even so, the Defendants prescribe and distribute large quantities of narcotics to most Insureds, as an inducement for the Insureds to continue reporting to the Medical Practice or RES for medically-useless Fraudulent Services that the Management Defendants, Dr. Strutsovskiy, and RES then can bill to GEICO, and to enable the Defendants to submit additional billing through VascuScript for the Drugs, themselves.

    (i)     **The Fraudulent Initial and Follow-Up Drug Screens**

157.     Dr. Strutsovskiy typically begins to prescribe the Drugs to Insureds on the first day that the Insureds present at the Medical Practice or RES for treatment. In most cases, Dr. Strutsovskiy does not wait until any Insured has failed conservative treatments before he begins to prescribe the Drugs.

158.    As a first step in this process, Dr. Strutsovskiy frequently purports to administer an initial drug screen to the Insureds, typically during the initial consultations. The Management Defendants, Dr. Strutsovskiy, and RES then bill GEICO and other insurers for the drug screens through the Medical Practice or RES.

159.    Dr. Strutsovskiy ostensibly administers the initial drug screens to the Insureds during the initial consultations in order to determine whether the Insureds have any preexisting drug problems that would militate against the substantial amount of Drugs that the Defendants prescribe and distribute.

160.    However, to the extent that the drug screens suggest that the Insureds have preexisting drug problems or are using any illegal drugs, Dr. Strutsovskiy disregards the results of the drugs screens and prescribes the Drugs anyway.

161.    The charges for the initial drug screens are fraudulent in that the drug screens are medically unnecessary, inasmuch as the Insureds virtually never present with any medical problems requiring narcotics, and – to the extent that the results of the drug screens suggest that the Insureds have any preexisting drug problems are using any illegal drugs – Dr. Strutsovskiy simply ignores the results of the screens and prescribes the Drugs anyway.

162.    To the extent that drug screens are performed at all, they either are performed pursuant to the kickback arrangements with the physicians or chiropractors who refer Insureds to the Medical Practice and RES, or else they are performed solely at the behest of Insureds who present at the Medical Practice or RES in search of narcotics, but without any genuine medical problems arising from any automobile accidents.

163.     In order to inflate their fraudulent billing for the initial drug screens, the Management Defendants, Dr. Strutsovskiy, and RES routinely fraudulently unbundle their charges for the drug screens.

164.     Specifically, in virtually every case, Dr. Strutsovskiy purports to screen for at least nine classes of drugs, such as cocaine, marijuana, opiates, amphetamines, benzodiazepines, etc.

165.     To the extent that Dr. Strutsovskiy conducts the initial drug screens in the first instance, he screens for all of these classes of drugs at the same time, using a single, multi-drug testing device. The Medical Practice and RES therefore are, at most, entitled to submit a single charge of $20.70 for each initial drug screen Dr. Strutsovskiy purports to perform, using CPT code 80104, which is the code used in billing for a multi-drug test device.

166.     In order to maximize the billing that they can submit for each initial drug screen they purport to provide, the Management Defendants, Dr. Strutsovskiy, and RES routinely submit nine separate charges of $20.70 under CPT code 80101, which is the code used in billing for a single-drug test device, resulting in a total charge of $186.21. The Defendants' use of CPT code 80101 to bill for the drug screens falsely represents that Dr. Strutsovskiy screens for each of at least nine classes of drugs using nine separate single-drug testing devices.

167.     By falsely representing that Dr. Strutsovskiy screens for each of at least nine classes of drugs using nine separate single-drug testing devices, the Management Defendants, Dr. Strutsovskiy, and RES unbundle what should be a single charge of $20.70 under CPT code 80104 into nine separate charges under CPT code 80101, totaling $186.21.

168.     Aside from the initial drug screens, Dr. Strutsovskiy frequently purports to administer follow-up drug screens to Insureds during the course of the Defendants' fraudulent

treatment and billing protocol. Dr. Strutsovskiy generally purports to administer the follow-up drug screens during the Insureds' follow-up evaluations. The Management Defendants, Dr. Strutsovskiy, and RES then bill for the follow-up drug screens through the Medical Practice or RES.

169.    Dr. Strutsovskiy purports to administer these follow-up drug screens in order to determine whether the Insureds are taking the Drugs that the Defendants prescribe and provide, and in order to determine whether the Insureds have any drug problems that would militate against the substantial amount of Drugs that the Defendants prescribe and distribute.

170.    To the extent that the follow-up drug screens suggest that the Insureds are not taking the Drugs, have preexisting drug problems, or are using any illegal drugs, Dr. Strutsovskiy generally disregards the results of the drug screens and prescribes additional Drugs anyway.

171.    Like the charges for the initial drug screens, the charges for the follow-up drug screens are fraudulent in that the drug screens are medically unnecessary, inasmuch as the Insureds virtually never present with any medical problems requiring narcotics.

172.    Furthermore, to the extent that the results of the drug screens suggest that the Insureds are not taking the Drugs, have any preexisting drug problems, are using any illegal drugs, the Defendants simply ignore the results of the screens and prescribe and distribute the Drugs anyway.

173.    As with the initial drug screens, to the extent that follow-up drug screens are performed at all, they either are performed pursuant to the kickback arrangements with the physicians or chiropractors who refer Insureds to the Medical Practice and RES, or else they are

performed solely at the behest of Insureds who present at the Medical Practice or RES in search of narcotics, but without any genuine medical problems arising from any automobile accidents.

174.    As is the case with the initial drug screens, the Management Defendants, Dr. Strutsovskiy, and RES routinely fraudulently unbundle their charges for the follow-up drug screens in order to inflate their billing. Specifically, as with the initial drug screens, the Defendants routinely submit nine separate charges for the follow-up drug screens under CPT code 80101, resulting in a total charge of $186.21, rather than a single charge of $20.70 under CPT code 80104.

**(ii)    The Drugs**

175.    Dr. Strutsovskiy prescribes a large amount of narcotics and, in many cases, benzodiazepines and other habit-forming drugs (i.e., the Drugs), to most Insureds.

176.    Dr. Strutsovskiy prescribes the Drugs to most Insureds without regard for their individual symptoms or presentment and, in fact, virtually none of the Insureds have any medical problems arising from any automobile accident that warrant narcotics or habit-forming medications, much less in the volume prescribed by Dr. Strutsovskiy. For example:

(i)    On May 22, 2009, an Insured named Patient "8" purportedly was involved in an automobile accident. Patient "8" did not present to Dr. Strutsovskiy for an "initial consultation" until September 13, 2010, more than 15 months after her alleged accident. During the initial consultation, Dr. Strutsovskiy provided Patient "8" with the Defendants' usual boilerplate list of phony diagnoses, despite the fact that she did not actually suffer any legitimate medical problems as the result of her purported 15 month-old automobile accident. Even so, over the course of four-and-a-half months following the initial consultation, Dr. Strutsovskiy prescribed, among other things, the following Drugs to Patient "8":

(a) 28 Lortab 10/500 tablets (i.e., 10 mg of hydrocodone and 500 mg of acetaminophen);

(b) 14 Opana 20 mg tablets (i.e., 20 mg of oxymorphone);

(c)  246 Soma 350 mg tablets (i.e., 350 mg of carisoprodol, a muscle relaxant that itself is a Schedule IV controlled substance and, because of its potentiating effects on narcotics, often is abused in conjunction with opioid drugs);

(d)  45 OxyContin 20 mg tablets (i.e., 20 mg of oxycodone hydrochloride);

(e)  420 Endocet 10/325 tablets (i.e., 10 mg of oxycodone hydrochloride and 325 mg of acetaminophen);

(f)  30 Lunesta 3 mg tablets (i.e., 3 mg of eszopiclone, a sedative hypnotic that is subject to abuse); and

(g)  60 MS Contin 60 mg tablets (i.e., 60 mg of morphine sulfate).

(ii)  On July 13, 2010, an Insured named Patient "15" purportedly was involved in an automobile accident. Patient "15" did not present to Dr. Strutsovskiy for an "initial consultation" until September 9, 2010, approximately two months after her alleged accident. During the initial consultation, Dr. Strutsovskiy provided Patient "15" with the Defendants' usual boilerplate list of phony diagnoses, despite the fact that she did not actually suffer any legitimate medical problems as the result of her purported two month-old automobile accident. Even so, over the course of three months following the initial consultation, Dr. Strutsovskiy prescribed, among other things, the following Drugs to Patient "15":

(a)  168 Opana 20 mg tablets (i.e., 20 mg of oxymorphone);

(b)  14 Opana 10 mg tablets (i.e., 10 mg of oxymorphone);

(c)  28 Opana 5 mg tablets (i.e., 5 mg of oxymorphone); and

(d)  336 Dilaudid 4 mg tablets (i.e., 4 mg of hydromorphone).

