1                    UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF NEW YORK

3

4

5     - - - - - - - - - - - - - - X
      GOVERNMENT EMPLOYER'S INS.  )     12CV330
6     CO, ET AL.   Plaintiffs     )
      vs.
7                                       Buffalo, New York
      MIKHAIL STRUTSOVSKIY, M.D.  )     February 5, 2015
8     a/k/a Michael Strut, et al.
                 Defendants.             10:30 a.m.
9     - - - - - - - - - - - - - - X
      **Motion**
10    **Transcribed from an Electronic Recording Device**

11                      TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JEREMIAH J. MCCARTHY
12                 UNITED STATES MAGISTRATE JUDGE

13

14                      MAX GERSHENOFF, ESQ.
                        Rivkin, Radler, LLO
15                      926 RXP Plaza
                        Uniondale, New York 11556
16

17                      ROBERT KNOER, ESQ.
                        The Knoer Group, PLLC
18                      424 Main Street, Suite 1820
                        Buffalo, New York 14202
19

20

21

22

23
      COURT REPORTER:  Karen J. Bush, Official Court Reporter
24                     (585) 613-4312
                       100 State Street
25                     Rochester, New York 14614

```
 1              GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL
 2                      P R O C E E D I N G S
 3                    *         *         *
 4
 5
 6              THE CLERK:  GEICO versus Strutsovskiy, docket No.
 7    12CV330.  This is argument on motion for summary judgment.  Max
 8    Gershenoff appearing on behalf of Plaintiff; Robert Knoer
 9    appearing on behalf of defendants.
10              MAGISTRATE JUDGE SCHROEDER:  Good afternoon.
11              MR. GERSHENOFF:  Good afternoon, your Honor.
12              MR. KNOER:  Good afternoon, your Honor.
13              MAGISTRATE JUDGE SCHROEDER:  We're here for
14    argument of Defendants' motion seeking summary judgment.
15              MR. KNOER:  We are.
16              MAGISTRATE JUDGE SCHROEDER:  All right.
17              MR. KNOER:  Would you like me to proceed from
18    here?
19              MAGISTRATE JUDGE SCHROEDER:  Wherever you're most
20    comfortable.
21              MR. KNOER:  I'm comfortable here.
22              MAGISTRATE JUDGE SCHROEDER:  All right.
23              MR. KNOER:  Good afternoon, your Honor.  May it
24    please the Court.  I represent Dr. Strutsovskiy, identified as
25    Michael Strut, and also his medical practice, which is
```

1        GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2    identified as RES Physical Medicine and Rehabilitation.  I note

3    that the remaining defendants have been dismissed voluntarily,

4    and we're here on the motion for summary judgment on a very

5    narrow issue, Judge.  I want to acknowledge to the Court that

6    this issue probably would not have been appropriate on a Rule

7    12(b)(6) motion, and that is why we didn't make it.  This is

8    now summary judgment.  We've had significant discovery,

9    depositions, expert exchanges, expert depositions, document

10   exchanges.  Mr. Gershenoff and I have been actively at this for

11   a couple of years.  And we're down to a point where I think

12   it's a legal issue the Court can rule on as a matter of law;

13   that is why we bring this motion.  The issues underlying this

14   case are whether or not certain medical treatments were

15   appropriate, and were appropriately billed for No-Fault

16   reimbursement.  Those issues would normally be dealt with in

17   the No-Fault system in the state court, or the state

18   arbitration system set up for No-Fault.  The exception, and the

19   reason why GEICO brings this case here, is that there is an

20   exception in the courts and in the case law for fraud.  If

21   there is fraud present in these kind of reimbursement cases,

22   then the courts have said you can come out of the no-fault

23   system and deal with it in the state system -- or the federal

24   system.  The exception, however, requires fraud.  It doesn't

25   require that GEICO doesn't like the no-fault system or hasn't

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     been successful.  They have to show the elements of fraud.

3     Mainly, for the purposes of our argument, and I'll get right to

4     the point, your Honor, it's about reliance and it's about

5     reasonable reliance.  We have done a lot of discovery in this

6     case.  We've gone through quite a bit of depositions and

7     documents.  We brought in the head GEICO guy for the state, and

8     I think for the region, which is multiple states.  And we've

9     also discovered through our document demands that in November

10    of 2010, GEICO had made a determination that they did not trust

11    Dr. Strut, period.  They did an internal review.  They had

12    external referrals to state and federal agencies seeking their

13    review.  And they came out with a report dated November of

14    2010, which basically said, our review is complete, we don't

15    trust him.  It's our position that from that point forward,

16    they were not relying on anything that Dr. Strut has admitted

17    or anything that Dr. Strut gave them in making a determination

18    of whether or not to pay.  They could have not paid if they

19    believed there was fraud involved here.  The no-fault system,

20    and I submitted with our papers a decision from the Department

21    of Insurance, which says very clearly, "a provider can refuse

22    to pay if they believe there is fraud."  GEICO had that option.

23    GEICO chose to pay for their own reasons.  And I think in their

24    papers, they indicate that the system is a little unfair, in

25    terms of expenses and attorneys fees and interest and things

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     that might accrue if they're wrong.  But in the end, they

3     cannot reasonably say to this Court that after November of

4     2010, that they themselves internally determined that he was

5     not reliable in their eyes, that they were trusting anything

6     that Dr. Strut says.  The second element of our motion is the

7     knowingly false part of fraud.  The statement has to be not

8     only incorrect in the sense it's not true, but it has to be

9     knowingly false.  To the extent that GEICO feels that the

10    treatments provided, and they're pretty much a wide slot, it's

11    the same type of treatment that is being provided that GEICO

12    doesn't like.  To the extent they feel those treatments were

13    not true, they were not correct, they're not materially

14    necessary, and that Dr. Strut, by billing for them, is making a

15    false statement, our response is that Dr. Strut has gone

16    through significant arbitration, not only with GEICO, but with

17    all of the carriers over these exact treatments, these exact

18    tests, these exact billing protocols, the exact manner in which

19    he practices.  And I'm not making an estoppel argument, which I

20    think is what GEICO referred to in their papers, that is not

21    the point.  The point is consistent, as we indicated, over 90

22    percent of the time in arbitration, the arbitrators, who in the

23    state system, in the comprehensive No-Fault system, were

24    deferred to as the people to make these determinations, have

25    over 90 percent of the time, said, correct treatment,

1        GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2    appropriately billed, appropriately reimbursed.  Now I'm not

3    saying that that makes every single case going forward that Dr.

4    Strut ever bills should automatically be paid.  If there is any

5    questions, they should be questioned.  But what I am saying is

6    that to the extent he has been told time and time and time and

7    time again by these arbitrators that he is doing it correctly,

8    it cannot possibly be a knowingly false statement to submit the

9    same type of bills for the same type of treatment.  One thing

10   is very curious in this case, your Honor.  There is not one,

11   not a single affidavit, piece of evidence from a single patient

12   saying that they didn't get the treatment, the treatment wasn't

13   effective, Dr. Strut was doing anything inappropriate.  GEICO

14   relies entirely on their expert peer reviews and on their

15   expert reports.  Now, we didn't submit an expert report,

16   because, frankly, if it became a battle of the experts, I could

17   not stand here in good conscience and tell the Court that this

18   is something that is appropriate on a motion for summary

19   judgment.  That is a fact question.  It's an expert battle.

