**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

———————————————————————

**GOVERNMENT EMPLOYEES INSURANCE**
**COMPANY,**

                              **Plaintiff,**                    **12-CV-330A(Sr)**

**v.**


**MIKHAIL STRUTSOVSKIY, M.D.,**
**and**
**RES PHYSICAL MEDICINE &**
**REHABILITATION SERVICES, P.C.,**

                              **Defendants.**

———————————————————————


## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. Richard J. Arcara,

in accordance with 28 U.S.C. § 636(b), for all pretrial matters and to hear and report

upon dispositive motions.  Dkt. #32.  It was subsequently transferred to the Hon.

Lawrence J. Vilardo.  Dkt. #92.


        Government Employees Insurance Company ("GEICO"), commenced this

action against Mikhail Strut, M.D., sued as Mikhail Strutsovskiy. M.D. ("Dr. Strut"), and

RES Physical Medicine & Rehabilitation Services, P.C. ("RES"), alleging a fraudulent

billing scheme for claims submitted pursuant to the New York Comprehensive Motor

Vehicle Reparations Act ("no-fault"), and asserting, *inter alia*, the following causes of

action: (1) declaratory judgment that Dr. Strut and RES have no right to receive

payment on pending bills submitted to GEICO; (2) RICO violations based upon

defendants' use of the mail to submit fraudulent no-fault bills for services that were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the defendants, or, in many cases, for services that were not performed at all; (3) common law fraud; (4) aiding and abetting fraud; and (5) unjust enrichment. Dkt. #1. GEICO seeks reimbursement of no-fault payments voluntarily paid to Dr. Strut and a declaration that it is not required to pay outstanding no-fault claims submitted by Dr. Strut. Dkt. #1. Dr. Strut counterclaims for payment of outstanding no-fault claims, as well as attorneys' fees and interest as provided under the no-fault statute. Dkt. #74-2, ¶¶ 265-266.

Currently before the Court is defendants' motion for summary judgment. Dkt. #74. For the following reasons, it is recommended that defendant's motion for summary judgment be denied, except as to GEICO's "consent to partial summary judgment dismissing its RICO, common law, and declaratory judgment claims to the limited extent that those claims are predicated on allegations that RES and Strut's predecessor unincorporated medical practice were owned and controlled by Hirsch and VascuFlo."[1] Dkt. #77, p.13.

## FACTS

Dr. Strut is a medical doctor duly licensed to practice in the State of New York. Dkt. #74-1, ¶ 8. He is the sole member of RES, where he focuses on physical

---

[1] GEICO entered into a stipulation of dismissal without prejudice with defendants Aaron Hirsch and VascuFlo. Dkt. ##63 & 64.

medicine and rehabilitation for victims of automobile accidents. Dkt. #74-3, ¶ 5.

Patients assign their rights to no-fault benefits to Dr. Strut, who submits claim forms to

his patients' insurance carriers.  Dkt. #74-3, ¶ 7.


In July of 2010, GEICO began to receive no-fault insurance claims from

Dr. Strut and VascuFlo, which was listed as the "billing provider" on some of Dr. Strut's

submissions.  Dkt. #82, ¶¶ 63-64.  Dr. Strut declares that he originally shared office

space with Aaron Hirsch, a pharmacist who operated VascuFlo, which is a medical

device business. Dkt. #74-3, ¶¶ 29-31 & Dkt. #74-28, p.3.  In response to GEICO's

inquiry as to the nature of the relationship between Dr. Strut and VascuFlo, Dr. Strut

provided a letter advising that the initial billing software was installed by a contractor

who erroneously named VascuFlo as the billing provider, but this error had been

corrected.  Dkt. #74-28, p.3.


In late October of 2010, GEICO Claims Examiner Michelle Santiesteban

asked GEICO's Special Investigative Unit ("SIU"), to investigate Dr. Strut and VascuFlo

because: (1) Dr. Strut's initial examination reports seemed to contain boilerplate

language that did not vary from patient to patient; (2) Dr. Strut was billing for lengthy

and complex initial examinations and providing a lengthy list of putative diagnoses to

patients whose injuries did not seem to warrant them; and (3) Dr. Strut was billing

inappropriately for a procedure called prolotherapy.[2]  Dkt. #82, ¶ 66.  Specifically, Ms.