(iii)  On August 31, 2011, an Insured named Patient "16" purportedly was involved in an automobile accident. Patient "16" presented to Dr. Strutsovskiy for an "initial consultation" on September 1, 2011, the day after his alleged accident. During the initial consultation, Dr. Strutsovskiy provided Patient "16" with the Defendants' usual boilerplate list of phony diagnoses, despite the fact that he did not actually suffer any legitimate medical problems as the result of his automobile accident. Even so, over the course of four-and-a-half months following the initial consultation, Dr. Strutsovskiy prescribed, among other things, the following Drugs to Patient "16":

(a) 45 Tramadol 50 mg tablets (i.e., tramadol hydrochloride, a habit-forming analgesic); and

(b) 296 Lortab 7.5/500 tablets (i.e., 7.5 mg of hydrocodone and 500 mg of acetaminophen).

(iv)   On August 31, 2011, Patient "16"'s girlfriend, an Insured named Patient "17", purportedly was involved in the same automobile accident as Patient "16". Patient "17" presented to Dr. Strutsovskiy for an "initial consultation" on September 2, 2011, the day after Patient "16"'s "initial consultation" and two days after the alleged accident. During the initial consultation, Dr. Strutsovskiy provided Patient "17" with the Defendants' usual boilerplate list of phony diagnoses, despite the fact that she did not actually suffer any legitimate medical problems as the result of her automobile accident. Indeed, Patient "17" received a phony diagnosis that was virtually identical to the one provided to Patient "16". Even so, over the course of four-and-a-half months following the initial consultation, Dr. Strutsovskiy prescribed, among other things, the following Drugs to Patient "17":

(a) 392 Lortab 10/500 tablets (i.e., 10 mg of hydrocodone and 500 mg of acetaminophen); and

(b) 56 Lortab 7.5/500 tablets (i.e., 7.5 mg of hydrocodone and 500 mg of acetaminophen).

(v)   On December 14, 2010, an Insured named Patient "18" purportedly was involved in an automobile accident. Patient "18" presented to Dr. Strutsovskiy for an "initial consultation" on December 28, 2010, two weeks after his alleged accident. During the initial consultation, Dr. Strutsovskiy provided Patient "18" with the Defendants' usual boilerplate list of phony diagnoses, despite the fact that he did not actually suffer any legitimate medical problems as the result of his automobile accident. Even so, over the course of the 12 months following the initial consultation, Dr. Strutsovskiy prescribed, among other things, the following Drugs to Patient "18":

(a) 168 Lortab 7.5/500 tablets (i.e., 7.5 mg of hydrocodone and 500 mg of acetaminophen);

(b) 660 Lortab 10/500 tablets (i.e., 10 mg of hydrocodone and 500 mg of acetaminophen);

(c) 90 diazepam 5 mg tablets;

(d) 450 diazepam 10 mg tablets;

(e) 90 Tramadol 50 mg tablets (i.e., tramadol hydrochloride, a habit-forming analgesic); and

(f) 60 Nucynta 200 mg tablets (i.e., 200 mg of tapentadol, a Schedule II narcotic).

(vi)   On January 14, 2011, an Insured named Patient "19" purportedly was involved in an automobile accident. Patient "19" presented to Dr. Strutsovskiy for an "initial consultation" on February 22, 2011, five weeks after his alleged accident. During the initial consultation, Dr. Strutsovskiy provided Patient "19" with the Defendants' usual boilerplate list of phony diagnoses, despite the fact that he did not actually suffer any legitimate medical problems as the result of his automobile accident. Even so, over the course of the 12 months following the initial consultation, Dr. Strutsovskiy prescribed, among other things, 1271 Lortab 10/500 tablets (i.e., 10 mg of hydrocodone and 500 mg of acetaminophen) to Patient "19".

(vii)   On April 7, 2011, an Insured named Patient "20" purportedly was involved in an automobile accident. Patient "20" presented to Dr. Strutsovskiy for an "initial consultation" on May 11, 2011, approximately one month after his alleged accident. During the initial consultation, Dr. Strutsovskiy provided Patient "20" with the Defendants' usual boilerplate list of phony diagnoses, despite the fact that he did not actually suffer any legitimate medical problems as the result of his automobile accident. Even so, over the course of the eight months following the initial consultation, Dr. Strutsovskiy prescribed, among other things, the following Drugs to Patient "20":

(a) 60 Tramadol 50 mg tablets (i.e., tramadol hydrochloride, a habit-forming analgesic);

(b) 45 Xanax .25 mg tablets (i.e., .25 mg of alprazolam);

(c) 555 Lortab 10/500 tablets (i.e., 10 mg of hydrocodone and 500 mg of acetaminophen);

(d) 150 Lortab 7.5/500 tablets (i.e., 7.5 mg of hydrocodone and 500 mg of acetaminophen); and

(e) 10 Nucynta 100 mg tablets (i.e., 100 mg of tapentadol, a Schedule II narcotic).

(viii)   On February 14, 2009, an Insured named Patient "21" purportedly was involved in an automobile accident. Patient "21" presented to Dr. Strutsovskiy for an "initial consultation" on August 31, 2010, approximately 18 months after her alleged accident. During the initial consultation, Dr. Strutsovskiy provided Patient "21" with the Defendants' usual boilerplate list of phony diagnoses, despite the fact that

she did not actually suffer any legitimate medical problems as the result of her 18 month-old automobile accident. Even so, over the course of the 11 months following the initial consultation, Dr. Strutsovskiy prescribed, among other things, the following Drugs to Patient "21":

(a) 960 Lortab 10/500 tablets (i.e., 10 mg of hydrocodone and 500 mg of acetaminophen);

(b) 630 hydrocodone 20 mg tablets;

(c) 63 methadone 10 mg tablets; and

(d) 60 diazepam 10 mg tablets.

177.    Dr. Strutsovskiy often prescribes high-dosage, long-acting or extended release narcotics to Insureds, such as extended release Opana, MS Contin, and hydrocodone, on a "prn" or "as-needed" basis, despite the fact that the Food and Drug Administration and the manufacturers of these drugs explicitly have stated that they are not for use as "prn" or "as-needed" analgesics.

178.    Dr. Strutsovskiy prescribes large amounts of narcotics to most Insureds solely as an inducement for the Insureds to continue reporting to the Medical Practice and RES for the medically-unnecessary Fraudulent Services, and to permit the Defendants to submit additional billing for the Drugs through VascuScript.

179.    As a component of the Defendants' fraudulent treatment and billing protocol, Dr. Strutsovskiy prescribes large amounts of narcotics and other Drugs to Insureds even when the Drugs pose a clear threat to the Insureds' health and well-being, and even when the Insureds' drug screen results suggest that the Insureds are not taking the prescribed Drugs and instead are re-selling the Drugs on the street. For example:

(i)     During a July 12, 2011 examination under oath, Dr. Strutsovskiy gave testimony indicating that the "general scenario" in his treatment of Insureds is that: (a) the

Insureds arrive with no substance abuse problems; (b) he prescribes the Drugs to the Insureds; (c) during the course of "treatment" the Insureds become addicted to the Drugs and face withdrawal as a result.

(ii)     Between September 27, 2010 and November 11, 2011, Dr. Strutsovskiy subjected an Insured named Patient "9" to the Defendants' usual fraudulent treatment protocol, including the prescription and distribution of the Drugs. During the course of the "treatment", Patient "9" became pregnant. The pregnancy was high risk because Patient "9" developed placenta previa, a complication of pregnancy in which the placenta grows in the lowest part of the womb (uterus) and covers all or part of the opening to the cervix. During his July 12, 2011 examination under oath, Dr. Strutsovskiy gave testimony indicating that: (a) he continued to provide Patient "9" with the Drugs, even after he became aware of her high-risk pregnancy; (b) Patient "9" became addicted to the Drugs during the course of "treatment" Dr. Strutsovskiy provided; (c) Dr. Strutsovskiy did not attempt to wean Patient "9" off of the Drugs after becoming aware of her high-risk pregnancy; and (d) Dr. Strutsovskiy could not recall whether he ever spoke with Patient "9"'s OB/GYN with respect to the "treatment" and Drugs he was prescribing to her. During his July 12, 2011 examination under oath, Dr. Strutsovskiy also testified that the Lortab he was prescribing to Patient "9" is in pregnancy category "B" and is not harmful, when – in actuality – the Lortab is in pregnancy category "C" and studies indicate that it poses a threat to the fetus.