20   That is not where we're at.  We're here because, as a matter of

21   law, you have to show -- sorry, Judge -- you have to show

22   reliance.  They can't show reliance here.  And I don't believe

23   they can show knowing falsehood here on any of these

24   submittals.  Now, it's not just us.  It's not just Dr. Strut.

25   They make a great bit of noise about Dr. Strut and his past and

his felony conviction and we don't hide from that.  It happened
and it's there.  But it's not us that is saying that GEICO
relied, GEICO put in exhibit B or exhibit A, rather, GEICO's
own report.  Their words, their documents, their report, we
don't trust this guy.  We took a deposition of GEICO's big guy,
didn't trust him, didn't trust him, then, yes, they flagged
every single, every single submittal by the tax identification
number from where it was coming.  They flagged it because they
didn't trust it, had to go for further review.  So, for GEICO
to say at this point they were relying on Dr. Strut and his
submittals, is simply, as a matter of law, unsupported.  In
addition to the fact that there is absolutely no evidence from
someone with personal knowledge, that is someone who was
present, a patient, that the treatments weren't provided, they
weren't provided as billed, et cetera.  I think that it's very
telling, your Honor, that there is nothing here that supports
that.

Now, GEICO, and Mr. Gershenoff, and I respect Mr.
Gershenoff, his firm does a lot of these cases.  He is going to
talk about these kind of cases.  He is going to say there are
cases in this district and in the Second Circuit and they're
all the same, and they're not.  They're very distinguished,
mainly on two grounds.  They are 12(b)(6) motions, which this
is not.  This is a summary judgment motion after full discovery

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2    or they're default motion in which someone is trying to

3    overturn the default, or they deal with after learned fraud.

4    Situations where it wasn't just unreasonable for the carrier to

5    find the fraud within the short thirty-day window that No-Fault

6    gives you, but situations where they actually didn't find it

7    until sometime later.  Medical practice fraud where someone

8    puts together a business that is a fraud in itself.  But there

9    is no way for GEICO or the other carriers to know during the

10   No-Fault process, because that is not part of the questions.

11   That is not this case.  This case is uniquely one in which, not

12   only did they suspect, they investigated, they reached a

13   determination, they flagged every single submittal.  So, those

14   cases are very different.  There is a little bit of a tension

15   between the state cases and federal cases.  Court of Appeals in

16   New York and the Second Circuit in the districts have a little

17   bit of a twist between this interplay between No-Fault and

18   fraud.  The *Fair Price* case, which was a case in which Court of

19   Appeals of New York said, you know, you can't use fraud as a

20   defense after you wait two years in the No-Fault.  Fine.  We

21   don't disagree with *Fair Price* in any way.  We also don't agree

22   that the district court cases or Court of Appeals or the Second

23   Circuit has in some way overruled *Fair Price*.  We think they're

24   distinguished.  And the big case I think the Court needs to

25   take into account here is there is a recent Court of Appeals

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2    case, a Second Circuit case in *Allstate v. Mun*.  And in the *Mun*

3    case, in the *Mun* case there was a question about whether or not

4    the carrier could be compelled to arbitrate claims.  And *Mun*

5    said, no, you can't compel to arbitrate these already paid

6    claims and there is a reason for that.  But *Mun* also said, if

7    you look at the district court case and the Magistrate report

8    and at the Second Circuit decision, the carrier can be forced

9    to arbitrate not yet paid claims.  And I would submit to the

10   Court that there is a reason for that.  Number one, the carrier

11   now has information that they believe creates establishes fraud

12   and they should bring that as a defense in the no-fault system,

13   which the no-fault system allows.  So, I think in *Allstate v.*

14   *Lyons*, same thing, the Court said that you can be compelled to

15   arbitrate not yet paid claims.  You can be compelled, even

16   though you're alleging fraud, that doesn't get you out of the

17   system of No-Fault, you can be compelled to arbitrate those

18   because you belong in No-Fault.

19          Now, GEICO doesn't like the No-Fault system and

20   they're not very successful with Dr. Strut's claims in the

21   No-Fault system, and I understand that.  But that's a question

22   between them and the New York State legislation.  There is a

23   verification process that they can use and other things they

24   can do in that system.  They have choices to make.  They could

25   choose not to pay a claim.  They face consequences, I

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     acknowledge that, they face potential interest and attorneys'

3     fees.  But it's a choice they make, not on the basis of

4     reliance, but on the basis of weighing these economic risks.

5     And that is the point I'm making.  GEICO, in any kind of fraud,

6     any kind of fraud, across the board, SEC fraud, fraudulent

7     antiques, whatever you want to do, that critical element of

8     reliance has to be shown, and reasonable reliance has to be

9     shown.  And, in their case, based on fraud, common law, RICO,

10    et cetera, if you pull that thread of reliance, the rest of it

11    falls apart.  And that is what we have here, Judge.  Claims

12    that were paid after 2010, were not paid in reliance on Dr.

13    Strut.  Claims that have not yet been paid, belong in the

14    No-Fault system.  They don't belong in front of this Court.

15    For this Court to sit in judgment on every single patient,

16    whether every single treatment, and their own experts agree

17    that these types of medical necessity depends on the patient's

18    presentation at the time of the treatment, we would be going

19    through a trial of months if this Court has to go through it.

20    And I think that, for a lot of reasons, your Honor, this case

21    belongs in the state system to the extent that the claims have

22    not yet been paid.  To the extent that they paid claims without

23    reasonable reliance, that is not fraud.  And to the extent that

24    there were claims paid prior to November of 2010, I would

25    honestly admit that maybe that little piece of this case

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2    remains.  But that is our case in a nutshell, your Honor, and

3    I'm prepared to answer any questions, but I think that that

4    really wraps up why we think that this is a proper motion for

5    summary judgment.

6               MAGISTRATE JUDGE SCHROEDER:  All right.  Mr.

7    Gershenoff.

8               MR. GERSHENOFF:  Good afternoon, your Honor.

9               MAGISTRATE JUDGE SCHROEDER:  Good afternoon.

10              MR. GERSHENOFF:  Obviously, GEICO opposes the

11   Defendant's motion for summary judgment.  As a threshold

12   matter, it's, of course, to know at the outset that it's the

13   movant's burden on a motion for summary judgment to prove

14   beyond a reasonable doubt that the Plaintiff can prove no set

15   of facts in support of its claim in support of the present

16   motion.  The defendants have not done that.

17              MAGISTRATE JUDGE SCHROEDER:  Beyond a reasonable

18   doubt?  I thought that was a burden only in a criminal case.

19   Preponderance of evidence?

20              MR. GERSHENOFF:  In *Terry vs. Ashcroft*, your

21   Honor, the Court, which was Second Circuit, 2003, the Court

22   said, "that summary judgment may be granted only in

23   circumstances where it appears beyond doubt that the Plaintiff

24   can prove no set of facts in support of its claim."