---

[2] Prolotherapy involves injecting an otherwise non-pharmacological and non-active
irritant solution into the body, generally in the region of tendons or ligaments, for the purpose of
strengthening weakened connective tissues and alleviating muscular skeletal pain. Dkt. #74-1,
¶ 22.

Santiesteban advised that

> narratives are "cookie cutter" right down to the misuse of
> "he/she." The history is varied only by the age and race.
> The remainder is identical down to the "c/o cervical, let [sic]
> shoulder, thoracic, and lumbar spine pain. Also he's c/o
> severe headaches and insomnia." There are many other
> aspects of the narratives that are identical regardless of the
> patient's age, sex, mechanism of injury or past medical
> history. The diagnosis are identical, to included [sic] the
> varied fonts and the recommendations remain the same,
> many have identical Visual Analog Pain Scale ratings and
> some have the same respiration rates and 02 saturation. I
> have 7 different claims with narratives on my desk that I can
> forward to SIU once assigned.

Dkt. #74-19, p.8.


In a Case Report prepared on or about October 29, 2010, GEICO's SIU

noted that Dr. Strut was prescribing an inordinate amount of narcotics to patients

involved in minor automobile accidents and that the prescriptions were being filled at

VascuScript, a pharmacy owned by Aaron Hirsh, who also owned VascuFlo. Dkt. #82,

¶ 67. For example, the Case Report notes that Dr. Strut prescribed patient K.J. 120

Oxycontin pills, 90 Endocet[3] pills and 120 Carisoprodol[4] pills in August; 120 Oxycodone

pills in September, and 90 Oxycontin pills in November. Dkt. #74-19, p.2. The Case

Report also noted that review of six claims demonstrated medical narratives containing

patient history which varied only by age and race. Dkt. #74-19, pp.1-2. GEICO's SIU

reported Dr. Strut to the New York State Department of Health and the United States

---

[3] Endocet contains a combination of acetaminophen and oxycodone.

[4] Carisoprodol is a muscle relaxer that blocks pain sensations between the nerves and
the brain.

Drug Enforcement Administration ("DEA").  Dkt. #82, ¶ 68.  GEICO's SIU also referred Dr. Strut to GEICO's Pre-Litigation Unit, which is responsible for requesting additional verification of no-fault claims.  Dkt. #82, ¶ 69.

Dr. Strut provided an Examination Under Oath on December 21, 2010, which continued on May 20, 2011 and was completed on July 12, 2011.  Dkt. #74-3, ¶ 119.

On January 31, 2011, Dr. Strut incorporated RES and began billing GEICO through RES rather than under his own name.  Dkt. #82, ¶¶ 76-77 & Dkt. #82-19.  In a Case Report prepared on or about March 23, 2011, GEICO's SIU noted that Dr. Strut is now billing GEICO under the auspices of RES, utilizing a new Tax Identification Number ("TIN"), but is still using boiler plate narratives for each claimant.  Dkt. #74-19, p.9 & Dkt. #82-20.  This Case Report was also referred to GEICO's Pre-Litigation Unit.  Dkt. #74-19, p.10.

Dr. Strut engaged counsel to demand arbitration of numerous unpaid claims. Dkt. #74-3, ¶ 128.  Pasquale V. Bochiechio, an attorney with a practice specializing in no-fault proceedings who has represented Dr. Strut in hundreds of arbitrations, declares that the no-fault review process has upheld Dr. Strut's reimbursement requests over 90% of the time since February, 2013.  Dkt. #88-3, ¶¶ 21 & 48.

GEICO declares that it is not seeking recovery of any payments made to defendants pursuant to arbitration awards, but is seeking recovery of more than $569,000 in voluntary payments to defendants.  Dkt. #82, ¶ 62.

As of October 1, 2014, Dr. Strut declares that he has outstanding claims totaling $425,000.00 awaiting processing by GEICO.  Dkt. #74-3, ¶ 134.

## DISCUSSION AND ANALYSIS

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

**Appropriate Forum**

The gravamen of defendants' argument is that GEICO's challenge to the medical necessity of Dr. Strut's treatment should be resolved within the confines of New York's no-fault arbitration system. Dkt. #75, pp.16 & 24-25. More specifically, defendants argue that because New York's no-fault system permits insurers to challenge the medical necessity of submitted claims, there is no reason that such claims should be considered in this court, even if the basis of such a challenge is fraud. Dkt. #75, p.20.