(iii)    During the 11-month course of "treatment" that Dr. Strutsovskiy allegedly provided to Insured Patient "21", Patient "21"'s drug screens repeatedly indicated that she abused illegal drugs, yet Dr. Strutsovskiy continued to prescribe narcotics to her at a staggering rate. For instance, although Patient "21" tested positive for cocaine, marijuana, and methadone (not methadone prescribed by Dr. Strutsovskiy) during an April 26, 2011 drug screen administered by Dr. Strutsovskiy, he nonetheless prescribed her 120 Lortab 10/500 tablets and 90 hydrocodone 20 mg tablets during that same April 26, 2011 office visit. Less than one month later, on May 24, 2011, Patient "21" again tested positive for cocaine, marijuana, and methadone (not methadone prescribed by Dr. Strutsovskiy) during a drug screen administered by Dr. Strutsovskiy. Even so, Dr. Strutsovskiy prescribed Patient "21" an additional 120 Lortab 10/500 tablets and 90 hydrocodone 20 mg tablets during that same May 24, 2011 office visit. Though Patient "21" clearly had a drug problem, Dr. Strutsovskiy prescribed her an additional 120 Lortab 10/500 tablets and 90 hydrocodone 20 mg tablets, as well as 60 diazepam 10 mg tablets, during a subsequent June 24, 2011 office visit. During the June 24, 2011 office visit, Dr. Strutsovskiy did not perform a drug screen at all, in order to conceal the fact that he was continuing to prescribe large amounts of medically-unnecessary narcotics to an apparent drug abuser.

(iv)     During the 12-month course of "treatment" that Dr. Strutsovskiy allegedly provided to Insured Patient "18", Patient "18"'s drug screens repeatedly suggested that he abused illegal drugs and suggested that he was re-selling some of the drugs prescribed to him, yet Dr. Strutsovskiy continued to prescribe narcotics to him. For instance, Patient "18" tested positive for marijuana during a January 12, 2011 drug screen administered by Dr. Strutsovskiy, but negative for the diazepam Dr. Strutsovskiy had prescribed to him. Even so, Dr. Strutsovskiy prescribed additional diazepam to Patient "18", as well as additional narcotics, during the same January 12, 2011 office visit. During his subsequent February 11, 2011 office visit, Patient "18" again tested positive for marijuana and negative for the diazepam Dr. Strutsovskiy had prescribed. Even so, Dr. Strutsovskiy prescribed additional narcotics to Patient "18" during this office visit.

(v)      During the course of "treatment" that Dr. Strutsovskiy allegedly provided to an Insured named Patient "22", Patient "22"'s drug screens repeatedly suggested that she abused illegal drugs and was re-selling some of the Drugs prescribed to her, yet Dr. Strutsovskiy continued to prescribe narcotics to her at a staggering rate. For instance, Patient "22" tested positive for marijuana in a drug screen report that Dr. Strutsovskiy received on about January 14, 2011, and negative for the Lortab and Soma that Dr. Strutsovskiy had prescribed to her. Even so, Dr. Strutsovskiy prescribed additional Lortab to Patient "22" during a January 20, 2011 office visit, and made no mention of the January 14, 2011 drug screen results in his report of the visit. Patient "22" again tested negative for the Lortab that Dr. Strutsovskiy prescribed in a drug screen report that Dr. Strutsovskiy received on about April 11, 2011.

(vi)     During a July 12, 2011 examination under oath, Dr. Strutsovskiy gave testimony indicating that an Insured named Patient "13" presented at his office seeking a refill on a narcotics prescription Dr. Strutsovskiy previously had provided. When Patient "13" refused to take a drug screen, Dr. Strutsovskiy testified that he wrote out a prescription anyway, and left it on his secretary's desk with instructions to give it to Patient "13" when and if he took a drug screen that satisfied Dr. Strutsovskiy. According to Dr. Strutsovskiy, the secretary left her desk for a moment, and Patient "13" absconded with the prescription. Dr. Strutsovskiy testified that, as a result of this behavior, he terminated his relationship with Patient "13". Though Dr. Strutsovskiy testified during the July 12, 2011 examination under oath that he had terminated his relationship with Patient "13", in actuality Dr. Strutsovskiy continued to "treat" Patient "13" and continued to write narcotics prescriptions for Patient "13" through at least November 2011.

180.    Upon information and belief, in most cases Dr. Strutsovskiy prescribes the medically-unnecessary Drugs to Insureds with the understanding that they will fill the prescriptions at VascuScript.

181.    VascuScript, and its owners – Hirsch, Trzewieczynski, and Andrus – know that the Drugs prescribed by Dr. Strutsovskiy are medically-unnecessary, and know that Dr. Strutsovskiy prescribes the drugs in order to induce Insureds to continue reporting to the Medical Practice and RES for medically-unnecessary treatments.

182.    Even so, VascuScript, Hirsch, Trzewieczynski, and Andrus fill Dr. Strutsovskiy's prescriptions for the Drugs because they profit from the prescriptions and wish to enable Hirsch and VascuFlo to continue profiting from the Fraudulent Services.

**4.      The Fraudulent Prolotherapy Injections**

183.    Based on the phony, boilerplate diagnoses provided to virtually every Insured during the initial consultations and follow-up evaluations, the Management Defendants, RES and Dr. Strutsovskiy subject most Insureds to a medically-useless series of prolotherapy injections, which they bill to GEICO and other insurers through the Medical Practice or RES.

184.    In most cases, the Defendants incentivize the Insureds to participate in the medically-unnecessary prolotherapy sessions by promising to prescribe additional Drugs to the Insureds.

185.    Prolotherapy, also known as "proliferation therapy", "regenerative injection therapy", or "proliferative injection therapy", involves injecting an otherwise non-pharmacological and non-active irritant solution into the body, generally in the region of tendons

or ligaments, for the purpose of strengthening weakened connective tissue and alleviating musculoskeletal pain.

186.    Legitimate peer-reviewed literature does not substantiate the value of prolotherapy and, indeed, prolotherapy injections have not been proven to be any more effective than placebo injections.

187.    The Centers for Medicare & Medicaid Services have determined that the medical effectiveness of prolotherapy has not been verified by scientifically controlled studies, and that reimbursement for prolotherapy should be denied on the ground that it is not reasonable and necessary.

188.    The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") lists prolotherapy among its unproven drugs, devices or medical treatment or procedures that are excluded from CHAMPUS benefits. See 32 C.F.R. 199.4.

189.    The charges for prolotherapy are fraudulent in that the prolotherapy allegedly performed by Dr. Strutsovskiy through the Medical Practice and RES is medically-useless, and is performed – to the extent that it is performed at all – pursuant to a pre-determined fraudulent protocol designed to maximize the billing that the Management Defendants, Dr. Strutsovskiy, and RES can submit or cause to be submitted to GEICO, not to benefit the Insureds who are subjected to it.

190.    Even if there were some medical use for the prolotherapy injections that Dr. Strutsovskiy purports to administer, the specific prolotherapy injection sites should vary from Insured-to-Insured, depending on each Insured's individual symptoms and presentment. Even if every patient in a discrete cohort presents with some cervical or lumbar back pain arising from an

automobile accident, the specific injection locations in the cervical or lumbar spine should vary to some degree amongst the patients, inasmuch as it is extremely unlikely that every patient within the cohort will present with pain arising from the exact same tendon or ligament areas.

191.    Dr. Strutsovskiy does not tailor the medically-useless prolotherapy injections to any Insured's discrete symptoms or presentment. Rather, pursuant to the Defendants' fraudulent treatment protocol, Dr. Strutsovskiy purports to administer prolotherapy injections to the same parts of virtually every Insured's body.

192.    Specifically, the Management Defendants, Dr. Strutsovskiy, and RES specify the following cervical spine injection sites in virtually every report that they generate in support of their billing for Dr. Strutsovskiy's cervical spine prolotherapy injections:

(i)      "Perifacet area of transverse process of Vertebrae … C2 … to … C7 bilaterally";

(ii)     "Tip of transverse process of vertebrae C2 … to … C5 bilaterally";

(iii)    "Inter and intraspinous ligaments at the level C2-C7";

(iv)     "Lesser and greater occipital line along the occipital protuberance"; and

(v)      "Mastoid processes bilaterally".

Representative examples of cervical spine prolotherapy reports identifying these identical injection sites for each Insured are annexed hereto as Exhibit "H".

193.    Likewise, the Management Defendants, Dr. Strutsovskiy, and RES specify the following lumbar spine injection sites in virtually every report that they generate in support of their billing for Dr. Strutsovskiy's lumbar spine prolotherapy injections:

(i)      "Perifacet area of transverse process of Vertebrae … L3 … to … L5 …";

(ii)     "Tip of transverse process of vertebrae L3 … to … L5";

(iii)      "SI joint at Hackett points A,B,C,D";

(iv)     "Tip and inferior pole of PSIS";

(v)      "Lateral border of the sacrum";

(vi)     "Superior Borders of the Iliac Crest … at attachment Of Gluteus Maximums [sic]";

(vii)    "Iliac Fossa attachment of the Gluteus Medius";

(viii)   "Ilio-lumbar Ligament"; and

(ix)     "Inter and Intra-spinous Ligaments L3 … to … S1 …"

Representative examples of lumbar spine prolotherapy reports identifying these identical injection sites for each Insured are annexed hereto as Exhibit "I".