25              THE COURT:  Beyond doubt, that's different than

1       GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2   beyond a reasonable doubt.

3       MR. GERSHENOFF:  Yes, your Honor, you are correct

4   and I apologize for the misstatement.  But as a threshold

5   matter, your Honor, the defendants haven't proven beyond doubt

6   that Plaintiffs can prove no set of facts in support of their

7   claim.

8       MAGISTRATE JUDGE SCHROEDER:  Isn't the phrase,

9   quote, "beyond doubt," synonymous with material fact in

10  dispute?

11      MR. GERSHENOFF:  Well, there are many material

12  facts in dispute in this case regarding the legitimacy of the

13  Defendant's treatment practices, your Honor.

14      MAGISTRATE JUDGE SCHROEDER:  Let me break it down

15  as I understand it from the papers that have been submitted and

16  from Mr. Knoer's argument.  Is it factually correct that

17  sometime in 2010, GEICO concluded that it couldn't trust Dr.

18  Strut, and that it was going to really focus on all of his

19  submissions?

20      MR. GERSHENOFF:  Actually, your Honor, I think

21  that is -- that sums up and ends it in somewhat of a misleading

22  way.  I would like to tell the Court a little bit about what

23  happened in late 2010.

24      MAGISTRATE JUDGE SCHROEDER:  All right.

25      MR. GERSHENOFF:  All right.  In late 2010, GEICO

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     had received a certain amount of Dr. Strut's claims, he had

3     been submitting the claims at that point for a few months.  And

4     it noted several things about the claims and it made them

5     appear suspicious, including the fact that Dr. Strut's

6     treatment notes, to that point, seemed to contain a lot of

7     boiler plate and cut and pasted language, and, also, that Dr.

8     Strut was prescribing a very problematic amount of narcotics to

9     GEICO insureds, which was very incongruous in the context of

10    the relatively minor automobile accidents that the insureds had

11    been involved in.  Therefore, GEICO commenced an investigation

12    of Dr. Strut, and concluded that moving forward, Dr. Strut's

13    claims would be flagged for further review as they came in.

14         MAGISTRATE JUDGE SCHROEDER:  Okay.  Now, at that

15    point then, there is at least some notice to GEICO?

16         MR. GERSHENOFF:  Yes.

17         MAGISTRATE JUDGE SCHROEDER:  About Dr. Strut?

18         MR. GERSHENOFF:  Yes.  And GEICO did, in fact,

19    follow up and review Dr. Strut's claims on an ongoing basis as

20    they came in.  However, as we set forth in our papers in

21    opposition to this motion, your Honor, you know, GEICO is

22    constrained in the type of investigation and verification that

23    it can seek by the No-Fault system.  The No-Fault regulations

24    require insurers, such as GEICO, to not treat claimants as

25    adversaries, to handle the claims in good faith, these are

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     written into the No-Fault regulations, and so they have the

3     force of law.  What's more, the No-Fault regulations do not, as

4     a practical matter, permit GEICO to conduct any sort of

5     in-depth investigation or to demonstrate on a claim-by-claim

6     basis, whether or not a claimant is engaging in a pattern of

7     fraudulent billing for medically unnecessary or illusory

8     services.  As we set forth in our papers, GEICO, when it gets a

9     claim for No-Fault benefits, from Dr. Strut or anyone else, has

10    15 days to determine whether or not to request additional

11    verification of the claim, and the additional verification of

12    the claim that GEICO is allowed to seek under the No-Fault

13    regulations is rather limited.  GEICO can't just ask for

14    anything it wants to.  It has to have a reasonable basis for

15    its request for additional verification.  And once the -- and

16    if it doesn't, for example, if it makes a request for

17    additional verification or if it delays a claim based on a

18    request for additional verification and it's later determined

19    by a court or an arbitrator that the request was unreasonable,

20    then any subsequent denial of the claim is going to be deemed

21    untimely, and GEICO is going to be liable to pay penalties or,

22    rather, interest and attorneys' fees on the claim.  GEICO is,

23    you know, not entitled to ask for whatever it wants in the

24    context of a claim.  It can't ask for additional clarification

25    of the universe of a provider's claim when handling a discrete

1    GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL
2  claim for a discrete insured.  And, therefore, there is no way
3  for GEICO, until it received a critical mass of Dr. Strut's
4  claims, as we set forth in the papers, it did not receive a
5  critical mass of Dr. Strut's claims until late 2011, there was
6  no way for GEICO to know the not only individual claims that
7  Dr. Strut had submitted were suspicious, but that Dr. Strut was
8  treating every patient, basically, in the same way, regardless
9  of their individual circumstances that were presented.  There
10  was no way to prove that.  What's more, Dr. Strut verified each
11  of his claims.  Dr. Strut, although he is a convicted felon,
12  and although he was convicted for felony insurance fraud, you
13  know, he is a licensed physician, and his professional
14  corporation is authorized, you know, to provide medical
15  services, and these are the people who were submitting the
16  claims.  And they were verifying each and every claim that was
17  submitted pursuant to New York Insurance Law Section 403 that
18  the claim didn't contain any false or misleading information.
19  Insurers such as GEICO are entitled to rely on facially valid
20  claims submitted by licensed health care providers, number one.
21  Number two, even if GEICO wasn't entitled to rely on facially
22  valid claims submitted by licensed health care providers and
23  for that reliance to be reasonable, there was no way, as we set
24  forth in our papers, supported by affidavits by people with
25  first-hand knowledge, there was no way for GEICO, as a

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     practical matter, to determine that Dr. Strut was providing his

3     medical services or purporting to provide them pursuant to a

4     predetermined fraudulent protocol until after it had received a

5     large number of those claims and could look at the entire

6     universe of claims and see that every patient was receiving

7     substantially the same services and substantially the same

8     pattern, with, you know, substantially the same treatment notes

9     provided, substantially the same massive amounts of narcotics

10    provided to patients who did not need them and so forth.  In

11    this context, reliance is typically a fact intensive inquiry.

12    We have put forth ample explanation for why GEICO's reliance

13    was reasonable under these circumstances.  It's in our papers,

14    it's in the declaration of Robert Leone, who is the GEICO's

15    claims manager, who was responsible for overseeing the claims

16    handling practices during the pertinent period.

17          MAGISTRATE JUDGE SCHROEDER:  But doesn't it come

18    down to the simple question or issue then, GEICO questioned the

19    necessity of whatever it was that Dr. Strut did for a

20    particular patient when submitting the claim?  What you are

21    telling me, as I understand it, is GEICO couldn't do some kind

22    of analysis on one claim or two claims or three claims, it had

23    to wait until it had accumulated a lot of claims to then say,

24    oh, this is a treatment that we now feel it was not necessary

25    or don't believe should have been undertaken only because he

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     did it for everybody.

3               MR. GERSHENOFF:  I'm not 100 percent clear on the

4     question.

5               MAGISTRATE JUDGE SCHROEDER:  Okay.  As I

6     understand your argument, GEICO was not barred from doing what

7     it's presently doing because the Plaintiff claims you relied on

8     the submission of a payment application of Dr. Strut when you

9     had knowledge that you already suspected Dr. Strut of not being

10    properly acting.