GEICO responds that the New York State Department of Financial Services and multiple courts within New York have concluded that insurers may sue to recover no-fault insurance benefits they were defrauded into paying by misrepresentations as to the medical necessity of the underlying service. Dkt. #77, p.19. GEICO argues that the no-fault statute does not provide a mechanism for consideration of anything other than individual claims, rendering it impossible to obtain consideration of Dr. Strut's fraudulent scheme within the arbitration system. Dkt. #77, p.28.

New York Insurance Law § 5106(a) generally requires insurers to pay or deny no-fault benefits within thirty calendar days of submission of a claim. *See also* 11 N.Y.C.R.R. 65-3.8(a)(1). This time period may be extended by a request for additional verification, which the insurer must make within 15 business days of receipt of any claim. 11 N.Y.C.R.R. 65-3.5(b). Failure to comply with these deadlines precludes the insurer from raising most defenses, including lack of medical necessity. *Presbyterian Hosp. v. Maryland Cas. Co.*, 90 N.Y.2d 274 (1997).

Insurers are required to provide a claimant with the option of submitting any dispute involving the insurer's liability to pay a claim to arbitration. N.Y. Ins. Law § 5106(b). Within the special expedited arbitration procedures set forth in the regulations, "[d]iscovery is limited or non-existent." *Allstate Ins. Co. v. Mun*, 751 F.3d 94, 99 (2d Cir. 2014), *citing* 11 N.Y.C.R.R. § 65-4.5. As a result, the Court of Appeals

has recognized that "[c]omplex fraud and RICO claims, maturing years after the initial claimants were fully reimbursed, cannot be shoehorned into this system." *Id.*

Defendants attempt to distinguish *Mun* as limited to the issue of whether or not arbitration was mandatory where the insurance carrier had made payment within the thirty day period without possessing knowledge that the provider was engaged in fraud. Dkt. #75, pp.20-21. Defendants urge reliance upon *Fair Price Med. Supply Corp. v. Travelers Indem. Co.*, 10 N.Y.3d 556 (2008). Dkt. #75, pp.21-22 & 24-25. GEICO argues that *Fair Price* is inopposite. Dkt. #77, p.20.

In *Fair Price*, the New York Court of Appeals precluded an insurance company from defending a complaint seeking payment of a no-fault claim on the ground that the services charged were never provided because, even though it had discovered the potential billing fraud within the 30-day period provided for an insurer to act upon a claim, the insurance company failed to deny the claim for nearly two years after receiving verification of the claim. 10 N.Y.3d 556. In the instant case, in contrast, there is no allegation that the claims at issue have either not been paid in a timely fashion or have been denied in an untimely fashion. Moreover, in *State Farm Mutual Automobile Insurance Co. v. Liguori*, the district court recognized that

> there is no language in the *Fair Price* decision suggesting
> that the insurer would also be precluded from asserting a
> separate lawsuit for fraud or unjust enrichment against a
> medical provider that arose from alleged fraudulent conduct
> by doctors related to that claim. In fact, to the contrary, the
> Appellate Term decision in *Fair Price* (which was affirmed by
> the Appellate Division and Court of Appeals) explicitly stated
> that, although the 30-Day Rule barred assertion of billing

fraud as a defense, the insurer 'is not without remedy; after paying such a claim, the insurer, for example, may have an action to recover benefits paid under a theory of fraud or unjust enrichment."

589 F. Supp.2d 221, 225 (E.D.N.Y. 2008), *quoting Fair Price Med. Supply Corp. v. Travelers Indem. Co.,* 9 Misc.3d 76 (N.Y. Sup. App. 2005). The Court noted a "critical difference" between the question of "whether the 30-Day Rule applies to a defense of fraud (an issue clearly resolved by *Fair Price*)," and "whether it bars affirmative claims brought after the insurer pays the claim to recover the money that was fraudulently obtained (which *Fair Price* never addressed)." 589 F. Supp.2d at 233.