194.    In keeping with the fact that prolotherapy is medically unnecessary, there is no CPT code for prolotherapy.

195.    Pursuant to the Fee Schedule, because there is no CPT code for prolotherapy, a healthcare provider seeking to bill for prolotherapy must, among other things, submit its charges under CPT code 20999, which is the CPT code for unlisted musculoskeletal procedures, and provide a complete description of the procedure.

196.    In an attempt to fraudulently conceal the fact that Dr. Strutsovskiy is purporting to administer medically-useless prolotherapy injections to Insureds, the Management Defendants, Dr. Strutsovskiy, and RES never submit their prolotherapy charges under CPT code 20999, and never identify the prolotherapy injections as prolotherapy in the billing they submit to GEICO.

197.    Instead, in most cases the Management Defendants, Dr. Strutsovskiy, and RES submit their prolotherapy billing as multiple charges under CPT code 20551, which is the CPT code for injections to a single tendon origin/insertion site.

198.     The use of CPT code 20551 to bill for the medically-useless prolotherapy that Dr. Strutsovskiy purports to perform constitutes a deliberate misrepresentation of the nature of the service.

199.     In most cases, the multiple charges under CPT code 20551 result in a charge to GEICO of between approximately $324.00 and $405.00 per Insured for each medically-useless prolotherapy session that Dr. Strutsovskiy purports to perform.

200.     In many cases, the Management Defendants, Dr. Strutsovskiy, and RES unbundle their prolotherapy billing by submitting separate charges for the prolotherapy under CPT codes 20600 or 20610, in addition to their charges under CPT code 20551.

201.     CPT codes 20600 or 20610 are the codes used for arthrocentesis, joint aspiration and/or injection, and the Defendants' use of these codes to bill for prolotherapy – like their use of CPT code 20551 – constitutes a deliberate misrepresentation of the nature of the service and an attempt to conceal the fact that Dr. Strutsovskiy is performing medically-useless prolotherapy.

202.     The Management Defendants', Dr. Strutsovskiy's, and RES's use of CPT codes 20600 or 20610 to unbundle their prolotherapy billing typically increases their charges for each prolotherapy session by between $46.00 and $92.00 per session.

203.     To further increase the fraudulent billing that they can submit for each medically-unnecessary prolotherapy session, the Management Defendants, Dr. Strutsovskiy, and RES routinely submit a separate charge of $211.32, under CPT code 76942, for "ultrasound guidance" of the prolotherapy injections.

204.     The charges for "ultrasound guidance" of the prolotherapy injections are fraudulent inasmuch as, like the underlying prolotherapy itself, the ultrasound guidance is not

medically necessary and is performed – to the extent that it is performed at all – pursuant to a pre-determined fraudulent protocol designed to maximize the Defendants' billing rather than to treat the Insureds who supposedly are subjected to it.

205.    The charges for "ultrasound guidance" of the prolotherapy injections also are fraudulent in that they misrepresent the nature and extent of the service that allegedly is performed. Specifically, the use of CPT code 76942 to bill for the "ultrasound guidance" represents that Dr. Strutsovskiy obtained permanent recorded images of the site to be localized, and maintained a thorough, documented description of the localization process either separately or within the report of the underlying procedure.

206.    Though the Management Defendants, Dr. Strutsovskiy, and RES routinely bill for "ultrasound guidance" of Dr. Strutsovskiy's prolotherapy injections under CPT code 76942, in most cases Dr. Strutsovskiy does not obtain permanent recorded images of the site to be localized to support the charges under CPT code 76942, and does not maintain a thorough, documented description of the localization process either separately or within the prolotherapy reports.

**5.        The Fraudulent Trigger Point and Anti-Inflammatory Injections**

207.    In addition to the medically-useless prolotherapy injections, the Management Defendants, Dr. Strutsovskiy, and RES subject some Insureds to a series of medically-unnecessary trigger point and joint injections. The Management Defendants, Dr. Strutsovskiy, and RES then bill GEICO and other insurers for the injections through the Medical Practice or RES.

208.    Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than

that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

209.    Trigger point injections typically involve injections of local anesthetic medication and/or steroids into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

210.    Steroid injections also may be warranted where a patient's pain arises from joint or tendon inflammation or irritation, as opposed to trigger points. In such instances, a steroid injection directly into an inflamed or irritated joint or around a tendon may reduce the inflammation and improve joint function.

211.     Any legitimate trigger point or inflamed joint or tendon treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

212.    In a legitimate trigger point, inflamed joint or inflamed tendon treatment, injections should not be administered until a patient has pain symptoms that have persisted for more than three months and has failed or been intolerant of conservative therapies for at least one month.

213.    The charges for trigger point and anti-inflammatory injections are fraudulent in that the injections allegedly performed by Dr. Strutsovskiy through the Medical Practice and RES are medically-useless, and are administered – to the extent that they are administered at all – pursuant to a pre-determined fraudulent protocol designed to maximize the billing that the

Defendants can submit or cause to be submitted to GEICO, not to benefit the Insureds who are subjected to them.

214.    The Insureds who report to Dr. Strutsovskiy for the purported trigger point and anti-inflammatory injections do not actually have any medical problems that can be attributed to any automobile accident, much less any trigger points or inflammation.

215.    Rather, in most cases, the Insureds who report to Dr. Strutsovskiy for the purported injections are incentivized to do so by the large amounts of Drugs prescribed and distributed to them by the Defendants. For example:

(i)     On December 8, 2010, Dr. Strutsovskiy prescribed – among other things – 56 Lortab 10/500 tablets, 42 Soma 350 mg tablets, and 42 Xanax .5 mg tablets to Insured Patient "22". Nine days later, on December 17, 2010, Dr. Strutsovskiy purported to administer trigger point injections to Patient "22". Even though Dr. Strutsovskiy had prescribed 56 Lortab tablets and 42 Soma tablets to Patient "22" only nine days earlier, Dr. Strutsovskiy gave Patient "22" fresh prescriptions for an additional 56 Lortab tablets and 42 Soma tablets on December 17, 2010, the day when he purported to administer the trigger point injections. Two weeks thereafter, on December 31, 2010, Dr. Strutsovskiy gave Patient "22" prescriptions for an additional 56 Lortab tablets, 42 Soma tablets, and 21 Xanax tablets.

(ii)    On December 14, 2010, Dr. Strutsovskiy prescribed 42 Opana 20 mg tablets and 84 Dilaudid 2 mg tablets to Insured Patient "15". Two weeks later, on December 28, 2010, Dr. Strutsovskiy purported to administer trigger point injections to Patient "15". Even though Dr. Strutsovskiy had prescribed 42 Opana tablets and 84 Dilaudid tablets to Patient "15" only two weeks earlier, Dr. Strutsovskiy gave Patient "15" a fresh prescription for an additional 84 Dilaudid tablets on December 28, 2010, the day when he purported to administer the trigger point injections.

216.    Dr. Strutsovskiy typically does not wait until any Insured has failed conservative therapies before attempting to provide trigger point or anti-inflammatory injections, because conservative therapy is not sufficiently remunerative and therefore is not part of the Defendants' fraudulent treatment and billing protocol.

217.    Instead, Dr. Strutsovskiy virtually always offers trigger point and anti-inflammatory injections to the Insureds during his first interaction with the Insureds, at the initial consultations, and during every follow-up evaluation, without regard for any Insured's discrete symptoms or presentment.

218.    When an Insured agrees to receive the trigger point or anti-inflammatory injections, Dr. Strutsovskiy routinely purports to identify and administer injections to multiple trigger points, inflamed tendons, or inflamed joints despite the fact that the Insureds virtually never have any actual trigger points or inflammation arising from any automobile accident.

219.    Dr. Strutsovskiy purports to identify and administer injections to multiple trigger points, inflamed tendons, or inflamed joints in order to maximize the fraudulent billing that the Management Defendants, Dr. Strutsovskiy, and RES can submit, or cause to be submitted, for each set of injections. Pursuant to Dr. Strutsovskiy's fraudulent diagnoses and medically-unnecessary injections, the Management Defendants, Dr. Strutsovskiy, and RES typically submit charges of at least $324.00, and often more than $480.00, for each set of injections that Dr. Strutsovskiy purports to administer, using CPT code 20553 or CPT code 20551.

**6.      The Fraudulent Electrodiagnostic Testing**

220.    Pursuant to the fraudulent, boilerplate diagnoses that Dr. Strutsovskiy provides during the initial consultations and follow-up evaluations, the Management Defendants, Dr. Strutsovskiy, and RES subject many Insureds to medically unnecessary electromyography ("EMG") tests and nerve conduction velocity ("NCV") tests (collectively, "electrodiagnostic" or "EDX" testing). Then, the Management Defendants, Dr. Strutsovskiy, and RES bill GEICO and other insurers for the EDX tests through the Medical Practice or RES.