11              MR. GERSHENOFF:  We --

12              MAGISTRATE JUDGE SCHROEDER:  That the Plaintiff

13    argues, using the common-law definition of fraud, the person

14    has to rely on what has been presented by the person

15    perpetrating the fraud, and is in a position where that person

16    cannot determine or have knowledge of or a way of reasonably

17    knowing that this is fraudulent, and so relies on what that

18    perpetrator is telling him or presenting to him, and acts in

19    that reliance.  As the Plaintiffs' argument is, as I understand

20    it, is when GEICO undertook this investigation in 2010 and

21    concluded that Dr. Strut could not be trusted, now GEICO is in

22    a frame of mind where it isn't going to rely on, as the

23    Plaintiff argues, it isn't going to rely just per se on what is

24    presented by Dr. Strut, it's going to look at whatever Dr.

25    Strut presents with a jaundice eye and make determinations as

1           GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2      to the validity or legitimacy of what is being presented.  Your

3      argument, as I understand it, is you can't do that under the

4      insurance regulations on a case-by-case basis, you can't

5      request more detailed information or investigation because you

6      can't penalize the patient or the person who received the

7      treatment by delaying these kinds of payments.  But, because of

8      that, GEICO could not really make a fraud claim based on one or

9      two or three or ten.  It wasn't until it accumulated a number

10     of claims from Dr. Strut that showed the same pattern and

11     practice of everybody getting the same treatment and, as

12     represented by you, receiving prescriptions, apparently, for

13     drugs or narcotics of an inordinate amount or for injuries that

14     wouldn't seem to require that kind of prescribing, et cetera,

15     and that is when you had enough now to say, there is a fraud

16     here.

17          MR. GERSHENOFF:  That is when GEICO had enough to

18     say that there was a fraud there.  But during the preceding

19     period, GEICO was, as a practical matter, forced to rely on Dr.

20     Strut's claims.

21          THE COURT:  Okay.  Now, this is where my next

22     question comes.  Mr. Knoer says you had a choice, GEICO, pay or

23     refuse to pay.

24          MR. GERSHENOFF:  Mm-hmm.

25          MAGISTRATE JUDGE SCHROEDER:  And if you refuse to

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2    pay, it can go to arbitration.

3          MR. GERSHENOFF:  If GEICO refused to pay, Dr.

4    Strut could take the claim to arbitration, at which point,

5    GEICO would be left without a defense at the arbitration.

6          MAGISTRATE JUDGE SCHROEDER:  But isn't that a

7    problem with the way the No-Fault thing is structured?

8          MR. GERSHENOFF:  Well, as a result, courts have

9    found that insurers, such as GEICO, and insurers are entitled

10   to rely on facially valid claim submissions that are submitted

11   through licensed physicians and licensed medical professional

12   corporations.  And, in fact, in that context, your Honor, I

13   would add, that in considering reasonable reliance, courts look

14   at the entire context of the transaction.  And that is why

15   reliance is typically not an issue that is decided on summary

16   judgment motions.  In this particular case, we would say that

17   looking at the entire context of the transactions at issue,

18   which we've presented to the Court and we explained to the

19   Court, something that was omitted from Dr. Strut's papers on

20   the motion, GEICO was, as a practical matter, forced to rely on

21   the claims or else to find itself in potentially in arbitration

22   with Dr. Strut where it would lack a defense.  Now, that is

23   something that the Court can take into account when determining

24   whether or not GEICO's reliance on the facially valid claims

25   submitted through this licensed physician was reasonable or

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     not.  And we would contend that is an issue which should be for

3     the jury, rather than an issue that should be decided on

4     summary judgment.

5          MAGISTRATE JUDGE SCHROEDER:  Am I correct in

6     understanding, GEICO does not say that what is listed by way of

7     what services were rendered did not occur?

8          MR. GERSHENOFF:  No, that is incorrect, your

9     Honor.  And several cases, and this is a feature that appeared

10    throughout Dr. Strut's papers, in some cases, GEICO contends --

11    actually, in every case, GEICO contends that the billed-for

12    services were medically unnecessary.

13         MAGISTRATE JUDGE SCHROEDER:  No, I didn't say

14    unnecessary, but they didn't happen.

15         MR. GERSHENOFF:  I'm getting -- in other cases,

16    GEICO asserts that the billed-for services did not happen at

17    all.  They were completely illusory.  In particular, your

18    Honor, Dr. Strut, in virtually every case, billed for extremely

19    high-level patient consultations.  The kind of examinations

20    that would take place for a cancer patient, HIV/AIDS patient,

21    facing a terminal or seriously life-threatening condition.

22    When, in actuality, to the extent that Dr. Strut provided any

23    patient examinations at all, they were perfunctory

24    examinations, patient examinations, taking a very short amount

25    of time, as evidenced by the fact that his treatment notes were

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     cut and pasted across, you know, large numbers of patients and

3     didn't materially differ from one patient to another.  So, in

4     the first instance, Dr. Strut billed for high-level complex

5     consultations, and I should preface this to the extent the

6     Court is not familiar with it.  When a physician or another

7     health care provider bills for a patient examination, he or she

8     has to choose in that bill from a variety of what's called

9     Current Procedural Terminology or CPT codes.  And each code

10    that is used corresponds to a certain level and a certain type

11    of service.  So, for example, patient examination codes ending

12    in the No. 4 or 5, carry with them the representation that the

13    examination that occurred was extremely high level and complex.

14    Extensive as far as timing, time is concerned, the consultation

15    or examination took a long time to do, it involved an in-depth

16    patient history, it involved an in-depth patient examination.

17    And there are standards that have to be met when you bill under

18    those high-level examination codes.  Well, Dr. Strut always or

19    virtually always billed under those high-level examination

20    codes, but, in fact, he never provided high-level examinations.

21    To the extent --

22                MAGISTRATE JUDGE SCHROEDER:  Now, as soon as you

23    see a claim with a code, high-level code --

24                MR. GERSHENOFF:  Mm-hmm.

25                MAGISTRATE JUDGE SCHROEDER:  -- and there is this

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     15-day window, GEICO could have said, why was it necessary for

3     this high-level examination, what do you have to back it up,

4     couldn't you?

5          MR. GERSHENOFF:  GEICO could have done that and

6     GEICO could have requested Dr. Strut's examination under oath,

7     which it did.

8          MAGISTRATE JUDGE SCHROEDER:  No, no, no, but I'm

9     just talking about in the early stages, when the claim comes

10    in, you have claims examiners.

11         MR. GERSHENOFF:  Mm-hmm.

12         MAGISTRATE JUDGE SCHROEDER:  They see and now

13    they're already on notice anything coming in from Strut, you

14    look at it with jaundice eye.  Okay.  I have a high-level code,

15    I got 15 days, I question whether all of this was necessary in

16    light of what the factual background is for these injuries.  I

17    send out a notice in that 15-day period, I want more detail as

18    to justify as to why you need to do this high-level examination

19    or what documentation do you have to back up the need and the

20    actual performance of this high-level examination.