In *Mun*, Allstate Insurance Company sought recovery of payments it had made to Dr. David Mun and Nara Rehab Medical on the grounds that defendants had fraudulently billed Allstate for Electrodiagnostic Testing that was fabricated or of no diagnostic value under theories of common law fraud and violations of the RICO Act. *Id.* at 95-96. Defendants moved to compel arbitration pursuant to, *inter alia*, New York Insurance Law § 5106. *Id.* at 96. The Court of Appeals determined that "[t]he weight of New York authority holds that the 30-day process in § 5106(a) does not constrain later insurer actions seeking recovery for fraud." *Id.* at 101. In reaching this conclusion, the Court of Appeals explained that

Defendants were "claimants" for "first party benefits" when they submitted their claims. If Allstate had disputed those claims without paying them promptly, disputes contemplated by the statute would have arisen. But Allstate paid Defendants' claims in full. Now, years later, when Allstate seeks recovery for losses caused by Defendants' alleged fraud, Defendants are no longer "claimants" asserting a right to first party benefits, and there is no "dispute involving the insurer's liability to pay first party benefits." This dispute

-10-

involves the *medical provider's liability to the insurer*, under a fraud theory, for what the provider already recovered in the claims process.

*Id.* at 98.


      The Court of Appeals also cited an informal letter opinion from the New York Insurance Department, dated November 29, 2000, addressing whether New York Insurance Law § 5106 "prohibits a subsequent civil action by an insurer for the recovery of claims previously paid . . . where the claimant had used fraudulent means to submit claims for No-Fault benefits and received payment for those claims." Dkt. #78-1, p.2. The New York Insurance Department answered that inquiry as follows:

> The New York No-Fault reparations law . . . is in no way intended and should not serve as a bar to *subsequent actions* by an insurer for the recovery of fraudulently obtained benefits from a claimant, where such action is authorized under the auspices of any other statute or under common law.  There is nothing in the legislative history or case law interpretations of the statute or in Insurance Department regulations, opinions or interpretations of the statute that supports the argument that the statute bars *such actions.*

*Mun*, 751 F.3d at 99-100 (emphasis in original); See Dkt. #78-1, p3. The Court of Appeals further quoted the following passage from the letter opinion:

> The payment of fraudulently obtained No-Fault benefits, without available recourse, serves to undermine and damage the integrity of the No-Fault system, which was created as a social reparations system for the benefit of consumers.  To conclude that the No-Fault statute bars the *availability of other legal remedies*, where the payment of benefits were secured through fraudulent means, renders the public as [sic] the ultimate victim of higher premiums based upon the resultant increased costs arising from the fraudulent actions.

*Mun*, 751 F.3d at 100 (emphasis in original); *See* Dkt. #78-1, p.3.

In light of the foregoing, it is clear that defendants may not compel arbitration of GEICO's claim for reimbursement of fraudulent no-fault claims already paid to defendants. *See Allstate Ins. Co. v. Hisham Elzanaty*, 929 F. Supp.2d 199, 207 (collecting cases). Moreover, even though the weight of authority concludes that, absent waiver, a claimant has a right to compel arbitration of unpaid claims, it is common for federal courts to stay such proceedings where, as here, plaintiff seeks a declaratory judgment that defendants have no right to payment of pending no-fault claims and defendants counterclaim seeking payment of outstanding no-fault claims. *See Id.* at 217 ("There is no doubt that staying all pending and future arbitrations is the most economic result."); *Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp.2d 243, 264 (E.D.N.Y. 2012) (acknowledging right to compel arbitration of unpaid claims, but staying arbitration in the interest of judicial economy pending resolution of declaratory judgment cause of action that provider was not entitled to reimbursement for unpaid claims). Thus, resolution of this action within this court is appropriate.

**Fraud**

Dr. Strut argues that GEICO's complaint "fails to explain why any individual claim is fraudulent," as required to satisfy the pleading standards for a claim of fraud. Dkt. #75, p.13.

GEICO responds that paragraphs 69 - 251 of its complaint specify with great particularity exactly how and why Dr. Strut's treatments were medically unnecessary or illusory and attaches exhibits specifying each of the fraudulent charges

submitted as of the commencement of this action by claim number, CPT code and amount billed.  Dkt. #77, pp.17-18.

"Under New York law, a plaintiff alleging fraud must plead five elements: (1) a material misrepresentation; (2) made by a defendant knowing that it was false when it was made; (3) with the intent to defraud; (4) upon which the plaintiff reasonably relies; and (5) which causes the plaintiff injury." *Excel Imaging,* 879 F. Supp.2d at 273. Pursuant to the Federal Rules of Civil Procedure, the circumstances constituting fraud must be stated with particularity.  Fed. R. Civ. P. 9(b).  Thus, a complaint alleging fraud must: (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent.  *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir. 2006).  Although intent may be averred generally, Fed. R. Civ. P 9(b), plaintiff must allege facts that give rise to a strong inference of fraudulent intent by alleging facts to show that defendants had both motive and opportunity to commit fraud or alleging facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *Id.* at 290-91.