### (i)       The Human Nervous System and Electrodiagnostic Testing

221.    The human nervous system is composed of the brain, spinal cord and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

222.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  Peripheral nerves consist of both sensory and motor nerves.  They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs. The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

223.    EMGs and NCVs both are forms of electrodiagnostic tests, and purportedly are provided by the Management Defendants, Dr. Strutsovskiy, and RES through Dr. Strutsovskiy because they are medically necessary to determine whether the Insureds have radiculopathies.

### (ii)      The Fraudulent NCVs

224.    NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or

"firing", of the nerve is measured and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance (the "conduction velocity"). In addition, the EMG machine displays the changes in amplitude over time as a "waveform". The amplitude, latency, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

225.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCVs. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCVs.

226.    H-reflex studies are an additional type of NCV tests that may be conducted in addition to the sensory and motor nerve NCV studies. H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

227.    Though the Management Defendants, Dr. Strutsovskiy, and RES purport to provide NCVs to Insureds in order to determine whether the Insureds suffer from radiculopathies, virtually none of the Insureds actually present with any radiculopathy symptoms or any other medical problems arising from any automobile accidents. In actuality, the Management Defendants, Dr. Strutsovskiy, and RES provide NCVs to Insureds pursuant as part of their pre-

determined, fraudulent treatment protocol designed to maximize the billing that they can submit for each Insured.

228.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of EDX medicine in the diagnosis of various forms of neuropathies, including radiculopathies. (A copy of the Recommended Policy is annexed hereto as Exhibit "J"). The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

229.    According to the Recommended Policy, the maximum number of NCVs necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCVs of three motor nerves; (ii) NCVs of two sensory nerves; and (iii) two H-reflex studies.

230.    However, in an attempt to extract the maximum billing out of each Insured who receives NCVs, the Management Defendants, Dr. Strutsovskiy, and RES routinely purport to perform and provide: (i) NCVs of at least four, and often as many as eight, motor nerves; and (ii) NCVs of at least four, and often as many as nine, sensory nerves. The Management Defendants, Dr. Strutsovskiy, and RES also typically purport to perform and provide at least one H-reflex study on each Insured who purportedly receives an NCV.

231.    The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve

must be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCVs are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCVs should vary from patient-to-patient.

232.    Dr. Strutsovskiy does not tailor the NCVs he purports to perform to the unique circumstances of each individual Insured. Instead, he applies a fraudulent "protocol" and purports to perform NCVs on the same peripheral nerves and nerve fibers for virtually every Insured that receives NCVs. Specifically, Dr. Strutsovskiy purports to test some combination of the following peripheral nerves and nerve fibers – and, in many cases, all of them – on virtually every Insured who receives NCVs:

(i)      left and right superficial peroneal sensory nerves;

(ii)     left and right sural sensory nerves;

(iii)    left and right median sensory nerves;

(iv)    left and right radial sensory nerves;

(v)     left and right ulnar sensory nerves;

(vi)    left and right median motor nerves;

(vii)   left and right ulnar motor nerves;

(viii)  left and right peroneal motor nerves; and

(ix)    left and right tibial motor nerves.

233.    The cookie-cutter approach to the NCVs that the Management Defendants, Dr. Strutsovkiy, and RES purport to provide to Insureds clearly is not based on medical necessity.

Instead, the cookie-cutter approach to the NCVs is designed solely to maximize the charges that the Management Defendants, Dr. Strutsovkiy, and RES can submit to GEICO and other insurers, and to maximize ill-gotten profits for the Defendants.

234.    Assuming that all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare providers in the Buffalo, New York area to submit maximum charges of: (i) $133.96 for each motor nerve in any limb on which an NCV is performed, under CPT code 95903; and (ii) $85.68 for each sensory nerve in any limb on which an NCV is performed, under CPT code 95904. The Management Defendants, Dr. Strutsovkiy, and RES routinely purport to provide and perform NCVs on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that can be submitted to GEICO and other insurers.

235.    In an attempt to conceal the fact that Dr. Strutsovskiy purports to perform NCVs on far more nerves than recommended by the Recommended Policy, the Management Defendants, Dr. Strutsovkiy, and RES routinely purport to provide and perform NCVs for a given Insured on two separate dates. Then, the Management Defendants, Dr. Strutsovkiy, and RES split their charges for the NCVs onto two separate bills, so as to reduce the number of NCV charges on any one bill, and hide the fact that they are exceeding the Recommended Policy by an order of magnitude. For instance:

(i)      On March 5, 2011, Dr. Strutsovskiy purported to perform NCVs on five sensory nerves and five motor nerves for an Insured named Patient "23". One week later, on March 12, 2011, Dr. Strutsovskiy purported to perform NCVs on an additional four sensory nerves and four motor nerves for Patient "23". Dr. Strutsovskiy purported to perform these NCVs on two separate dates, and the Defendants split the charges for these NCVs onto two separate bills, solely in order to conceal the fact that the number of NCVs that the Defendants allegedly provided to Patient "23" exceeded the Recommended Policy.

(ii)     On April 16, 2011, Dr. Strutsovskiy purported to perform NCVs on four sensory nerves and four motor nerves for an Insured named Patient "11". Less than one week later, on April 21, 2011, Dr. Strutsovskiy purported to perform NCVs on an additional five sensory nerves and four motor nerves for Patient "11". Dr. Strutsovskiy purported to perform these NCVs on two separate dates, and the Defendants split the charges for these NCVs onto two separate bills, solely in order to conceal the fact that the number of NCVs that the Defendants allegedly provided to Patient "11" exceeded the Recommended Policy.

(iii)    On June 30, 2011, Dr. Strutsovskiy purported to perform NCVs on five sensory nerves and four motor nerves for an Insured named Patient "24". Three weeks later, on July 21, 2011, Dr. Strutsovskiy purported to perform NCVs on an additional four sensory nerves and four motor nerves for Patient "24". Dr. Strutsovskiy purported to perform these NCVs on two separate dates, and the Defendants split the charges for these NCVs onto two separate bills, solely in order to conceal the fact that the number of NCVs that the Defendants allegedly provided to Patient "24" exceeded the Recommended Policy.

(iv)     On September 22, 2011, Dr. Strutsovskiy purported to perform NCVs on five sensory nerves and four motor nerves for an Insured named Patient "25". Three weeks later, on October 13, 2011, Dr. Strutsovskiy purported to perform NCVs on an additional four sensory nerves and four motor nerves for Patient "25". Dr. Strutsovskiy purported to perform these NCVs on two separate dates, and the Defendants split the charges for these NCVs onto two separate bills, solely in order to conceal the fact that the number of NCVs that the Defendants allegedly provided to Patient "25" exceeded the Recommended Policy.

(v)      On October 13, 2011, Dr. Strutsovskiy purported to perform NCVs on five sensory nerves and four motor nerves for an Insured named Patient "16". Three weeks later, on November 3, 2011, Dr. Strutsovskiy purported to perform NCVs on an additional four sensory nerves and four motor nerves for Patient "16". Dr. Strutsovskiy purported to perform these NCVs on two separate dates, and the Defendants split the charges for these NCVs onto two separate bills, solely in order to conceal the fact that the number of NCVs that the Defendants allegedly provided to Patient "16" exceeded the Recommended Policy.

(vi)     On December 15, 2011, Dr. Strutsovskiy purported to perform NCVs on five sensory nerves and four motor nerves for an Insured named Patient "26". Two weeks later, on December 29, 2011, Dr. Strutsovskiy purported to perform NCVs on an additional four sensory nerves and four motor nerves for Patient "26". Dr. Strutsovskiy purported to perform these NCVs on two separate dates, and the Defendants split the charges for these NCVs onto two separate bills, solely in

order to conceal the fact that the number of NCVs that the Defendants allegedly provided to Patient "26" exceeded the Recommended Policy.

(vi)    On January 12, 2012, Dr. Strutsovskiy purported to perform NCVs on five sensory nerves and four motor nerves for an Insured named Patient "27". One weeks later, on January 19, 2012, Dr. Strutsovskiy purported to perform NCVs on an additional four sensory nerves and four motor nerves for Patient "27". Dr. Strutsovskiy purported to perform these NCVs on two separate dates, and the Defendants split the charges for these NCVs onto two separate bills, solely in order to conceal the fact that the number of NCVs that the Defendants allegedly provided to Patient "27" exceeded the Recommended Policy.

236.    For each Insured that receives medically useless NCVs from the Management Defendants, Dr. Strutsovkiy, and RES, the Defendants typically bill GEICO at least $1,000.00, and often more than $2,000.00.