21         MR. GERSHENOFF:  Sure.  And when GEICO would do

22    that, Dr. Strut submitted his examination reports in support of

23    his examinations, which, on their face, touched every base.

24    So, for example, when Dr. Strut would submit a bill under CPT

25    code 99244 or 99245, representing a very high-level

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     examination, he would, typically, either on his own or at

3     GEICO's request, would submit what purported to be a report of

4     that examination.  These reports were multiple-pages long,

5     single spaced.  They purported to set forth a highly detailed

6     examination.  However, after GEICO had received a critical mass

7     of these claims, which took some time, GEICO discerned at that

8     point that the language in virtually all of these examination

9     reports were cut and pasted.  But there was no way for GEICO,

10    getting a bill and examination reports to deny that claim.

11         MAGISTRATE JUDGE SCHROEDER:  Well, let me -- let

12    me -- I will give you my favorite complaint when I'm talking to

13    lawyers in this day and age of technology, which, obviously, is

14    carried over to all of the other fields.  Cloning or cutting

15    and pasting is no longer a surprise to anybody.  When I see the

16    motions for discovery or bills of particulars or

17    interrogatories or motions to suppress, it's the exact same

18    language from every defendant, and it's the exact same language

19    for every case.  I'm assuming the medical field has gotten to

20    the same point that when you got this coding, this is what you

21    got to describe.  And some secretary hits the button and it

22    spews it out.

23         MR. GERSHENOFF:  Your Honor, that may be true.  I,

24    frankly, am not aware of whether or not doctors routinely cut

25    and paste their treatment records for one patient into the

1        GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2   treatment records of another patient.  And, in any case, I

3   don't think -- I don't see how it's really germane to this

4   motion for summary judgment.  We allege --

5        MAGISTRATE JUDGE SCHROEDER:  Let me go to another

6   question.  This claims examiner now has this detailed report

7   attached and looks at it.  It's that detailed report that is

8   going to help someone make a decision whether there is fraud

9   involved or not, aren't they?  I mean, claims examiners are

10  trained, you got the code, you know what the code requires as

11  far as treatment, and now you got a detailed report submitted

12  by a physician saying this is what I did.

13       MR. GERSHENOFF:  You have one detailed report.

14       MAGISTRATE JUDGE SCHROEDER:  If you decide it was

15  fraudulent, what was being described in this one report, you're

16  supposed to act upon it within a certain period of time.

17       MR. GERSHENOFF:  Well, you have 30 days to make a

18  decision whether to pay or deny a claim.

19       MAGISTRATE JUDGE SCHROEDER:  Right.  But if you

20  read this report and then make a decision to pay, how can you

21  say that you relied on the report as being fraudulent.

22       MR. GERSHENOFF:  You've relied on the facially

23  valid bill and the facially valid treatment report that is

24  submitted by a doctor.

25       MAGISTRATE JUDGE SCHROEDER:  Or you could have

1    GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2    done something within the 15-day period.

3         MR. GERSHENOFF:  You could have requested

4    additional verification, and then to the extent that the

5    provider provides the additional verification, and, by the way,

6    you're limited in the additional verification you can request,

7    you cannot request any kind of esoteric thing you want.

8         MAGISTRATE JUDGE SCHROEDER:  No, I understand.

9    Did GEICO make 15-day requests?

10        MR. GERSHENOFF:  Yes.  GEICO did, and Dr. Strut

11   would produce enough to meet the assurances, so to speak, at

12   which point GEICO had to pay the claims as a practical matter.

13   Incidentally, it's worthwhile to note that in the context of

14   the reasonable reliance inquiry, assurances or additional

15   verification in this particular context, is germane to the

16   inquiry.  All right?  So, a suspicious Plaintiff, okay, who

17   receives assurances from a defendant, that is supposed to be

18   taken into consideration in determining whether or not the

19   Plaintiff's reliance thereafter was reasonable.  In this case,

20   Dr. Strut appeared for two examinations under oath to defend

21   his practices, and along the way, also provided additional

22   verification periodically when GEICO would request it.  And

23   every single one of his bills was verified pursuant to

24   Insurance Law 403 that it was true and correct, and didn't

25   contain any false or misleading information.  In that context,

GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

1       GEICO's reliance was reasonable.  GEICO has put forth, you

2       know, a lengthy explanation of that context in its papers, and

3       we would contend, respectfully, that given the totality of the

4       circumstances here, the reasonableness of GEICO's reliance is

5       appropriate for trial rather than to be determined on summary

6       judgment.

7               MAGISTRATE JUDGE SCHROEDER:  Doesn't it all come

8       down to GEICO saying, we don't agree all of the things that

9       were allegedly done in these submissions and these detailed

10      statements were necessary?

11              MR. GERSHENOFF:  In a manner of speaking.  GEICO

12      contends that what Dr. Strut did here -- I should actually

13      start at the beginning, okay?  Dr. Strut, shortly after being

14      released from house arrest, after being convicted for felony

15      insurance fraud in this Court, and declaring bankruptcy, he was

16      without credit, he was without malpractice insurance, he is

17      barred for life from billing Medicare because of the Medicare

18      fraud in which he was engaged in.  He can't bill major medical

19      ordinary insurance carriers or worker's compensation because he

20      doesn't have any malpractice insurance and can't get

21      malpractice insurance.  So, the only thing that he was really

22      eligible to do as a licensed physician was to bill no-fault

23      insurance, which, of course, is more of a state insurance

24      regime.  So, he has clearly had a motive to commit fraud or to

1       GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2       GEICO's reliance was reasonable.  GEICO has put forth, you

3       know, a lengthy explanation of that context in its papers, and

4       we would contend, respectfully, that given the totality of the

5       circumstances here, the reasonableness of GEICO's reliance is

6       appropriate for trial rather than to be determined on summary

7       judgment.

8               MAGISTRATE JUDGE SCHROEDER:  Doesn't it all come

9       down to GEICO saying, we don't agree all of the things that

10      were allegedly done in these submissions and these detailed

11      statements were necessary?

12              MR. GERSHENOFF:  In a manner of speaking.  GEICO

13      contends that what Dr. Strut did here -- I should actually

14      start at the beginning, okay?  Dr. Strut, shortly after being

15      released from house arrest, after being convicted for felony

16      insurance fraud in this Court, and declaring bankruptcy, he was

17      without credit, he was without malpractice insurance, he is

18      barred for life from billing Medicare because of the Medicare

19      fraud in which he was engaged in.  He can't bill major medical

20      ordinary insurance carriers or worker's compensation because he

21      doesn't have any malpractice insurance and can't get

22      malpractice insurance.  So, the only thing that he was really

23      eligible to do as a licensed physician was to bill no-fault

24      insurance, which, of course, is more of a state insurance

25      regime.  So, he has clearly had a motive to commit fraud or to

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     at least to engage strictly in a No-Fault practice.

3          MAGISTRATE JUDGE SCHROEDER:  He may have had a

4     motive, but to prove it, motive is on the defense, on the

5     insurance company.