Contrary to defendants' argument, GEICO's complaint clearly alleges sufficient facts to support its claim of fraud.  For example, the complaint alleges that Dr. Strut submitted verified claims for consultations charging CPT code 99244 and 99245, which requires him to, *inter alia,* compile a comprehensive patient history, conduct a comprehensive physical examination, and engage in medical decision-making of high

complexity, but Dr. Strut's initial consultation reports reveal the use of boilerplate language, including identical typographical errors, in his description of patient history and physical examination and his diagnoses are a virtually identical laundry list of maladies unlikely to be caused by the relatively minor motor vehicle accidents experienced by his patients, with virtually identical recommendations for a limited number of medically unnecessary pain management treatments, including substantial quantities of narcotic drugs. Dkt. #1, ¶¶ 69-114 & 175-182. With respect to his pain management treatment, GEICO alleges that a substantial number of its insureds have been subjected to medically useless prolotherapy injections at the very same injection sites on virtually every verified claim submitted to GEICO. Dkt. #1, ¶¶ 183-202. Moreover, GEICO alleges that Dr. Strut routinely submits verified claims for ultrasound guidance for his prolotherapy injections without obtaining permanent recorded images of the site to be localized as required by CPT code 76942. Dkt. #1, ¶¶ 203-206. Examples of these and other fraudulent statements by Dr. Strut are set forth in the complaint itself and in exhibits attached to the complaint of patient evaluations. Dkt. #1. Moreover, the complaint includes an exhibit detailing each of the allegedly fraudulent charges by claim number, date, CPT code and amount billed. Dkt. #1-11. As it is hard to imagine how plaintiff's complaint could be more specific as to its allegations of fraud against defendants, it is recommended that this aspect of defendants' motion be denied.


**Justifiable Reliance**

Defendants argue that GEICO cannot demonstrate justifiable reliance. Dkt. #75, p.14. More specifically, defendants argue that because GEICO was

suspicious of defendants, commenced an investigation into defendants' claims and utilized no-fault procedures for verifying certain claims, GEICO cannot claim that it relied upon defendants' representations in processing claims submitted by defendants. Dkt. #75, pp.14-19.  Because GEICO informed defendants in November of 2010 that it was continuing to verify the legitimacy of defendants' billing practices, defendants argue that GEICO was not relying in any way on the statements made therein so that any billing submitted thereafter cannot support a claim of fraud.  Dkt. #75, p.22.

GEICO argues that it was entitled to rely upon Dr. Strut's facially valid claims in making payment pursuant to the no-fault statue and that the nature of Dr. Strut's fraudulent scheme could not be determined immediately due to the nature of the fraud and the variety of entities under which he submitted claims. Dkt. #77, pp.24-25. More specifically, GEICO argues that it did not have a sufficient sample of claims to determine that Dr. Strut's claims were fraudulent until late 2011.  Dkt. #77, p.26.

Defendants reply that once GEICO became aware of information that rendered its reliance upon the claim forms submitted by Dr. Strut unreasonable, then the requisite reliance necessary to assert a fraud claim can no longer be established. Dkt. #88-4, p.7.  Defendants argue that GEICO was not relying upon Dr. Strut's verifications as of November of 2010.  Dkt. #88-4, p.11.

GEICO is entitled to rely upon the verifications[5] submitted by healthcare providers for purposes of the no fault reimbursement scheme even as it investigates the veracity of those verifications for purposes of a broader fraud claim. *See Allstate Ins. Co. v. Lyons*, 843 F. Supp.2d 358, 375 (E.D.N.Y. 2012) (Allstate was entitled to rely upon defendants' facially reasonable diagnoses and claims for payment and was not barred from asserting fraud claims based upon the delay in detecting the complex fraudulent scheme). In any event, a determination as to when GEICO possessed sufficient information as to render its reliance upon such verifications unreasonable is not appropriate for summary judgment, particularly where, as here, the allegedly fraudulent scheme required comparison of a sufficiently large pool of claims and where defendants billed under different names. *See Excel*, 879 F. Supp.2d at 270 ("Where it is possible to draw conflicting inferences about when plaintiffs were on notice of the fraud complained of, the issue cannot be determined as a matter of law"); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp.2d 478, 484-85 (S.D.N.Y. 2012) (because evaluation of the reasonable reliance element requires consideration of many factors, it is often a question of fact for the jury rather than a question of law for the court); *AIU Ins. Co. v. Olmecs Med. Supply, Inc.*, No. CV-0402934, 2005 WL 3710370, at *14 (Feb. 22, 2005) ("claim that any reliance by the plaintiffs was unreasonable is a question of fact").