**(iii)    The Fraudulent EMGs**

237.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

238.    Though the Management Defendants, Dr. Strutsovkiy, and RES purport to provide EMGs to Insureds in order to determine whether the Insureds suffer from radiculopathies, virtually none of the Insureds actually present with any radiculopathy symptoms or any other medical problems arising from any automobile accidents. In actuality, the Management Defendants, Dr. Strutsovkiy, and RES provide EMGs to Insureds as part of their pre-determined, fraudulent treatment protocol designed to maximize the billing that they can submit for each Insured.

239.     There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

240.     Dr. Strutsovskiy does not tailor the performance of EMGs to the unique circumstances of each patient. Instead, he routinely tests the same muscles in the same limbs over and over again, without regard for individual patient presentment.

241.     The Management Defendants', Dr. Strutsovkiy's, and RES's cookie-cutter approach to the EMGs that they purport to provide to Insureds clearly is not tailored to the unique circumstances of any Insured and is not based upon medical necessity. Rather, the Defendants' cookie-cutter approach to the EMGs is designed solely to maximize the charges that the Defendants can submit to GEICO and other insurers.

242.     Furthermore, the Recommended Policy states that the maximum number of EMGs necessary to diagnose a radiculopathy in 90 percent of all patients is EMGs of two limbs.

243.     Even if there were any need for any of the EMGs that the Management Defendants, Dr. Strutsovkiy, and RES purport to provide, the nature and number of the EMGs that the Management Defendants, Dr. Strutsovkiy, and RES generally purport to provide and perform grossly exceeds the maximum number of such tests – i.e., EMGs of two limbs – that should be necessary in at least 90 percent of all patients with a suspected diagnosis of

radiculopathy. Typically, the Management Defendants, Dr. Strutsovkiy, and RES purport to provide EMGs of four limbs, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they can submit to GEICO and other insurers.

244.    More specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare professionals in the Buffalo, New York area to submit maximum EMG charges of: (i) $149.46 if an EMG is performed on at least five muscles of one limb; (ii) $194.34 if an EMG is performed on at least five muscles in each of two limbs; (iii) $252.96 if an EMG is performed on at least five muscles in each of three limbs; and (iv) $328.84 if an EMG is performed on at least five muscles in each of four limbs.

245.    Not only do the Management Defendants, Dr. Strutsovkiy, and RES routinely purport to provide four-limb EMGs to Insureds, they frequently unbundle their billing into two separate two-limb EMG charges of $194.34 per Insured, rather than a single four-limb EMG charge of $328.84. The Defendants then submit the separate two-limb EMG charges on two separate bills, in order to maximize their fraudulent EMG billing and conceal the fact that they are providing four-limb EMGs to Insureds in contravention of the Recommended Policy.

246.    Thus, instead of charging $328.84 per Insured for a single, medically-useless four-limb EMG, the Management Defendants, Dr. Strutsovkiy, and RES routinely submit $388.68 for two medically-useless two-limb EMGs, resulting in an overcharge of almost $60.00 for each Insured who purportedly receives the medically-unnecessary EMGs.

**(iv)    The Fraudulent Radiculopathy Diagnoses**

247.    Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009

study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in <u>Muscle & Nerve</u>, the official journal of the AANEM.

248.     Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds Dr. Strutsovskiy purportedly treats. As a result, the frequency of radiculopathy in <u>all</u> motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is likely to be significantly lower than 19 percent.

249.     Virtually none of the Insureds whom Dr. Strutsovskiy purports to treat suffer any serious medical problems as the result of any automobile accident, much less any radiculopathy.

250.     Even so, Dr. Strutsovskiy purports to diagnose radiculopathies in the majority of the Insureds that receive EDX testing from the Defendants.

251.     Dr. Strutsovskiy purports to arrive at his pre-determined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services and Drugs provided through the Defendants.

## III.     The Fraudulent HCFA-1500 Forms Submitted to GEICO

252.     To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits (<u>i.e.</u>, HCFA-1500 forms) consistently have been submitted to GEICO by and on behalf of the Defendants seeking payment for Fraudulent Services and Drugs for which the Defendants are ineligible to receive payment.

253.    The HCFA-1500 forms submitted to GEICO by and on behalf of the Defendants

are false and misleading in the following material respects:

(i)     The HFCA-1500 forms submitted through RES uniformly misrepresent to GEICO
        that RES is lawfully licensed, and therefore, eligible to receive No-Fault Benefits
        pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).   In
        fact, RES is not properly licensed in that it is a medical professional corporation
        that was fraudulently incorporated and has been owned and controlled by
        unlicensed non-physicians.

(ii)    The HCFA-1500 forms submitted through RES and the Medical Practice
        uniformly misrepresent to GEICO that RES, Dr. Strutsovskiy, and the Medical
        Practice are in compliance with all material licensing laws and, therefore, are
        eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and
        11 N.Y.C.R.R. § 65-3.16(a)(12).   In fact, RES, Dr. Strutsovskiy, and the Medical
        Practice are not in compliance with all material licensing laws in that they engage
        in unlawful fee-splitting with unlicensed non-physicians.

(iii)   The HCFA-1500 forms submitted through RES and the Medical Practice
        uniformly misrepresent to GEICO that the Fraudulent Services actually are
        performed, and that the Fraudulent Services are medically necessary. In fact, the
        Fraudulent Services frequently are not performed at all and, to the extent that they
        are performed, they are not medically necessary and are performed as part of a
        pre-determined fraudulent protocol designed solely to financially enrich the
        Defendants.

(v)     The HCFA-1500 forms submitted through VascuScript for the Drugs deliberately
        omit any reference to the fact that Hirsch, one of VascuScript's owners, has a
        secret and unlawful ownership interest in RES and the Medical Practice, through
        which the Drugs are prescribed, and deliberately omit any reference to the fact that
        the Defendants knowingly cause Dr. Strutsovskiy to prescribe the Drugs and then
        distribute the Drugs through VascuScript as part of a pre-determined fraudulent
        protocol designed solely to financially enrich the Defendants.

**IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

254.    The Defendants legally and ethically are obligated to act honestly and with

integrity in connection with the billing that they submit, or cause to be submitted, to GEICO.

255.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services and Drugs, the Defendants systemically have concealed their fraud and have gone to great lengths to accomplish this concealment.

256.    Specifically, the Defendants knowingly have misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services and Drugs are medically unnecessary and are performed and provided pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly are subjected to them.

257.    Furthermore, the Defendants knowingly have misrepresented and concealed facts related to RES and the Medical Practice in an effort to prevent discovery that RES is unlawfully incorporated, owned and controlled by non-physicians, that RES and the Medical Practice engage in fee splitting, and that RES and the Medical Practice therefore are ineligible to bill for or collect No-Fault Benefits. For example, the Defendants misrepresented Dr. Strutsovskiy's ownership of and control over RES in filings with the New York State Department of Education, so as to induce the New York State Department of Education to issue the license required to permit medicine to be practiced through RES. Additionally, the Management Defendants entered into complex financial arrangements with Dr. Strutsovskiy, RES, and the Medical Practice that were designed to, and did, conceal their true ownership of and control over RES and the Medical Practice.

258.    What is more, the Defendants split their billing for the Fraudulent Services across the Medical Practice and RES, two ostensibly different businesses with different tax identification numbers, in order to reduce the amount of billing submitted under any single tax

identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

259.     The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

260.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $300,000.00 dollars based upon the fraudulent charges representing payments made by GEICO to the Defendants.

261.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Dr. Strutsovskiy, RES, and VascuScript**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

262.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 261 above.

263.    There is an actual case in controversy between GEICO, Dr. Strutsovskiy, RES, and VascuScript regarding more than $405,000.00 in billing for Fraudulent Services and Drugs that has been submitted to GEICO.

264.    RES has no right to receive payment on any pending bills submitted to GEICO because it is fraudulently incorporated, owned and controlled by non-physicians and, therefore, is ineligible to seek or recover No-Fault Benefits.

265.    RES and Dr. Strutsovskiy have no right to receive payment on any pending bills submitted to GEICO because they engage in unlawful fee-splitting with non-physicians and, therefore, are not in compliance with material licensing laws and may not seek or recover No-Fault Benefits.

266.    RES, Dr. Strutsovskiy, and VascuScript have no right to receive payment on any pending bills submitted to GEICO because the Fraudulent Services and Drugs are not medically necessary and have been provided – to the extent that they have been provided at all – pursuant to a pre-determined, fraudulent treatment and billing protocol designed to financially enrich the Defendants rather than to benefit the Insureds that have been subjected to it.