6          MR. GERSHENOFF:  Yeah.  And we look forward to

7     proving it at trial, your Honor.  We think it's eminently

8     provable given the circumstances of this case.  Shortly after

9     he emerged from house arrest, he starts billing GEICO for these

10    types of treatments.  And what emerged after he submitted a

11    critical mass of billing to GEICO, and GEICO was able to

12    examine the totality of his billing over a fairly extended

13    period of time, was that every patient would receive a

14    substantially identical diagnosis, regardless of whether they

15    were fat or skinny, old or young, in good health or in bad

16    health, were involved in a serious motor vehicle accident or

17    whether they were involved, as was generally the case, in

18    trivial fender benders.  They would all receive substantially

19    identical diagnoses, and they would all receive substantially

20    identical treatment recommendations, and then they would all

21    receive a substantially identical course of treatment, again,

22    regardless of their individual circumstances that were

23    presented.  That was a fact pattern that could emerge only

24    after a certain period of time.

25          MAGISTRATE JUDGE SCHROEDER:  With a representative

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     sample.

3          MR. GERSHENOFF:  A fairly large representative

4     sample, quite frankly.  And, what's more, in the context of

5     individualized no-fault insurance arbitrations, GEICO was, as a

6     practical matter, powerless to put evidence of this pattern of

7     fraudulent treatment in front of the arbitrators, because,

8     number one, the arbitrators, No-Fault arbitrations, as set

9     forth in the *Allstate vs. Mun* case, a Second Circuit case, as a

10    practical matter involved typically really no opportunities for

11    discovery, okay.  And to the extent that arbitrators, as set

12    forth in our papers, permit any discovery at all in the context

13    of No-Fault arbitrations, it's almost limited to the discrete

14    claim in front of them rather than the universe of claims

15    submitted by a provider.  So when GEICO goes, and this is

16    something that I think, frankly, should be taken into account

17    in the context of determining whether or not GEICO was entitled

18    to reasonably rely on the facially -- substantially the claims

19    submitted by Dr. Strut or through his professional corporation,

20    as a practical matter, when GEICO is in a No-Fault arbitration

21    against Dr. Strut or any other provider, that arbitrator is not

22    interested in and will not look at and will not consider and

23    will give GEICO no opportunity to present evidence that the

24    health care provider provided the same treatment to every

25    insured without regard to their individual circumstances

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     they're presented.  All that arbitrator is going to consider

3     is, number one, did the health-care provider make out its prima

4     facie case, which is basically showing that the bill was

5     submitted and wasn't paid, and then the burden goes onto the

6     insurer to show that the treatments were medically unnecessary

7     or were not provided.  But, if the evidence of lack of medical

8     necessity or of the treatments not being provided is that the

9     provider was using boiler plate treatment notes across a large

10    universe of patients or that the provider was providing

11    identical treatment to a large number of insureds without

12    regard to their individual circumstances, then the insurer is

13    not going to be able to present that evidence in the context of

14    a PIP arbitration.  And that is why GEICO typically loses in

15    PIP arbitrations against Dr. Strut.  But, again, in recognition

16    of the fact that this is the state of affairs in the no-fault

17    insurance system, the Department of Financial Services, then it

18    was the Department of Insurance, has explicitly said that an

19    insurer -- the prompt payment provisions of the No-Fault

20    statement present no bar to an insurer later bringing an action

21    in fraud or unjust enrichment to recoup No-Fault benefits that

22    were paid pursuant to a fraudulent scheme, like the one in this

23    case.  And I think that's important to note the Department of

24    Insurance, the Department of Financial Services, explicitly has

25    stated, and many courts have deferred to this Insurance

1        GEICO, ET AL. VS. M. STRUTSOVSKIY, ET AL

2    Department, in my opinion, that insurance companies can, in

3    fact, bring these types of actions in deference to the DOI

4    decision, virtually every court to consider the issue --

5    actually, in fact, every court to consider the issue has

6    deferred to the Insurance Department's position and has

7    rejected contentions like the contentions like Dr. Strut in

8    this case that cases like this somehow have to be folded into

9    the context of a No-Fault arbitration. I mean, that is absurd.

10   As a practical matter, GEICO can't bring civil racketeering

11   claims in a PIP arbitration. The arbitrators would be

12   powerless to award trouble damages. GEICO can't present

13   evidence in the context of a No-Fault arbitration of a pattern

14   of fraudulent billing or a pattern of fraudulent treatment

15   practices. So, it could never prove a RICO claim in the

16   context of PIP arbitration.

17         Dr. Strut also contends that his success in these

18   discrete and individualized No-Fault PIP arbitrations somehow

19   point to the fact that he didn't have the requisite scienter to

20   commit fraud. I think that with respect to Dr. Strut's state

21   of mind, we've presented considerable evidence to create a fact

22   question with respect to Dr. Strut's fraudulent intent,

23   starting with the fact that he was obviously barred from

24   engaging in a legitimate medical practice and had a motive to

25   commit fraud, and that he was, at the time that he began

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     billing GEICO, desperate for cash as a result of his bankruptcy

3     and his criminal conviction and his inability to obtain, you

4     know, highly remunerative medical employment.  You know, and I

5     think that's important to note.  I don't think it's fair to say

6     at all that it's appropriate to resolve the question of Dr.

7     Strut's scienter on a motion for summary judgment based solely

8     on the fact that he was successful in No-Fault arbitrations

9     over time, and, therefore, believed that the treatment and the

10    things he was doing and billing for were somehow legitimate.

11    In this context, we've also presented, and it's worthwhile to

12    note, we've presented in opposition to this motion, the

13    opinions of and affidavits from two very distinguished

14    physicians.  One a pain management professor at Johns Hopkins

15    University; and another the Chief of Physical Medicine and

16    Rehabilitation at North Shore University Hospital.  Both of

17    them have concluded, not only that Dr. Strut routinely billed

18    for medically unnecessary or illusory services, but also that

19    Dr. Strut had to know that he was billing for medical

20    unnecessary or illusory services based on the way he was

21    submitting his billing.  And, also, incidentally, that the

22    manner in which Dr. Strut was purporting to treat his patients,

23    to the extent the treatments were provided at all, demonstrated

24    a disregard for the patient's welfare.  And if the Court were

25    to read our papers, and I'm sure the Court has, I'm sure the

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     Court would note that some of the aspects of what Dr. Strut was

3     doing were extremely troubling.  He was billing for -- or

4     rather he was providing GEICO insureds, who were involved in

5     minor automobile accidents, truly trivial fender benders, low

6     speed, low-impact, rear-end collisions in parking lots, things

7     of that nature, with massive amounts of narcotics and other

8     habit-forming drugs.  Oftentimes, in many cases, and we cite

9     them in our papers, and they are certainly cited by our experts

10    in their affidavits, oftentimes, despite clear indications that

11    the drugs were being abused or diverted, and often despite

12    clear indications that the patients had preexisting substance

13    abuse problems and shouldn't have been getting narcotics from

14    Strut in the first place.  We've alleged in our complaint, that

15    Dr. Strut used these narcotic prescriptions to incentivize the

16    insured to report on a continuing basis for medically useless

17    or illusory treatments.  Quite frankly, Dr. Strut contends that

18    we haven't presented any patient testimony in opposition to the

19    summary judgment motion.  That is fairly rich, your Honor,

20    considering that Dr. Strut, whose burden -- who has got the

21    burden on this motion himself, apparently was not able to come

22    up with a single patient of his who was a GEICO insured to come

23    in and testify that they got his treatments or that they

24    obtained any medical benefit from his treatments or that the

25    treatments were medically necessary.  Although Dr. Strut hired

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     an expert in this case, and produced the expert for a

3     deposition, not only has it emerged, as we set forth in our

4     papers, that the expert has actually had a long and intimate

5     personal relationship with Dr. Strut and actually pleaded for

6     clemency for Dr. Strut in his criminal case, but the expert

7     also, during his deposition, repeatedly confirmed that the way

8     that Dr. Strut was purporting to treat the GEICO insureds fell

9     below the standard of care and was not what he would have done

10    under analogous circumstances.