---

[5] Pursuant to New York Insurance Law § 403(d), all claim forms contain the following notice: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation."

**RICO**

　　　　　Defendants argue that a RICO claim is precluded where a comprehensive statute, such as the no-fault statute, provides a remedy for plaintiff's claims. Dkt. #75, p.26. However, the case law cited in support of this argument provides that federal RICO claims are "precluded where the source of the asserted right is covered by a more detailed *federal* statute." *Hintergerger v. Catholic Health Sys.*, No. 08-CV-952, 2012 WL 125270 at *6 (W.D.N.Y. Jan. 17, 2012) (emphasis added), *aff'd*, 536 Fed. App'x 14 (2013) . As plaintiff's RICO claim does not attempt to circumvent remedies afforded by another federal statute, defendants' argument is without merit.

**CounterClaim**

　　　　　Dr. Strut seeks summary judgment on his counterclaim for payment of unpaid claims plus interest and attorneys' fees on the basis that the billing forms he submitted: (1) accurately described the treatment he provided; (2) were not relied upon by GEICO; and (3) have been universally upheld in the no-fault system by independent arbitrators. Dkt. #75, p.28 & Dkt. #88-4, p.4.

　　　　　GEICO argues that there is a genuine dispute as to whether defendants systematically submitted inflated billing for medically unnecessary and illusory services pursuant to a pre-determined, fraudulent protocol. Dkt. #77, p.14. In opposition to defendants' motion for summary judgment, GEICO submitted declarations from Dr. Peter Staats, a diplomat of the American Board of Anesthesiology, with added qualifications in Pain Management, and a diplomat of the American Board of Pain

Medicine and the American Board of Interventional Pain Physicians; Jacqueline Thelian, a Certified Professional Coder and Professional Medical Coding Instructor accredited by the American Academy of Professional Coders; and Matthew Shatzer, D.O., and board certified in physical medicine and rehabilitation.

Upon review of GEICO's claims files for patients receiving treatment from Dr. Strut through 2012, Dr. Staats declares that Dr. Strut routinely misrepresented the complexity of the GEICO insureds' presenting problems, as well as the level of medical decision-making required for such problems; routinely prescribed large amounts of opiods and other controlled substances to GEICO insureds who did not require them, in deviation for the standard of care and, in a number of cases, disregarded information suggesting that the GEICO insureds were abusing or diverting the drugs he prescribed; and routinely recommended and/or administered prolotherapy injections, steroid injections, spinal injections, and trigger point injections to GEICO insureds who did not require them, in a deviation from the standard of care. Dkt. #79.

Ms. Thelian reviewed randomly selected billing documents and medical records from 100 patients who sought treatment from Dr. Strut and determined that every patient received an initial examination billed to GEICO under Current Procedural Terminology ("CPT"), code 99245 or 99244, which was improper.  Dkt. #80-1, p.12. Aside from noting that documentation "for both initial examinations and follow-up visits appear to be similar from patient visit to patient visit and from beneficiary to beneficiary, to the extent that they appear to be cloned, Ms. Thelian explained that

> the use of CPT codes 99245 or 99244 - which are "consultation" codes - requires that the patient be sent to the physician for advice and that the opinion be requested by another physician or appropriate source. As such, the American Medical Association Current Procedural Terminology specifically states "A 'consultation' initiated by a patient . . . and not requested by a physician, is not reported using the consultation codes but may be reported using the office visit codes, as appropriate." The CPT Guidelines also require that the consulting physician's findings be communicated by written report to the requesting physician.
>
> In this context, a referral - or the transfer of total or specific care of a patient from one physician to another - does not constitute a "consultation."
>
> In this case, the patient records often loosely suggested that other physicians or chiropractors had referred the patients to [Dr. Strut]. . . . However, the records did not include a request for [Dr. Strut's] opinion from a requesting physician, nor - in most cases - did they include any indication that a written report was sent back to any requesting physician. . . . Therefore, the use of CPT codes 99245 or 99244 - which posits that a "consultation" occurred - was inappropriate and misrepresented the type of service that was provided.