267.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     RES has no right to receive payment on any pending bills submitted to GEICO because RES is fraudulently incorporated, owned and controlled by non-physicians and, therefore, is ineligible to bill for or to collect No-Fault Benefits;

(ii)    RES and Dr. Strutsovskiy have no right to receive payment on any pending bills submitted to GEICO because Dr. Strutsovskiy and RES engage in unlawful fee-splitting with non-physicians and, therefore, are ineligible to bill for or to collect No-Fault Benefits; and

(iii)   RES, Dr. Strutsovskiy, and VascuScript have no right to receive payment on any pending bills submitted to GEICO because the Fraudulent Services and Drugs are not medically necessary, and have been provided – to the extent that they have been provided at all – pursuant to pre-determined, fraudulent protocols solely designed to financially benefit the Defendants, rather than to treat the Insureds who supposedly are subjected to them.

## SECOND CAUSE OF ACTION
### Against Dr. Strutsovskiy and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

268.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 267 above.

269.    RES Physical Medicine & Rehabilitation Services, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

270.    Dr. Strutsovskiy, Hirsch, and VascuFlo knowingly have conducted and/or participated, directly or indirectly, in the conduct of RES's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for approximately one year seeking payments that RES is not eligible to receive under the No-Fault Laws because: (i) it is unlawfully incorporated and owned and controlled by non-physicians; (ii) it engages in fee-splitting with

non-physicians; (iii) the billed-for services are not medically necessary, are performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, and in many cases are not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint is described, in part, in the chart annexed hereto as Exhibit "K".

271.    RES's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Strutsovskiy, Hirsch, and VascuFlo have operated RES, insofar as RES never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for RES to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit billing through RES and attempt collection on the fraudulent billing submitted through RES to the present day. The Defendants' use of the Drugs to incentivize Insureds to report for treatment likewise implies a threat of continued criminal activity.

272.    RES is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. RES likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other

insurers. These inherently unlawful acts are taken by RES in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

273.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $154,000.00 pursuant to the fraudulent bills submitted by the Defendants through RES.

274.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Dr. Strutsovskiy, the Management Defendants, Trzewieczynski, Andrus, and VascuScript
### (Violation of RICO, 18 U.S.C. § 1962(d))

275.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 274 above.

276.    RES Physical Medicine & Rehabilitation Services, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

277.    Dr. Strutsovskiy, Hirsch, VascuFlo, Trzewieczynski, Andrus, and VascuScript are employed by and/or associated with the RES enterprise.

278.    Dr. Strutsovskiy, Hirsch, VascuFlo, Trzewieczynski, Andrus, and VascuScript knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the RES enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341,

based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that RES was not eligible to receive under the No-Fault Laws because: (i) it is unlawfully incorporated and owned and controlled by non-physicians; (ii) it engages in fee-splitting with non-physicians; (iii) the billed-for services are not medically necessary, are performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, and in many cases are not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint is described, in part, in the chart annexed hereto as Exhibit "K". Each such mailing was made in furtherance of the mail fraud scheme.

279.    Dr. Strutsovskiy, Hirsch, VascuFlo, Trzewieczynski, Andrus, and VascuScript knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

280.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $154,000.00 pursuant to the fraudulent bills submitted by the Defendants through RES.

281.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Dr. Strutsovskiy and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

282.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 281 above.

283.    The Medical Practice is an ongoing "enterprise," as that term is defined in 18

U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

284.    Dr. Strutsovskiy, Hirsch, and VascuFlo knowingly have conducted and/or

participated, directly or indirectly, in the conduct of the Medical Practice's affairs through a

pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute,

18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be

submitted hundreds of fraudulent bills on a continuous basis for over six months seeking

payments that the Medical Practice is not eligible to receive under the No-Fault Laws because: (i)

it engages in fee-splitting with non-physicians; and (ii) the billed-for services are not medically

necessary, are performed and billed pursuant to a pre-determined, fraudulent treatment and

billing protocol designed solely to enrich the Defendants, and in many cases are not performed at

all. A representative sample of the fraudulent bills and corresponding mailings submitted to

GEICO that comprise, in part, the pattern of racketeering activity identified through the date of

this Complaint is described, in part, in the chart annexed hereto as Exhibit "L".

285.    The Medical Practice's business is racketeering activity, inasmuch as the

enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts

of mail fraud are the regular way in which Dr. Strutsovskiy, Hirsch, and VascuFlo have operated

the Medical Practice, insofar as the Medical Practice never has been eligible to bill for or collect

No-Fault Benefits, and acts of mail fraud therefore are essential in order for RES to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Medical Practice to the present day. The Defendants' use of the Drugs to incentivize Insureds to report for treatment likewise implies a threat of continued criminal activity.

286.    The Medical Practice is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Medical Practice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

287.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $77,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Medical Practice.

288.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Dr. Strutsovskiy, the Management Defendants, Trzewieczynski, Andrus, and VascuScript**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

289.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 288 above.

290.     The Medical Practice is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

291.     Dr. Strutsovskiy, Hirsch, VascuFlo, Trzewieczynski, Andrus, and VascuScript are employed by and/or associated with the Medical Practice enterprise.

292.     Dr. Strutsovskiy, Hirsch, VascuFlo, Trzewieczynski, Andrus, and VascuScript knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Medical Practice enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that the Medical Practice was not eligible to receive under the No-Fault Laws because: (i) it engages in fee-splitting with non-physicians; and (ii) the billed-for services are not medically necessary, are performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, and in many cases are not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint is described, in part, in the chart annexed hereto as Exhibit "L". Each such mailing was made in furtherance of the mail fraud scheme.

293.     Dr. Strutsovskiy, Hirsch, VascuFlo, Trzewieczynski, Andrus, and VascuScript knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

294.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $77,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Medical Practice.

295.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION
**Against Dr. Strutsovskiy and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

296.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 295 above.

297.    RES and the Medical Practice together constitute an association-in-fact "enterprise" (the "RES-Medical Practice Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the RES-Medical Practice Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, RES and the Medical Practice ostensibly are independent businesses – with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO. The RES-Medical Practice Enterprise has been operated under two separate names and tax identification numbers in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to

the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the RES-Medical Practice Enterprise acting singly or without the aid of each other.

298.     The RES-Medical Practice Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

299.     Dr. Strutsovskiy, Hirsch, and VascuFlo each has been employed by and/or associated with the RES-Medical Practice Enterprise.

300.     Dr. Strutsovskiy, Hirsch, and VascuFlo knowingly have conducted and/or participated, directly or indirectly, in the conduct of the RES-Medical Practice Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that RES and the Medical Practice are not eligible to receive under the No-Fault Laws because: (i) they are unlawfully incorporated and owned and controlled by non-physicians; (ii) they engage in fee-splitting with

non-physicians; and/or (iii) the billed-for services are not medically necessary, are performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, and in many cases are not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint is described, in part, in the chart annexed hereto as Exhibits "K" and "L".

301.    The Defendants have submitted the fraudulent billing, or have caused it to be submitted, on a continuous basis for more than 18 months. Furthermore, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Defendants continue to submit fraudulent billing and are attempting collection on the fraudulent billing to the present day. Moreover, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity. The Defendants' use of the Drugs to incentivize Insureds to report for treatment likewise implies a threat of continued criminal activity.

302.    The RES-Medical Practice Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Strutsovskiy, Hirsch, and VascuFlo operate the RES-Medical Practice Enterprise, insofar as RES and the Medical Practice never have been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for the RES-Medical Practice Enterprise to function.

303.    The RES-Medical Practice Enterprise is engaged in inherently unlawful acts, inasmuch as RES's very corporate existence is an unlawful act, considering that it is fraudulently

incorporated, owned and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. The RES-Medical Practice Enterprise likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the RES-Medical Practice Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

304.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $231,000.00 pursuant to the fraudulent bills submitted by the Defendants through RES and the Medical Practice.

305.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Dr. Strutsovskiy, the Management Defendants, Trzewieczynski, Andrus, and VascuScript**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

306.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 305 above.

307.    Dr. Strutsovskiy, Hirsch, VascuFlo, Trzewieczynski, Andrus, and VascuScript are employed by and/or associated with the RES-Medical Practice Enterprise.

308.    Dr. Strutsovskiy, Hirsch, VascuFlo, Trzewieczynski, Andrus, and VascuScript knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the RES-Medical Practice Enterprise's affairs, through a pattern of

racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that RES and the Medical Practice are not eligible to receive under the No-Fault Laws because: (i) they are unlawfully incorporated and owned and controlled by non-physicians; (ii) they engage in fee-splitting with non-physicians; and/or (iii) the billed-for services are not medically necessary, are performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, and in many cases are not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint is described, in part, in the chart annexed hereto as Exhibits "K" and "L". Each such mailing was made in furtherance of the mail fraud scheme.

309.    Dr. Strutsovskiy, Hirsch, VascuFlo, Trzewieczynski, Andrus, and VascuScript knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

310.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $231,000.00 pursuant to the fraudulent bills submitted by the Defendants through RES and the Medical Practice.