11         So, you know, the bottom line for us, your Honor,

12    is it's Dr. Strut's burden on this motion to show that he was

13    entitled to summary judgment.  As Mr. Knoer points out, his

14    arguments boil down to a contention that GEICO can't show

15    reasonable reliance and a contention that GEICO can't establish

16    the scienter necessary to ultimately prove its fraud or

17    racketeering claim.  Well, we would submit to the Court, your

18    Honor, that the reasonableness of GEICO's reliance is something

19    that must be considered in the context of the totality of the

20    circumstances.  We've come forward with a large -- a lengthy

21    explanation of what those circumstances were surrounding the

22    submission and handling of Dr. Strut's claims.  We contend that

23    in the totality of those circumstances, GEICO's reliance was,

24    in fact, reasonable, or, at a minimum, the reasonableness of

25    GEICO's reliance really should be a question for the fact

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     finder.  I point to the cases in our papers which state that an

3     insurance company is entitled to rely on facially valid claim

4     submissions.  Courts have come to that conclusion over and over

5     again.  They've come to that conclusion on 12(b)(6) motions,

6     but they've also held, as a matter of law, that in New York, an

7     insurance company is entitled to rely on claim submissions.

8     Again, Dr. Strut provided reassurances with respect to his

9     treatments over the course of time.  That also bears on the

10    reliance inquiry.  And, finally, what's more, every single one

11    of Dr. Strut's bills was verified.  And I think that what it

12    comes down to is what kind of world do we want to live in?  Do

13    we want to live in a world where a license to practice medicine

14    doesn't carry with it any responsibilities and obligations?  In

15    this particular case, Dr. Strut, a licensed physician,

16    submitted claims to GEICO.  The question is:  Can insurance

17    companies rely on claims that are submitted by licensed

18    doctors?  And they should be able to, your Honor.  And, I

19    think, that is one of the considerations that has led court

20    after court after court to reject motions to dismiss these

21    types of claims despite contentions by the movants that the

22    insurer Plaintiffs were sophisticated, had claims verification

23    tools at their disposal, that could or should have entitled or

24    enabled them to uncover the fraudulent scheme earlier, and,

25    thereby, obviate any reasonable reliance.  Well, it's true that

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     insurance companies, like GEICO, do have claim verification

3     tools at their disposal.  But it's equally true that those

4     tools are limited and that the No-Fault insurance regulations

5     obligate insurers, as a practical matter, to handle claims in

6     an expedited fashion, in good faith, and to not treat claimants

7     as an adversary.  And as a consequence of that, the Department

8     of Financial Services has explicitly held that the expedited

9     claims handling requirements of the No-Fault laws present no

10    bar to a subsequent insurer action to recoup benefits.

11              And just, finally, with respect to Dr. Strut's

12    scienter arguments, again, you know, we have, at a minimum,

13    presented considerable evidence that Strut had a motive and

14    opportunity to commit fraud and that he had fraudulent intent

15    when he submitted these bills.  Although he may contend through

16    his own conclusory statements, that because the No-Fault

17    arbitrators were issuing awards in his favor, he reasonably

18    believed that his treatment and billing practices were

19    legitimate, we would respectfully submit that is a question for

20    the fact finder as well, your Honor, in light of the

21    considerable evidence of motive and fraudulent intent that

22    we've submitted here.

23              Other than that, we would simply, just to handle a

24    few of the remaining arguments that were raised in Dr. Strut's

25    papers, but not by Mr. Knoer here today, we would point out to

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     the Court that GEICO's fraud-based claims have been pleaded

3     with the requisite particularity.  Although, Rule 9(b) issues

4     can be raised on a motion for summary judgment, we would point

5     out to the Court that literally in dozens of the cases,

6     admittedly mostly from the Eastern District and Southern

7     District of New York, dozens of cases have concluded that

8     virtually identical pleadings with a virtual level, identical

9     level of detail were sufficient under Rule 9(b).  We've cited

10    those cases in our papers.  I don't think there is a colorable

11    argument to be made here that our pleading is somehow

12    insufficient as a matter of law.  And, Dr. Strut also raised an

13    argument to the effect that to the extent that our RICO claims

14    are denied, the Court should decline to exercise supplemental

15    jurisdiction of the remaining claims.  We, respectfully, would

16    point out that that ignores the fact that we've alleged

17    completely diverse parties in the requisite jurisdictional

18    amount.  I think that's it for the Plaintiffs, your Honor.

19    Thank you very much.

20          MAGISTRATE JUDGE SCHROEDER:  All right.  Mr.

21    Knoer, anything you want to add?

22          MR. KNOER:  Very briefly, Judge.  First point I

23    just want to get back to, Mr. Gershenoff kept saying that

24    GEICO's hands were constrained, there is little verification.

25    The reality is, as soon as GEICO received a reimbursement form,

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL
2     they had the ability to issue a notice to the patient, to the
3     doctor to appear in front of a person and in front of an
4     attorney and give testimony.  There is no better verification.
5     They could have brought in a patient and they could have asked
6     them the question, and they could have found out what happened.
7     The fact they didn't, doesn't relieve them of their duty to do
8     that under No-Fault.

9          MAGISTRATE JUDGE SCHROEDER:  No.  But as I
10    understand GEICO's argument is, claim A comes in, they look at
11    it and say, okay, we'd like this additional information and we
12    want to bring the patient in and so on and so forth.  By just
13    having one, that isn't sufficient to establish a pattern and
14    practice.

15          MR. KNOER:  True.

16          MAGISTRATE JUDGE SCHROEDER:  And that they can't
17    do that with each and every individual claim because they are
18    supposed to process those claims in good faith and get them
19    paid within a reasonable period of time.  Then that it wasn't
20    until, now they got thirty, forty or more of these claims, when
21    they put them in front, they say, okay, when we look at the
22    language of what was done and the codes that were used,
23    everything is exactly the same, regardless of whether the
24    person was in the front seat or the back seat, whether it was a
25    rear ender, a t-bone accident or whatever, everything is

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     duplicated, there is no change, et cetera, et cetera, now I've

3     got a fuller picture or better picture, and this isn't making

4     any sense, and now I can start really doing something of

5     substance as far as claiming fraud.  That is what I understand

6     the Defendants' argument to be and why this taking one

7     individual claim in a snapshot type of situation wasn't going

8     to do it for them and it couldn't do it for them.