Dkt. #80-1, p.13. In addition, Ms. Thelian noted that in a substantial number of cases, Dr. Strut billed for follow-up examinations on the same dates of service when he also billed under surgical CPT codes, explaining "[w]here a physician performs a surgical procedure, any charges for the immediate preoperative visit . . . necessary to examine the patient, complete the records, and initiate the treatment are included in the CPT code used for the surgical procedure." Dkt. #80-1, p.14. Furthermore, as to Dr. Strut's billing for prolotherapy, Ms. Thelian explained:

> There is no CPT code designated for prolotherapy. Accordingly, to the extent that a physician attempts to bill for prolotherapy, the billing must be submitted under CPT code 20999, which is the code applicable to unlisted musculoskeletal procedures.

From my review of the bills and treatment records generated by [Dr. Strut], it appears that [he] routinely billed . . . prolotherapy injections as multiple charges of $40.00 - $45.00 under CPT code 20551, generally resulting in hundreds of dollars in charges per patient per date of service.

This misrepresented the nature of the service that [Dr. Strut] provided.  CPT code 20551  is the code used to bill for injections into single tendon origin or insertion types, not prolotherapy.

Furthermore, in a number of cases ultrasound guidance (CPT code 76942 Ultrasonic guidance for needle placement (e.g., biopsy, aspiration, injection, localization device), imaging supervision and interpretation) was reported by [Dr. Strut] in addition to the injection without supporting documentation.

Ultrasonic guidance for needle placement requires that the ultrasound is used to guide the needle such as for a needle biopsy or fine needle aspiration of an organ or body area.  It is not required that the ultrasound guidance be used specifically for the insertion of the needle through the skin but the imaging must be used to guide the needle placement in order to report the code.

The medical record did not include documentation indicating the needle guidance, medical necessity as to why the injection required imaging guidance or any . . . images taken at the time of the injection.  Accordingly, the use of CPR code 76942 to bill for ultrasound guidance in connection with the injections was inappropriate.

Dkt. #80-1, p.15.


Dr. Shatzer reviewed medical records for approximately 100 GEICO insureds who sought treatment from Dr. Strut and observed that: (1) in a substantial number of cases, critical language contained within initial consultation and follow-up examination reports regarding patient histories, patient examinations, and patient

diagnoses did not vary from patient to patient, and instead appeared to be boilerplate language that was cut-and-pasted from one patient to another without regard for their individual circumstances and conflicted with contemporaneous information contained within other records; (2) in a substantial number of cases, Dr. Strut diagnosed patients with the continuing effects of soft tissue injuries arising from automobile accidents months after the accidents occurred, long after any actual soft tissue injuries arising from the accidents should have resolved, without attempt to further evaluate the reason for such prolonged symptoms; (3) in a substantial number of cases, Dr. Strut recommended and/or administered invasive prolotherapy injections and other pain management injections during his first encounter with patients, without first attempting a course of conservative treatment in accordance with the accepted standard of care; (4) prolotherapy injections, which are not scientifically proven to have any medical benefit, were not administered so as to address individual circumstances; and (5) in a substantial number of cases, Dr. Strut prescribed large amounts of narcotics, tranquilizers, and other habit-forming drugs during or shortly after his first visit with a patient, despite the fact that such drugs were not indicated for the patients' soft-tissue injury complaints and placed the patients at risk of addiction and despite the fact that in a number of cases, there was evidence to suggest that the patients had drug abuse problems or were diverting their prescriptions. Dkt. #81-1, pp.2-3.

These submissions are more than sufficient to create a question of fact as to the appropriateness of defendants' no-fault claims. Accordingly, it is recommended that defendants' motion for summary judgment as to their counterclaim be denied.

## CONCLUSION

For the foregoing reasons, it is recommended that defendants' motion for summary judgment (Dkt. #74), be granted insofar as plaintiff's complaint alleges RICO, common law, and declaratory judgment claims based upon allegations that RES and Strut's predecessor unincorporated medical practice were owned and controlled by Hirsch and VascuFlo, but otherwise denied.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn*, 474

U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>Failure to comply with the provisions of Rule 72(b) may result in the District Judge's refusal to consider the objection.</u>

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

**DATED:**      **Buffalo, New York**
**December 2, 2016**

                                        _s/ H. Kenneth Schroeder, Jr._
                                        **H. KENNETH SCHROEDER, JR.**
                                        **United States Magistrate Judge**