311.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against RES, Dr. Strutsovskiy, Hirsch, and VascuFlo
### (Common Law Fraud)

312.     GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 311 above.

313.     RES, Dr. Strutsovskiy, Hirsch, and VascuFlo intentionally and knowingly made

false and fraudulent statements of material fact to GEICO and concealed material facts from

GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the

Fraudulent Services.

314.     The false and fraudulent statements of material fact and acts of fraudulent

concealment include:

(i)      In every claim submitted through RES, the representation that RES is lawfully
         licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance
         Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).   In fact, RES is not
         properly licensed in that it is a medical professional corporation that was
         fraudulently incorporated and has been owned and controlled by unlicensed non-
         physicians.

(ii)     In every claim submitted through RES and the Medical Practice, the
         representation that RES, Dr. Strutsovskiy, and the Medical Practice are in
         compliance with all material licensing laws, and therefore, eligible to receive No-
         Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-
         3.16(a)(12). In fact, RES, Dr. Strutsovskiy, and the Medical Practice are not in
         compliance with all material licensing laws in that they engage in unlawful fee-
         splitting with unlicensed non-physicians.

(iii)    In every claim submitted through RES and the Medical Practice, the
         representation that the Fraudulent Services actually are performed, and that the
         Fraudulent Services are medically necessary. In fact, the Fraudulent Services
         frequently are not performed at all and, to the extent that they are performed, they
         are not medically necessary and are performed as part of a pre-determined
         fraudulent protocol designed solely to financially enrich the Defendants.

315.     The Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted by, through, or on behalf of the Defendants that were not compensable under the No-Fault Laws.

316.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $231,000.00 pursuant to the fraudulent bills submitted by the Defendants through RES and the Medical Practice.

317.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

318.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Trzewieczynski, Andrus, and VascuScript
### (Aiding and Abetting Fraud)

319.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 318 above.

320.     Trzewieczynski, Andrus, and VascuScript knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by RES, Dr. Strutsovskiy, Hirsch, and VascuFlo.  The acts of Trzewieczynski, Andrus, and VascuScript in furtherance of the fraudulent scheme include knowingly filling prescriptions for medically unnecessary Drugs prescribed by Dr. Strutsovskiy to Insureds as an inducement to continue reporting to RES and Dr. Strutsovskiy for the Fraudulent Services, and concealing the fact that Hirsch, one of VascuScript's owners,

also maintains a secret and unlawful ownership interest in and control over RES and the Medical Practice.

321.     The conduct of Trzewieczynski, Andrus, and VascuScript in furtherance of the fraudulent scheme is significant and material. The conduct of Trzewieczynski, Andrus, and VascuScript is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, including filling the prescriptions for the medically unnecessary Drugs and concealing Hirsch's dual role as VascuScript owner and secret owner of RES and the Medical Practice, there would be no opportunity for RES, Dr. Strutsovskiy, Hirsch, and VascuFlo to obtain payment from GEICO and from other insurers.

322.     Trzewieczynski, Andrus, and VascuScript aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to RES and the Medical Practice for medically unnecessary services or illusory services that were not compensable under New York's No-Fault Laws, because they sought to continue profiting through the fraudulent scheme.

323.     The conduct of Trzewieczynski, Andrus, and VascuScript caused GEICO to pay more than  $231,000.00 pursuant to the fraudulent bills submitted by the Defendants through RES and the Medical Practice.

324.     Trzewieczynski's, Andrus's, and VascuScript's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

325.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and

punitive damages, together with interest and costs, and any other relief the Court deems just and

proper.

## TENTH CAUSE OF ACTION
### Against Hirsch, Trzewieczynski, Andrus, and VascuScript
### (Common Law Fraud)

326.     GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 325 above.

327.     Hirsch, Trzewieczynski, Andrus, and VascuScript intentionally and knowingly

made false and fraudulent statements of material fact to GEICO and concealed material facts

from GEICO in the course of their submission of dozens of fraudulent bills seeking payment for

the Drugs.

328.     The false and fraudulent statements of material fact and acts of fraudulent

concealment include, in every claim submitted through VascuScript:

(i)      deliberate omission and concealment of the fact that Hirsch, one of VascuScript's
         owners, has a secret and unlawful ownership interest in RES and the Medical
         Practice, through which the Drugs are prescribed; and

(ii)     deliberate omission and concealment of the fact that the Defendants knowingly
         cause Dr. Strutsovskiy to prescribe the Drugs and then distribute the Drugs
         through VascuScript as part of a pre-determined fraudulent protocol designed
         solely to financially enrich the Defendants.

329.     The Defendants made false and fraudulent statements and concealed material facts

in a calculated effort to induce GEICO to pay charges submitted by, through, or on behalf of the

Defendants that were not compensable under the No-Fault Laws.

330.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $69,000.00 pursuant to the fraudulent bills submitted by the Defendants through VascuScript.

331.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

332.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
### Against Dr. Strutsovskiy
### (Aiding and Abetting Fraud)

333.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 332 above.

334.     Dr. Strutsovskiy knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Hirsch, Trzewieczynski, Andrus, and VascuScript.  The acts of Dr. Strutsovskiy in furtherance of the fraudulent scheme include knowingly issuing prescriptions for medically unnecessary Drugs, and knowingly disregarding drug screen results indicating that Insureds to whom the Drugs were prescribed either abused illegal drugs and should not have the Drugs or else were not taking the prescribed Drugs.

335.     The conduct of Dr. Strutsovskiy in furtherance of the fraudulent scheme is significant and material. The conduct of Dr. Strutsovskiy is a necessary part of and is critical to the success of the fraudulent scheme because without his actions, including writing the

prescriptions for the medically unnecessary Drugs, there would be no opportunity for VascuScript to obtain payment from GEICO and from other insurers.

336.    Dr. Strutsovskiy aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to VascuScript for medically unnecessary Drugs that were not compensable under New York's No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

337.    The conduct of Dr. Strutsovskiy caused GEICO to pay more than  $69,000.00 pursuant to the fraudulent bills submitted by the Defendants through VascuScript.

338.    Dr. Strutsovskiy's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

339.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWELFTH CAUSE OF ACTION
**Against All Defendants**
**(Unjust Enrichment)**

340.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

341.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

342.    When GEICO paid the bills and charges submitted by or on behalf of RES, the Medical Practice, and VascuScript for No-Fault Benefits, it reasonably believed that it was

legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

343.    The Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

344.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

345.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $300,000.00.

## JURY DEMAND

346.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that RES, Dr. Strutsovskiy, and VascuScript have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Dr. Strutsovskiy, Hirsch, and VascuFlo, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $154,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Dr. Strutsovskiy, Hirsch, VascuFlo, Trzewieczynski, Andrus, and VascuScript, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $154,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Dr. Strutsovskiy, Hirsch, and VascuFlo, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $77,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against Dr. Strutsovskiy, Hirsch, VascuFlo, Trzewieczynski, Andrus, and VascuScript, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $77,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.      On the Sixth Cause of Action against Dr. Strutsovskiy, Hirsch, and VascuFlo, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $231,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against Dr. Strutsovskiy, Hirsch, VascuFlo, Trzewieczynski, Andrus, and VascuScript, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $231,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Dr. Strutsovskiy, RES, Hirsch, and VascuFlo, compensatory damages in favor of GEICO an amount to be determined at trial but in

excess of $231,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Trzewieczynski, Andrus, and VascuScript, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $231,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.      On the Tenth Cause of Action against Hirsch, Trzewieczynski, Andrus, and VascuScript, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $69,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Dr. Strutsovskiy, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $69,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

L.      On the Twelfth Cause of Action against Dr. Strutsovskiy, RES, Hirsch, VascuFlo,

Trzewieczynski, Andrus, and VascuScript, more than $300,000.00 in compensatory damages,

plus costs and interest and such other and further relief as this Court deems just and proper.


Dated:  Buffalo, New York
        April 16, 2012

                                **JAECKLE, FLEISCHMANN & MUGEL, LLP**

                                By:_____s/ Dennis K. Schaeffer_____
                                      Heath J. Szymczak, Esq.
                                      Dennis K. Schaeffer, Esq.
                                Avant Building - Suite 900
                                200 Delaware Avenue
                                Buffalo, New York 14202
                                (716) 856-0600
                                dschaeffer@jaeckle.com
                                hszymczak@jaeckle.com

                                -and-

                                **RIVKIN RADLER LLP**
                                Barry I. Levy, Esq.
                                Max Gershenoff, Esq.
                                Susan L. Miller, Esq.
                                926 RXR Plaza
                                Uniondale, New York  11556
                                (516) 357-3000

                                *Counsel for Plaintiffs, Government Employees*
                                *Insurance Co., GEICO Indemnity Co, GEICO General*
                                *Insurance Company and GEICO Casualty Co.*


/jfm1055748