9          MR. KNOER:  And I agree with that.

10          MAGISTRATE JUDGE SCHROEDER:  Okay.

11          MR. KNOER:  And, in November of 2010, they had

12     made a determination, written a report that --

13          MAGISTRATE JUDGE SCHROEDER:  Right, you just told

14     me that.

15          MR. KNOER:  That they were cookie cutter.  It's

16     part of the report, they looked at a bunch of claims Dr. Strut

17     had been submitting, they were cookie cutter, he was using a

18     template, he was prescribing excessive amount of prescriptions,

19     the automobile accidents were of minimal impact, et cetera, et

20     cetera, et cetera, all the things that they are now claiming.

21     And I don't disagree with the 2000 insurance letter that they

22     keep referencing here and all of the cases that they bring.

23     But if you read the language of that letter, it says, "there is

24     no reason to deny the No-Fault claim at the time payment is

25     due."  So the Department of Insurance said, look, we're not

GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

going to penalize you when you comply with the rules when there
is no reason to deny the No-Fault claim at the time payment is
due.  And then a few months later in 2001, they issued the
opinion that we put in our papers, which made it very clear to
the carrier, "insurer may delay payments under No-Fault portion
of its insured policy due to the suspicion of fraud in a claim
submission."  The conclusion is, yes.  So the Insurance
Department told the carriers in 2001, yeah, if you pay a claim
and then later find out that it was fraudulent, we're not going
to penalize you, you can bring it for that.  But they also told
them, if you suspect fraud and believe there is fraud, you have
a right not to pay.  And during that period, they could have
asked the patient to come in, Dr. Strut to come in, and
everyone to come in.  I think their argument might be a little
more compelling if they were able to prove any one time that
what they're claiming happened happened.  They haven't.  They
haven't brought in a patient, they haven't brought in anybody.
So, they say there is this massive across-the-board fraud
happening with all these patients, but they haven't proven a
one.  Ninety percent of the times, they're not successful in
arbitration.  They can ask for patient depositions and bring
those depositions to arbitration.  They can bring the patient
records.  They can subpoena other doctors, because many times
these patients are being treated by more than one physician for

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     different reasons.  They can bring in other doctors.  They can

3     do anything in arbitration.  The idea that Mr. Gershenoff is

4     expressing that some of their hands are tied, well, they may be

5     tied economically because they don't want to spend their money

6     there.  That doesn't mean they come to Federal Court and bring

7     a fraud claim here.  I don't disagree, your Honor, with the

8     idea that the first claims, second claims, tenth claims,

9     twentieth claims, fiftieth claim might not have been enough.

10    But once they put in writing in 2010 and acknowledge that they

11    didn't trust Dr. Strut, there is no longer reliance that can be

12    reasonable.  And even their own insurance opinion indicates

13    that if you have reason to deny it, you should do it.

14              MR. GERSHENOFF:  May I just briefly respond, your

15    Honor?

16              MAGISTRATE JUDGE SCHROEDER:  Sure.

17              MR. GERSHENOFF:  As I previously noted and just in

18    response to Mr. Knoer, GEICO did bring Dr. Strut in for

19    examinations on direct, twice, along the way.  Now, when Dr.

20    Strut first began to submit his bills, and this is set forth in

21    our papers, when Dr. Strut first began to submit his bills and

22    GEICO completed its initial investigation into Dr. Strut in

23    late 2010, it requested Dr. Strut come in and appear for an

24    examination under oath, which he did in December of 2010.  And

25    he attempted to justify his claims practices and his treatment

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2    practices.  And once that examination under oath was finished

3    and Dr. Strut had given his reassurances, GEICO, as a practical

4    matter, had no choice but to rely on his claims.  However, in

5    order to make sure -- well, let me retract that.  Then what

6    happened was in early 2011, Dr. Strut stopped submitting his

7    claims under his own name and he began to submit his claims

8    through a medical professional corporation, RES Physical

9    Medicine, which is also a defendant in this case.  It took

10   GEICO a few months, as described in our papers, a few months to

11   realize that RES Physical Medicine and Dr. Strut were one in

12   the same.  Once GEICO realized that that was the case, I

13   requested Dr. Strut's examination under oath again.  The

14   examination under oath was completed between May and July of

15   2011.  And during that period, Dr. Strut, once again, gave

16   assurances as to the legitimacy of his treatments and billing

17   practices.  And, again, you know, GEICO could not, after

18   getting claims by Dr. Strut, ask for a separate examination

19   under oath or separate additional verification for every single

20   one of those claims.  It couldn't do it.  It wouldn't meet the

21   good-faith requirements and the don't treat the claimant as an

22   adversary requirements as are set forth in the No-Fault

23   regulations.  But GEICO did act to try and verify Dr. Strut's

24   claims, and Dr. Strut came in and provided that additional

25   verification and provided assurances.  And, in the context of

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL

2     that, you know, that is something that should be considered in

3     determining whether GEICO's reliance was reasonable.  After

4     Strut came in and gave those examinations under oath, GEICO

5     couldn't just deny the claims and say, well, you came in and

6     gave us additional verification, you provided assurances with

7     respect to your claims submission practices, but we're going to

8     deny the claim anyway.  Okay?  GEICO can't do that.  You know,

9     listen, once the additional verification is provided, GEICO has

10    30 days to make a decision whether to pay or deny the claim.

11    And if it denies the claim, it better have a good reason,

12    because if it denies the claim without a sufficient reason,

13    it's going to lose at arbitration and it's going to be

14    obligated to pay all of the penalties and things like that.

15    So, the system does create some perverse incentives for

16    insurance companies, but those are incentives that should be

17    considered in the context of determining whether or not GEICO's

18    reliance was reasonable.  And, again, it's important to

19    emphasize that when confronted with similar arguments in the

20    context of 12(b)(6) motions, multiple courts, in Federal Courts

21    in the Second Circuit, have determined that insurance companies

22    should be entitled to rely on facially valid claim submissions

23    that are verified by licensed physicians.  And if they can't

24    be, then we've got a problem in our society.  Because it means

25    that a doctor's medical license means absolutely nothing and

1          GEICO, ET AL.  VS. M. STRUTSOVSKIY, ET AL
2     you can't trust a doctor to act with integrity and with
3     professional integrity.  And I don't think that is the kind of
4     world we want to live in.  And I don't think that is -- that
5     the law of the (inaudible) would fail to take that into
6     account.  Thank you.
7          MAGISTRATE JUDGE SCHROEDER:  Okay, I understand
8     the position of the parties.  I'll reserve.  As both of you
9     know, all I can do is a Report and Recommendation to the
10    district judge who has this case.
11         MR. KNOER:  Thank you, your Honor.
12         MR. GERSHENOFF:  Thank you, Judge.
13         MAGISTRATE JUDGE SCHROEDER:  Thank you.
14
15
16                      CERTIFICATE OF TRANSCRIBER
17
18       I certify that the foregoing is a correct transcript from
19    the official electronic sound recording of the proceedings in
20    the above-entitled matter.
21    /s Karen J. Bush, RPR
22    Official Court Reporter
23
24
25